**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS**

WILLIAM O'KANE, SYNERGY SOURCE, LLC,  )
and AZKARTA CREST CORPORATION,  )
)
          Plaintiffs,  )
)
      vs.  )
)
VERLEY SEMBRITZKY, JR., a/k/a ROCKY  )
SEMBRITZKY, RASLI BAHARI KENYA  )
LIMITED, GOLDIE ROSE, ROSEMARIE  )    **Case No. 4:18-cv-2728**
JOHNSON, BOUNTY OF THE OCEAN, INC.,  )
a Bahamian corporation, OCEAN HARVEST,  )    (Chief Judge Lee H. Rosenthal)
LLC, a Delaware limited liability company,  )
QUEST IRA INC., as trustee of the CAROLYN  )
MENE ROTH IRA, MALCOLM MORRIS, as  )
trustee of the MALCOLM MORRIS ROTH IRA,  )
and CHRISTIN R. HARDIN,  )
)
          Defendants.  )


**SECOND AMENDED COMPLAINT**

    NOW COME Plaintiffs William O'Kane ("O'Kane"), Synergy Source, LLC, an Indiana

limited liability company ("Synergy"), and Azkarta Crest Corporation, a Georgia corporation

("Azkarta"), and for their complaint (the "Complaint") against Defendants Verley Sembritzky, Jr.,

a/k/a Rocky Sembritzky ("Rocky"), Rasli Bahari Kenya Limited ("RBKL"), Goldie Rose

("Rose"), Rosemarie Johnson ("Johnson"), Bounty of the Ocean, Inc., a Bahamian corporation

("BOTO"), Ocean Harvest, LLC, a Delaware limited liability company ("Ocean Harvest"), Quest

IRA Inc., as trustee of the Carolyn Mene Roth IRA (the "Mene IRA Trustee"), Malcolm Morris,

as trustee of the Malcolm Morris Roth IRA (the "Morris IRA Trustee" or "Morris"), and Christin

R. Hardin ("Hardin"), state as follows:

## INTRODUCTION

1.      As alleged below, Rocky and his various affiliates and shell companies (BOTO, Ocean Harvest and RBKL) defrauded Plaintiffs by inducing them to wire $1,404,000.00 to an account titled in the name of BOTO. Rocky represented to Plaintiffs that their money would be used to purchase shares of stock in RBKL and that RBKL would, in turn, use Plaintiffs' investment to build a desalination plant in Kenya. According to Rocky, Plaintiffs' investment would earn substantial profits and provide humanitarian benefits to the people of Kenya.

2.      Unfortunately, Rocky's representations were false. As soon as Plaintiffs wired their money to BOTO's operating account, BOTO simply transferred it to Rocky's personal bank account. Thereafter, Plaintiffs' money was exchanged between accounts titled in the name of Rocky and his wife, Rose, until it was ultimately used for the personal expenses of Rocky, Rose and possibly Johnson.

3.      The biggest item purchased by Rocky and Rose with Plaintiffs' money was a luxury condominium commonly known as 2727 Kirby Drive, Unit 26L, Houston, Texas (the "Kirby Condominium"). The fact that Plaintiffs' money was used to purchase the Kirby Condominium is beyond dispute. The bank records of BOTO, Rocky and Rose readily reveal Plaintiffs' money was fraudulently transferred directly from BOTO to Rocky within days after BOTO received it. Thereafter, Plaintiffs' money was almost immediately fraudulently transferred among accounts belonging to Rocky and Rose until it was used to purchase the Kirby Condominium.

4.      Plaintiffs have filed this Complaint to hold Rocky and his accomplices responsible for their wrongdoing. This Complaint also demonstrates the priority of Plaintiffs' claims against the Kirby Condominium relative to the competing claims of Rocky, Rose, Johnson, the Mene IRA Trustee, Morris and Hardin.

2

## PARTIES

5.      Plaintiff William O'Kane ("O'Kane") is an individual who is domiciled in the State of Illinois. O'Kane resides and conducts business in Chicago, Illinois.

6.      Plaintiff Synergy Source, LLC, ("Synergy") is an Indiana limited liability company. Synergy's principal place of business is in Lebanon, Indiana. Synergy's members are are all domiciled in Indiana where they reside and conduct business.

7.      Plaintiff Azkarta Crest Corporation ("Azkarta") is a Georgia corporation. Azkarta's principal place of business is in Marietta, Georgia.

8.      Defendant Verley Sembritzky, Jr. a/k/a Rocky Sembritzky ("Rocky") is an individual who is domiciled in the State of  Texas. Rocky resides and conducts business in Houston, Texas. Rocky is an officer and director of RBKL who successfully solicited more than $7 million from U.S. investors for RBKL and then promptly misappropriated the money.

9.      Defendant Rasli Bahari Kenya Limited ("RBKL") is a Kenyan company created and managed by Rocky. RBKL's principal place of business is located in Kenya where it claimed it would construct and operate two desalination plants that would provide fresh water to local residents and yield minerals for sale on the open market. RBKL also conducted significant business in Harris County, Texas, soliciting and receiving more than $7 million from U.S. investors that was deposited into accounts maintained by its agents at financial institutions located in Harris County, Texas.

10.      Defendant Goldie Rose ("Rose") is an individual who is domiciled in the State of Texas. Rose resides and conducts business in Houston, Texas. At all times relevant to this Complaint, Rose was married to Rocky. Rose has or claims title to the Kirby Condominium, which

is more particularly described in **Exhibit 1** attached hereto. The Kirby Condominium was purchased with the proceeds of the fraudulent scheme alleged below.

11.     Defendant Rosemarie Johnson ("Johnson") is an individual who is domiciled in the State of Texas. Johnson resides and conducts business in Houston, Texas. Johnson is and/or has been romantically involved with Rocky. Johnson has or claims an interest in the Kirby Condominium.

12.     Defendant Bounty of the Ocean, Inc. ("BOTO") is a Bahamian corporation. BOTO's principal place of business is located in Harris County, Texas. Upon information and belief, Rocky is a director and officer of BOTO and its sole shareholder. BOTO received proceeds from the fraudulent scheme alleged below in Texas.

13.     Defendant Ocean Harvest, LLC ("Ocean Harvest") is a Delaware corporation. Ocean Harvest's principal place of business is located in Harris County, Texas. Upon information and belief, Rocky is a manager of Ocean Harvest and its sole member.

14.     Defendant Quest IRA, Inc. (the "Mene IRA Trustee") is the trustee of the Carolyn Mene Roth IRA (the "Mene IRA"). The Mene IRA Trustee is a Texas corporation and its principal place of business is located in Houston, Texas. The Mene IRA Trustee has recorded a *lis pendens* notice against the Kirby Condominium in the Official Public Records of Real Property of Harris County, Texas. A true and correct copy of the *lis pendens* notice recorded against the Property by the Mene IRA Trustee is attached hereto as **Exhibit 2**.

15.     Defendant Malcolm Morris (the "Morris IRA Trustee" or "Morris") is the trustee of the Malcolm Morris Roth IRA (the "Morris IRA"). Morris is domiciled in Texas. He resides and conducts business in Harris County, Texas. Morris has recorded a *lis pendens* against the Kirby Condominium in the Official Public Records of Real Property of Harris County, Texas, as well as

an Intervening Petition in the divorce proceedings of Rocky and Rose currently pending in the District Court of Harris County, Texas. A true and correct copy of the *lis pendens* notice recorded against the Property by Morris is attached hereto as Exhibit 2. A true and correct copy of the above-referenced Intervening Petition filed by Morris is attached hereto as **Exhibit 3**.

16.     Defendant Christin R. Hardin ("Hardin") is domiciled in Texas. She resides and conducts business in Montgomery County, Texas. Hardin has claimed an interest in the Kirby Condominium in an Intervening Petition she filed in the divorce case of Rocky and Rose currently pending in the District Court of Harris County, Texas. A true and correct copy of Hardin's above-referenced Intervening Petition is attached hereto as **Exhibit 4**.

## JURISDICTION

17.     This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332 in that the dispute is between citizens of different States and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

18.     This Court also has federal question jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because it involves a civil action arising under the Constitution, laws, or treaties of the United States. Specifically, the allegations of Count XX involve violations of 15 U.S.C § 77e and 15 U.S.C. § 77l.

## VENUE

19.     Venue is also proper in this Court pursuant to 28 U.S.C. § 1391 because: (a) several Defendants reside in the judicial district in which this Court is located and all Defendants are residents of Texas; (b) a substantial part of the events or omissions giving rise to this case occurred in the judicial district in which this Court is located; and (c) a substantial part of the property that is the subject of this case is situated in the judicial district in which this Court is located.

## FACTUAL BACKGROUND

**The PPM**

20.     In early November of 2015, Rocky provided O'Kane with the Regulation D, Rule 506 Private Placement Letter Offering for RBKL dated as of October 14, 2015 (the "10/14/15 PPM"). Previously, Rocky had provided O'Kane with a version of the PPM that was nearly identical and contained all of the representations quoted below. A true and correct copy of the 10/14/15 PPM is attached hereto as **Exhibit 5**.

21.     Rocky also provided the 10/14/15 PPM to Synergy in late October or early November of 2015. Rocky provided Azkarta with a version of the PPM dated as of December 1, 2015 that was nearly identical to the 10/14/15 PPM and contained all of the representations quoted below. The 10/14/15 PPM and the December 1, 2015 version provided to Azkarta are hereinafter collectively referred to as the "PPM."

22.     In the PPM, Rocky represented that he was authorized to sell 1,000 shares of stock in RBKL to investors for an aggregate purchase price of $175.5 million. Specifically, the PPM stated RBKL was the "issuer" of "a maximum of 1,000 Shares of Common stock (the 'Shares')," which would be sold to "Accredited Investors" for "a purchase price of $175,500.00 per Share." The PPM stated Rocky was the "Founder & Managing Director" of RBKL with full power and authority to solicit and accept offers to purchase shares of stock in RBKL.

23.     According to Rocky, the money he obtained from investors pursuant to the offering described in the PPM would be used to design, build and operate a desalination facility in Kenya. In this regard, the PPM provided RBKL was raising money "for the first of two desalination – mineral recovery facilities in Kenya (Mombasa and Lamu)." The PPM further stated RBKL was

"formed in March of 2015 to design, construct and own [a] 30 MGD desalination [plant] with mineral recovery facilities for Mombasa … in the Lamu area."

24.     In the PPM, Rocky represented the desalination facility constructed by RBKL would harvest large quantities of valuable minerals from ocean water that could be sold for hundreds of millions of dollars each year. Specifically, the PPM stated "[y]our investment in RBKL is designed to yield outstanding returns from its mineral processing facilities," which will "sustainabl[y] extract[] … high-purity minerals" from ocean water, "including: Salt, Magnesia, Calcium Chloride, Gypsum, Potash, Bromine and Boric Acid, all in very high purity, pharmaceutical quality." The "Project Proforma" attached to the PPM indicated RBKL would earn hundreds of millions of dollars of revenue from mineral sales beginning in 2019.

25.     According to Rocky, the desalination facility constructed by RBKL would also "Change the World" because it would produce vast amounts of fresh water for local residents and hundreds of millions of dollars of charitable donations for safe-drinking-water initiatives throughout Kenya. On this subject, the PPM stated "RBKL's desalination produces ultra-pure water." It also represented that RBKL would "provid[e] all revenue from water sales of about $20 million annually to our JV partner Millennium Water Alliance Kenya, which is helping to bring safe drinking water for all of Kenya."

26.     In the PPM, Rocky repeatedly assured investors that their money would be used for productive economic and humanitarian purposes in Africa. For example, under a picture of two children drawing water from a well, the PPM states "[a]ll investors in RBKL will know that in addition to economic returns, the humanitarian impact [of their investment] will be immense."

27.     Rocky promised Plaintiffs that any money they invested in RBKL would remain in RBKL's operating account until RBKL began constructing its desalination facility, subject only to

RBKL's potential use of investor funds for offering or legal expenses. Specifically, the PPM provided "[a]ny funds not used (placement & legal) will be allocated to the company operating account."

28.     Rocky also assured Plaintiffs that they would be provided with quarterly audited financial statements regarding the status of their investment. In its pertinent part, the PPM states "Company books will be audited quarterly and results made available to all shareholders."

**O'Kane's Investment and Subscription Agreement**

29.     On or about November 20, 2015 – following his review of the PPM – O'Kane completed and signed the Stock Subscription Agreement provided to him by Rocky. A true and correct copy of O'Kane's executed Stock Subscription Agreement (the "O'Kane Subscription Agreement") is attached hereto as **Exhibit 6**. O'Kane delivered the O'Kane Subscription Agreement to Rocky on November 20, 2015.

30.     In the O'Kane Subscription Agreement, O'Kane offered to purchase 5 shares of stock in RBKL for a total price of $875,000.00. Rocky promptly countersigned the O'Kane Subscription Agreement on November 20, 2015, representing in his own hand writing on the face of the O'Kane Subscription Agreement that O'Kane's offer was being "Accepted By Rocky Sembritzky, Executive Chairman & Founder."

31.     When he executed and delivered the O'Kane Subscription Agreement to Rocky, O'Kane was relying on the contents of the PPM and the O'Kane Subscription Agreement.

32.     Under the terms of the O'Kane Subscription Agreement, O'Kane was instructed to send a check to Ocean Harvest for his subscription payment once his subscription offer was accepted. The O'Kane Subscription Agreement represented that Ocean Harvest maintained an operating account for RBKL in the United States as RBKL's agent.

8

33.     Nevertheless, on or about November 24, 2015, O'Kane was instructed to wire his subscription payment to a bank account titled in the name of BOTO at BBVA Compass Bank ("Compass") in Houston, Texas. Rocky represented to O'Kane that BOTO was RBKL's agent in the United States and maintained the operating account at Compass for the benefit of RBKL.

34.     In connection with Rocky's revised payment instructions, O'Kane was also provided with a cover email from Rocky, which reiterated O'Kane's investment would be used for RBKL's business expenses. O'Kane was further informed that his total subscription payment needed to be $877,500.00 (*i.e.,* $175,500.00 for each of the five shares in RBKL that O'Kane was supposed to receive).

35.     On November 25, 2017, shortly after receiving wire instructions from Rocky, O'Kane wired his subscription payment of $877,500.00 to BOTO's bank account at Compass. In making his subscription payment to BOTO, O'Kane relied on the contents of the PPM and the O'Kane Subscription Agreement, as well as Rocky's above-referenced email and wire instructions.

**The Misappropriation of O'Kane's Investment**

36.     Within a few days after receiving O'Kane's wire for $877,500.00, Rocky transferred the funds to bank accounts at Compass owned by him and his wife, Rose. The transfers were completed without O'Kane's knowledge or consent.

37.     Prior to November 23, 2015, BOTO's operating account at Compass had a balance of $0. From November 23, 2015 through November 25, 2015, a total of $2,106,000.00 was deposited into BOTO's operating account at Compass.

38.     On November 30, 2015, $2,000,000.00 was transferred from BOTO's operating account at Compass to Rocky's personal account at Compass without O'Kane's knowledge or consent. That same day, Rocky transferred the very same $2,000,000.00 to Rose's personal

account at Compass. Thereafter, the funds were exchanged between Rocky's and Rose' personal accounts until they were used to purchase the Kirby Condominium.

**Synergy's Investment and Subscription Agreement**

39.     On or about November 5, 2015 – following its review of the PPM – Synergy completed and executed the Stock Subscription Agreement provided to them by Rocky. A true and correct copy of Synergy's executed Stock Subscription Agreement (the "Synergy Subscription Agreement") is attached hereto as **Exhibit 7**. Synergy delivered the Synergy Subscription Agreement to Rocky on November 5, 2015.

40.     In the Synergy Subscription Agreement, Synergy offered to purchase 2 shares of stock in RBKL for a total price of $351,000.00. Rocky promptly countersigned the Synergy Subscription Agreement on November 17, 2015, representing in his own hand writing on the face of the Synergy Subscription Agreement that he was the "Executive Chairman & Founder" of RBKL.

41.     When it executed and delivered the Synergy Subscription Agreement to Rocky, Synergy was relying on the contents of the PPM and the Synergy Subscription Agreement.

42.     Under the terms of the Synergy Subscription Agreement, Synergy was instructed to send a check to BOTO for its subscription payment once its subscription offer was accepted. The Synergy Subscription Agreement represented that BOTO maintained an operating account for RBKL in the United States as RBKL's agent.

43.     On November 23, 2017, shortly after receiving wire instructions from Rocky, Synergy wired their subscription payment of $351,000.00 to BOTO's bank account at Compass. In making their subscription payment to BOTO, Synergy relied on the contents of the PPM and the Synergy Subscription Agreement, as well as Rocky's wire instructions.

**The Misappropriation of Synergy's Investment**

44.     Within a few days after receiving Synergy's wire for $351,000.00, Rocky transferred the funds to bank accounts at Compass owned by him and his wife, Rose. The transfers were completed without Synergy's knowledge or consent.

45.     Prior to November 23, 2015, BOTO's operating account at Compass had a balance of $0. From November 23, 2015 through November 25, 2015, a total of $2,106,000.00 was deposited into BOTO's operating account at Compass.

46.     On November 30, 2015, $2,000,000.00 was transferred from BOTO's operating account at Compass to Rocky's personal account at Compass without Synergy's knowledge or consent. That same day, Rocky transferred the very same $2,000,000.00 to Rose's personal account at Compass. Thereafter, the funds were exchanged between Rocky's and Rose' personal accounts until they were used to purchase the Kirby Condominium.

**Azkarta's Investment and Subscription Agreement**

47.     On or about December 5, 2015 – following its review of the PPM – Azkarta completed and signed the Stock Subscription Agreement provided to them by Rocky. A true and correct copy of Azkarta's executed Stock Subscription Agreement (the "Azkarta Subscription Agreement") is attached hereto as **Exhibit 8**. The O'Kane Subscription Agreement,  the Synergy Subscription Agreement, and the Azkarta Subscription Agreement are herein collectively referred to as the "Subscription Agreements." Azkarta delivered the Azkarta Subscription Agreement to Rocky on December 5, 2015.

48.     In the Azkarta Subscription Agreement, Azkarta offered to purchase 1 share of stock in RBKL for a total price of $175,500.00. Rocky promptly countersigned the Azkarta Subscription Agreement on December 7, 2015, representing in his own hand writing on the face

of the Azkarta Subscription Agreement that Azkarta's offer was being accepted by him as "Executive Chairman & Founder" of RBKL.

49.     When it executed and delivered the Azkarta Subscription Agreement to Rocky, Azkarta was relying on the contents of the PPM and the Azkarta Subscription Agreement.

50.     Under the terms of the Azkarta Subscription Agreement, Azkarta was instructed to send a check to BOTO for their subscription payment once their subscription offer was accepted. The Azkarta Subscription Agreement represented that BOTO maintained an operating account for RBKL in the United States as RBKL's agent.

51.     On December 16, 2017, shortly after receiving wire instructions from Rocky, Azkarta wired their subscription payment of $175,500.00 to BOTO's bank account at Compass. In making its subscription payment to BOTO, Azkarta relied on the contents of the PPM and the Azkarta Subscription Agreement, as well as Rocky's wire instructions.

**The Misappropriation of Azkarta's Investment**

52.     Within a day after receiving Azkarta's wire for $175,500.00, Rocky transferred the funds to bank accounts at Compass owned by him. The transfers were completed without Azkarta's knowledge or consent.

53.     On December 7, 2015, BOTO's operating account at Compass had a balance of $56,000.00. From December 8, 2015 through December 16, 2015, a total of $526,500.00 was deposited into BOTO's operating account at Compass.

54.     On December 17, 2015, $581,447.00 was transferred from BOTO's operating account at Compass to Rocky's personal account at Compass without Azkarta's knowledge or consent. Thereafter, the funds were used to purchase the Kirby Condominium.

**Rocky's Failure to Make Investments in RBKL's Business**

55.     Contrary to Rocky's representations, none of the money Plaintiffs attempted to invest in RBKL was used to design, build or operate a desalination facility in Kenya. Indeed, none of the money Plaintiffs attempted to invest in RBKL was ever used for any business purpose even remotely associated with RBKL. Instead, Plaintiffs' subscription payments were intercepted and converted by Rocky and Rose before they ever reached RBKL.

56.     Contrary to Rocky's representations, RBKL has never attempted to design, build or operate a desalination facility in Kenya or anywhere else. In fact, RBKL has never conducted any material operations, nor has it attempted to design or build anything.

57.     Contrary to Rocky's representations, RBKL has never attempted to harvest any minerals from ocean water, nor has it attempted to produce or sell any minerals to anyone.

58.     Contrary to Rocky's representations, RBKL has never attempted to produce fresh water for residents of Kenya, nor has it made any donations to charitable organizations of any kind.

59.     Contrary to Rocky's representations, none of the money Plaintiffs or anyone else attempted to invest in RBKL was used for productive economic or humanitarian purposes in Africa.

60.     Contrary to Rocky's representations, the money Plaintiffs and others attempted to invest in RBKL was not kept in an operating account for RBKL until it could be used for legitimate RBKL business expenses, such as the expenses of designing, building or operating a desalination facility or placement or legal expenses. Indeed, the vast majority of the money Plaintiffs and others invested in RBKL has been squandered on the personal expenses of Rocky, Rose and possibly Johnson.

61.     Contrary to Rocky's representations, neither RBKL nor Rocky has provided Plaintiffs or anyone else with any financial statements (audited or unaudited). In fact, neither RBKL nor Rocky has even attempted to prepare financial statements, let alone have them audited.

62.     Contrary to Rocky's representations, Plaintiffs' subscription payments were not used to purchase shares of stock in RBKL for Plaintiffs. Plaintiffs have never received any shares of stock in RBKL and both RBKL and Rocky have informed Plaintiffs that they will never be issued shares of stock in RBKL.

63.     Contrary to Rocky's representations, Plaintiffs' subscription payments were not deposited and held in an operating account for RBKL. Instead, Plaintiffs' subscription payments were deposited into an account titled in BOTO's name and then successively transferred to Rocky's account and/or Rose's account as alleged above. Plaintiffs' subscription payments never reached an account titled in RBKL's name. Thereafter, the proceeds of Plaintiffs' subscription payments were used to purchase the Kirby Condominium as alleged below.

**The Kirby Condominium**

64.     Immediately after misappropriating Plaintiffs' subscription payments, Rocky and Rose used the money to buy a luxury condominium in Houston, Texas; namely, the Kirby Condominium. In connection with their acquisition of the Kirby Condominium, Rocky and Rose caused the property to be deeded into Rose' name. A true and correct copy of the Warranty Deed that Rose received for the Kirby Condominium on or about December 14, 2015 (the "Deed") is attached hereto as **Exhibit 9**.

65.     Although Rose was named as the sole grantee in the Deed, Rocky caused Rose to execute a Statutory Durable Power of Attorney on December 9, 2015 (the "POA"). The POA was effective immediately and appointed Rocky as Rose's attorney-in-fact with full power and

authority to act for her with respect to any real-estate transactions relating to the Kirby Condominium or otherwise. A true and correct copy of the POA is attached hereto as **Exhibit 10**.

66.     In October of 2016, Rocky commenced divorce proceedings against Rose in the District Court of Harris County, Texas.

67.     On March 1, 2018, Rocky executed and delivered a certain Deed in Trust dated March 1, 2018 (the "Mortgage") to Johnson with regard to the Kirby Condominium. The Mortgage was recorded the next day, on March 2, 2018, as document number RP-2018-89224 in the Official Public Records of Real Property of Harris County, Texas.  A true and correct copy of the Mortgage is attached hereto as **Exhibit 11**.

68.     Under the terms of the Mortgage, the Kirby Condominium was purportedly pledged as collateral to secure an alleged loan of $1,300,000.00 from Johnson to Rocky. When Rocky executed and delivered the Mortgage to Johnson, he was not only divorcing Rose, but he was also involved in a romantic relationship with Johnson.

**Plaintiffs' Discovery of Defendants' Wrongdoing**

69.     Plaintiffs did not discover there might be an issue with their investments in RBKL until earlier this year. At that time, Morris contacted Plaintiffs and informed them that he had instituted legal proceedings against Rocky, Rose and BOTO because he believed they had misappropriated an investment that the Morris IRA attempted to make in RBKL.

70.     Based on Morris' allegations, Plaintiffs investigated the matter and discovered their own subscription payments had been misappropriated as detailed above.

71.     Contrary to Rocky's representations, none of Plaintiffs' subscription payments were actually invested in RBKL.

## COUNT I
### (CONVERSION AGAINST ROCKY, ROSE, BOTO AND OCEAN HARVEST)

72.     As alleged above, Plaintiffs wired  a total of $1,404,000.00 to BOTO's operating account at Compass. The funds Plaintiffs wired to BOTO's bank account belonged to Plaintiffs; they both owned those funds and had the right to possess them.

73.     Rocky, Rose, BOTO and Ocean Harvest unlawfully and without authorization assumed and exercised control over the funds Plaintiffs wired to BOTO's bank account by diverting those funds to Rocky's and/or Rose's personal bank accounts. As alleged above, the funds Plaintiffs wired to BOTO's bank account were intended to be an investment in RBKL for its use in developing a desalination facility in Kenya – they were not intended for the personal use of either Rocky or Rose. Therefore, Rocky, Rose, BOTO and Ocean Harvest had neither a legal right nor authorization to transfer said funds to their own personal bank accounts or spend them on their own personal expenses.

74.     Plaintiffs have demanded the return of the above-referenced funds, but Rocky, Rose, BOTO and Ocean Harvest have refused to return them.

75.      As a result of the foregoing, Plaintiffs have suffered actual monetary damages in excess of $1,404,000.00.

76.     Rocky, Rose, BOTO and Ocean Harvest committed the foregoing acts of conversion with the specific intent to cause substantial harm to Plaintiffs, or with at least the subjective awareness that their actions posed an extreme degree of risk of harm to Plaintiffs, considering the probability and magnitude of the potential harm to Plaintiffs, but nevertheless proceeded with conscious indifference to the rights, safety and welfare of Plaintiffs. Therefore, Plaintiffs are entitled to recover exemplary damages from Rocky, Rose, BOTO and Ocean Harvest.

## COUNT II
### (FRAUD AGAINST ROCKY, BOTO, OCEAN HARVEST AND RBKL)

77.     As alleged above, Rocky represented to Plaintiffs that:

a.     The proceeds of Plaintiffs' subscription payments would be used by RBKL to design, build and operate a desalination facility in Kenya;

b.     RBKL's desalination facility would harvest large quantities of valuable minerals from ocean water that could be sold for hundreds of millions of dollars annually;

c.     RBKL's desalination facility would produce vast amounts of fresh water for local residents near the facility and hundreds of millions of dollars of charitable donations for safe-drinking-water initiatives throughout Kenya;

d.     The proceeds of Plaintiffs' subscription payments would be used by RBKL for productive economic and humanitarian purposes in Africa;

e.     The proceeds of Plaintiffs' subscription payments would remain in RBKL's operating account until RBKL began constructing its desalination facility, subject only to RBKL's potential use of said proceeds for offering or legal expenses;

f.     Plaintiffs would be provided with quarterly audited financial statements regarding the status of their investment;

g.     Plaintiffs' subscription offers for shares of stock in RBKL had been accepted; and

h.     Ocean Harvest and BOTO were both the agents of RBKL in the United Sates and maintained bank accounts in their names in Texas solely for the benefit of RBKL.

78.     Rocky made the above-referenced representations on behalf of himself, RBKL, BOTO and Ocean Harvest.

79.     The above-referenced representations were both material and false. Rocky's representations have been exposed as false by the discovery of the following facts:

a.     RBKL never attempted to design, build or operate a desalination facility in Kenya or anywhere else;

b.     RBKL never attempted to harvest any minerals from ocean water or produce or sell any minerals to anyone;

c.     RBKL never attempted to produce fresh water for residents of Kenya, nor has it made any donations to charitable organizations of any kind;

      d.     The proceeds of Plaintiffs' subscription payments were not used for any productive economic or humanitarian purpose in Africa or anywhere else;

      e.     The proceeds of Plaintiffs' subscription payments were not kept in RBKL's operating account, nor were they spent on any legitimate RBKL business expense, such as designing, building or operating a desalination facility or placement or legal expenses;

      f.     Neither RBKL nor Rocky has provided Plaintiffs or anyone else with any financial statements (either audited or unaudited);

      g.     Plaintiffs subscription payments were not used to purchase shares of stock in RBKL for Plaintiffs; and

      h.     Plaintiffs' subscription payments were intercepted by Rocky and Rose, who ultimately used the money to purchase the Kirby Condominium for their own personal use.

80.     Rocky, RBKL, BOTO and Ocean Harvest never had any intention of using Plaintiffs subscription payments for productive business or humanitarian purposes in Africa (or anywhere else). The above-referenced representations were simply part of a scheme to defraud Plaintiffs and other prospective investors. Rocky, RBKL, BOTO and Ocean Harvest all knew the above-referenced representations were false when they made them.

81.     Rocky, RBKL, BOTO and Ocean Harvest intended to induce Plaintiffs to act upon their misrepresentations by executing the Subscription Agreement and transmitting their subscription payments to BOTO's operating account.

82.     Plaintiffs actually and justifiably relied upon the above-referenced representations when they executed the Subscription Agreements and transmitted their subscription payments to BOTO's operating account;

83.     As a result of the foregoing, Plaintiffs have suffered actual monetary damages in excess of $1,404,000.00.

84.     Rocky, BOTO, Ocean Harvest and RBKL committed the foregoing acts of fraud with the specific intent to cause substantial harm to Plaintiffs, or with at least the subjective awareness that their actions posed an extreme degree of risk of harm to Plaintiffs, considering the

probability and magnitude of the potential harm to Plaintiffs, but nevertheless proceeded with conscious indifference to the rights, safety and welfare of Plaintiffs. Therefore, Plaintiffs are entitled to recover exemplary damages from Rocky, BOTO, Ocean Harvest and RBKL.

## COUNT III
### (BREACH OF FIDUCIARY DUTY AGAINST ROCKY, ROSE, BOTO, OCEAN HARVEST AND RBKL)

85.     By assuming possession and control of Plaintiffs' subscription payments and the proceeds thereof, Rocky, Rose, BOTO, Ocean Harvest and RBKL voluntarily assumed fiduciary duties to Plaintiffs, including, without limitation, the following:

a.     A duty to use said funds for their intended purpose, *i.e.,* to make a capital contribution to RBKL on Plaintiffs' behalf;

b.     A duty to exchange said funds for shares of stock in RBKL for Plaintiffs;

c.     A duty to make sure the proceeds of said funds were used for legitimate RBKL business expenses as outlined in the PPM and the Subscription Agreements;

d.     A duty to refrain from misappropriating said funds or aiding and abetting others in doing so; and

e.     A duty to provide timely, accurate information to Plaintiffs regarding the disposition of said funds.

86.     Rocky, Rose, BOTO, Ocean Harvest and RBKL breached their fiduciary duties to Plaintiffs by, among other things:

a.     Failing to use Plaintiffs' subscription payments or the proceeds thereof for their intended purpose, *i.e.,* to make a capital contribution to RBKL on Plaintiffs' behalf;

b.     Failing to exchange said funds for shares of stock in RBKL for Plaintiffs;

c.     Failing to make sure the proceeds of said funds were used for legitimate RBKL business expenses as outlined in the PPM and the Subscription Agreements;

d.     Misappropriating said funds or aiding and abetting others in doing so; and

e.     Failing to provide timely, accurate information to Plaintiffs regarding the disposition of said funds.

87.     As a result of the foregoing, Plaintiffs have suffered actual monetary damages in excess of $1,404,000.00.

88.     Rocky, Rose, BOTO, Ocean Harvest and RBKL committed the foregoing acts with the specific intent to cause substantial harm to Plaintiffs, or with at least the subjective awareness that their actions posed an extreme degree of risk of harm to Plaintiffs, considering the probability and magnitude of the potential harm to Plaintiffs, but nevertheless proceeded with conscious indifference to the rights, safety and welfare of Plaintiffs. Therefore, Plaintiffs are entitled to recover exemplary damages from Rocky, Rose, BOTO, Ocean Harvest and RBKL.

## COUNT IV
### (AIDING AND ABETTING BREACH OF FIDUCIARY DUTY AGAINST ROCKY, ROSE, BOTO, OCEAN HARVEST AND RBKL)

89.     By assuming possession and control of Plaintiffs' subscription payments and the proceeds thereof, Rocky, Rose, BOTO, Ocean Harvest and RBKL voluntarily assumed fiduciary duties to Plaintiffs, including, without limitation, the following:

a.     A duty to use said funds for their intended purpose, *i.e.,* to make a capital contribution to RBKL on Plaintiffs' behalf;

b.     A duty to exchange said funds for shares of stock in RBKL for Plaintiffs;

c.     A duty to make sure the proceeds of said funds were used for legitimate RBKL business expenses as outlined in the PPM and the Subscription Agreements;

d.     A duty to refrain from misappropriating said funds or aiding and abetting others in doing so; and

e.     A duty to provide timely, accurate information to Plaintiffs regarding the disposition of said funds.

90.     Rocky, Rose, BOTO, Ocean Harvest and RBKL breached their fiduciary duties to Plaintiffs by, among other things:

a.     Failing to use Plaintiffs' subscription payments or the proceeds thereof for their intended purpose, *i.e.,* to make a capital contribution to RBKL on Plaintiffs' behalf;

b.      Failing to exchange said funds for shares of stock in RBKL for Plaintiffs;

c.      Failing to make sure the proceeds of said funds were used for legitimate RBKL business expenses as outlined in the PPM and the Subscription Agreements;

d.      Misappropriating said funds or aiding and abetting others in doing so; and

e.      Failing to provide timely, accurate information to Plaintiffs regarding the disposition of said funds.

91.     Rocky, Rose, BOTO, Ocean Harvest and RBKL all knowingly participated in a scheme to defraud Plaintiffs of their investment in RBKL to allow Rocky and Rose to use the proceeds of Plaintiffs investment for their own personal uses. As such, Rocky, Rose, BOTO, Ocean Harvest and RBKL all aided and abetted one another to breach their respective fiduciary duties to Plaintiffs.

92.     As a result of the foregoing, Plaintiffs have suffered actual monetary damages in excess of $1,404,000.00.

93.     Rocky, Rose, BOTO, Ocean Harvest and RBKL committed the foregoing acts with the specific intent to cause substantial harm to Plaintiffs, or with at least the subjective awareness that their actions posed an extreme degree of risk of harm to Plaintiffs, considering the probability and magnitude of the potential harm to Plaintiffs, but nevertheless proceeded with conscious indifference to the rights, safety and welfare of Plaintiffs. Therefore, Plaintiffs are entitled to recover exemplary damages from Rocky, Rose, BOTO, Ocean Harvest and RBKL.

## COUNT V
### (DEFALCATION AGAINST ROCKY, ROSE, BOTO, OCEAN HARVEST AND RBKL)

94.     As alleged above, Rocky, Rose, BOTO, Ocean Harvest and RBKL breached their fiduciary duties to Plaintiffs with respect to their subscription payments and the proceeds thereof.

95.     The actions of Rocky, Rose, BOTO, Ocean Harvest and RBKL in this regard constituted willful neglect of their fiduciary duties.

96.     As a result of the foregoing, Plaintiffs have suffered actual monetary damages in excess of $1,404,000.00.

97.     Rocky, Rose, BOTO, Ocean Harvest and RBKL committed the foregoing acts with the specific intent to cause substantial harm to Plaintiffs, or with at least the subjective awareness that their actions posed an extreme degree of risk of harm to Plaintiffs, considering the probability and magnitude of the potential harm to Plaintiffs, but nevertheless proceeded with conscious indifference to the rights, safety and welfare of Plaintiffs. Therefore, Plaintiffs are entitled to recover exemplary damages from Rocky, Rose, BOTO, Ocean Harvest and RBKL.

## COUNT VI
### (EMBEZZLEMENT AGAINST ROCKY, ROSE, BOTO AND OCEAN HARVEST)

98.     Rocky, Rose, BOTO and Ocean Harvest were Plaintiffs' agents with regard to their subscription payments and the proceeds thereof. Specifically, their agency required them to transmit Plaintiffs subscription payments to RBKL as a capital contribution in exchange for shares of stock in RBKL.

99.     Rocky, Rose, BOTO and Ocean Harvest received Plaintiffs' subscription payments or the proceeds thereof, either directly or through their own agents, during the course of their engagement as Plaintiffs' agents.

100.    Rocky, Rose, BOTO and Ocean Harvest embezzled, converted and misapplied Plaintiffs' subscription payments and the proceeds thereof for the personal expenses of Rocky and Rose.

101.    As a result of the foregoing, Plaintiffs have suffered actual monetary damages in excess of $1,404,000.00.

102.    Rocky, Rose, BOTO and Ocean Harvest committed the foregoing acts with the specific intent to cause substantial harm to Plaintiffs, or with at least the subjective awareness that

their actions posed an extreme degree of risk of harm to Plaintiffs, considering the probability and magnitude of the potential harm to Plaintiffs, but nevertheless proceeded with conscious indifference to the rights, safety and welfare of Plaintiffs. Therefore, Plaintiffs are entitled to recover exemplary damages from Rocky, Rose, BOTO and Ocean Harvest.

## COUNT VII
### (BREACH OF CONTRACT AGAINST RBKL)

103.    As alleged above, RBKL entered into the Subscription Agreements with Plaintiffs.

104.    Plaintiffs fully performed all of their contractual obligations under the terms of the Subscription Agreements.

105.    RBKL breached the Subscription Agreements by failing and refusing to issue shares of stock in RBKL to Plaintiffs.

106.    As a result of the foregoing, Plaintiffs have suffered actual monetary damages in excess of $1,404,000.00.

107.    Under Texas law, attorneys' fees are recoverable against RBKL with regard to its breach of contract.

## COUNT VIII
### (CONSTRUCTIVE TRUST AGAINST ROCKY, ROSE, BOTO AND OCEAN HARVEST)

108.    As alleged above, Rocky, Rose, BOTO and Ocean Harvest all had a fiduciary relationship with Plaintiffs with respect to their subscription payments and the proceeds thereof.

109.    As alleged above, Rocky, Rose, BOTO and Ocean Harvest breached their fiduciary duties with acts that constituted both actual fraud and constructive fraud. Ultimately, their actions resulted in the misappropriation of Plaintiffs' subscription payments and the proceeds thereof as alleged previously.

110.    As a result of the foregoing, Rocky, Rose, BOTO and Ocean Harvest were all unjustly enriched.

111.    The Kirby Condominium constitutes an identifiable res that can be traced back to Plaintiffs' subscription payments and the proceeds thereof. Other such property may ultimately be traceable back to Plaintiffs' subscription payments and the proceeds thereof.

### COUNT IX
### (ACCOUNTING AGAINST ROCKY, ROSE, BOTO, OCEAN HARVEST AND RBKL)

112.    Based on the foregoing, Plaintiffs are entitled to an accounting from Rocky, Rose, BOTO, Ocean Harvest and RBKL with respect to the disposition of their subscription payments and the proceeds thereof.

### COUNT X
### (FRAUDULENT CONVEYANCE AGAINST ROCKY, ROSE AND BOTO – BOTO'S TRANSFER TO ROCKY – § 24.005(A)(1))

113.    Under Section 24.005(a)(1) of the Texas enactment of the Uniform Fraudulent Transfer Act ("UFTA"), a transfer made by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or within a reasonable time after the transfer was made, if the debtor made the transfer with actual intent to hinder, delay or defraud any creditor of the debtor.

114.    As alleged above, Plaintiffs are creditors of BOTO pursuant to their claims in this case.

115.    As alleged above, BOTO transferred the proceeds of Plaintiffs' subscription payments to Rocky with the actual intent to hinder, delay and defraud Plaintiffs and BOTO's other creditors.

116.    BOTO's actual intent to hinder, delay and defraud Plaintiffs and its other creditors is clearly demonstrated by the circumstances surrounding the transfers, including, without limitation, the following:

a. The transfers were made to an insider (Rocky);

b. BOTO concealed the circumstances and nature of the transfers from Plaintiffs and their other creditors;

c. The transfers divested BOTO of all of its material, unencumbered assets;

d. The transfers were made by BOTO to Rocky in exchange for no consideration;

e. BOTO was insolvent after the transfers were made; and

f. The transfers occurred immediately after BOTO incurred a substantial debt to Plaintiffs and their other creditors pursuant to its unlawful conduct alleged above.

117. The above-referenced actions of BOTO and Rocky violated Section 24.005(a)(1) of UFTA.

118. As alleged above, Rocky transferred the proceeds of Plaintiffs' subscription payments to Rose immediately after receiving the transfers from BOTO.

119. As alleged above, the value of Plaintiffs' claims against BOTO exceeds $1,404,000.00.

## COUNT XI
### (FRAUDULENT TRANSFER AGAINST ROCKY, ROSE AND BOTO – BOTO'S TRANSFER TO ROCKY - § 24.005(A)(2))

120. Under Section 24.005(a)(2) of UFTA, a transfer made by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or within a reasonable time after the transfer was made, if the debtor made the transfer without receiving a reasonably equivalent value in exchange for the transfer and the debtor intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

121. As alleged above, Plaintiffs are creditors of BOTO pursuant to the claims alleged in this case.

122.     BOTO made the transfer of the proceeds of Plaintiffs' subscription payments to Rocky without receiving a reasonably equivalent value in exchange for the transfer.  Indeed, BOTO received no consideration in exchange for the transfer.

123.     At the time of the transfer, BOTO intended to incur, or believed or reasonably should have believed that it would incur, debts beyond BOTO's ability to pay as they became due.

124.     As alleged above, BOTO was rendered insolvent by the transfer.  Yet, at the time, BOTO was incurring millions of dollars of debts to Plaintiffs and other victims of the fraudulent scheme detailed above.

125.     As alleged above, Rocky transferred the proceeds of Plaintiffs' subscription payments to Rose immediately after receiving the transfers from BOTO.

126.     As alleged above, the value of Plaintiffs' claims against BOTO exceeds $1,404,000.00.

## COUNT XII
### (FRAUDULENT TRANSFER AGAINST ROCKY, ROSE AND BOTO – BOTO'S TRANSFER TO ROCKY - § 24.006(A))

127.     Under Section 24.006(a) of UFTA, a transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the debtor made the transfer without receiving a reasonably equivalent value in exchange for the transfer and the debtor was insolvent at the time or the debtor became insolvent as a result of the transfer.

128.     As alleged above, Plaintiffs are creditors of BOTO pursuant to the claims alleged herein.

129.     As alleged above, BOTO made the transfer of the proceeds of Plaintiffs' subscription payments without receiving a reasonably equivalent value in exchange for the transfer.  Indeed, BOTO received no consideration in exchange for the transfer.

130.    As alleged above, BOTO was insolvent at the time of the transfer.

131.    As alleged above, Rocky transferred the proceeds of Plaintiffs' subscription payments to Rose immediately after receiving the transfers from BOTO.

132.    As alleged above, the value of Plaintiffs' claims against BOTO exceeds $1,404,000.00.

### COUNT XIII
### (FRAUDULENT CONVEYANCE AGAINST ROCKY AND ROSE – ROCKY'S AND ROSE'S TRANSFERS TO EACH OTHER – § 24.005(A)(1))

133.    Under Section 24.005(a)(1) of UFTA, a transfer made by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or within a reasonable time after the transfer was made, if the debtor made the transfer with actual intent to hinder, delay or defraud any creditor of the debtor.

134.    As alleged above, Plaintiffs are creditors of Rocky and Rose pursuant to their claims in this case.

135.    As alleged above, Rocky and Rose exchanged the proceeds of Plaintiffs' subscription payments between each other with the actual intent to hinder, delay and defraud Plaintiffs and their other creditors.

136.    Rocky's and Rose's actual intent to hinder, delay and defraud Plaintiffs and their other creditors is clearly demonstrated by the circumstances surrounding the transfers, including, without limitation, the following:

        a.      The transfers were made to insiders;

        b.      Rocky and Rose retained possession and control of the proceeds of Plaintiffs' subscription payments after the transfers;

        c.      Rocky and Rose concealed the circumstances and nature of the transfers from Plaintiffs and their other creditors;

d.      The transfers divested Rocky and Rose of all of their material, unencumbered assets;

e.      The transfers were made in exchange for no consideration;

f.      Rocky and Rose were insolvent after the transfers were made; and

g.      The transfers occurred immediately after Rocky and Rose incurred a substantial debt to Plaintiffs and their other creditors pursuant to their unlawful conduct alleged above.

137.    The above-referenced actions of Rocky and Rose violated Section 24.005(a)(1) of UFTA.

138.    As alleged above, the value of Plaintiffs' claims against Rocky and Rose exceeds $1,404,000.00.

## COUNT XIV
### (FRAUDULENT TRANSFER AGAINST ROCKY AND ROSE – ROCKY'S AND ROSE'S TRANSFERS TO EACH OTHER - § 24.005(A)(2))

139.    Under Section 24.005(a)(2) of UFTA, a transfer made by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or within a reasonable time after the transfer was made, if the debtor made the transfer without receiving a reasonably equivalent value in exchange for the transfer and the debtor intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

140.    As alleged above, Plaintiffs are creditors of Rocky and Rose pursuant to the claims alleged in this case.

141.    Rocky and Rose made the transfers to each other without receiving a reasonably equivalent value in exchange for the transfers.  Indeed, they received no consideration in exchange for the transfers.

142.     At the time of the transfers, Rocky and Rose intended to incur, or believed or reasonably should have believed that they would incur, debts beyond their ability to pay as they became due.

143.     As alleged above, Rocky and Rose were rendered insolvent by the transfers.  Yet, at the time, Rocky and Rose were incurring millions of dollars of debts to Plaintiffs and other victims of the fraudulent scheme detailed above.

144.     As alleged above, the value of Plaintiffs' claims against Rocky and Rose exceeds $1,404,000.00.

## COUNT XV
### (FRAUDULENT TRANSFER AGAINST ROCKY AND ROSE – ROCKY'S AND ROSE'S TRANSFERS TO EACH OTHER - § 24.006(A))

145.     Under Section 24.006(a) of UFTA, a transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the debtor made the transfer without receiving a reasonably equivalent value in exchange for the transfer and the debtor was insolvent at the time or the debtor became insolvent as a result of the transfer.

146.     As alleged above, Plaintiffs were creditors of Rocky and Rose pursuant to the claims alleged herein.

147.     As alleged above, Rocky and Rose made the transfers of the proceeds of Plaintiffs' subscription payments without receiving a reasonably equivalent value in exchange for the transfers.  Indeed, Rocky and Rose received no consideration in exchange for the transfers.

148.     As alleged above, Rocky and Rose were insolvent at the time of the transfers.

149.     As alleged above, the value of Plaintiffs' claims against Rocky and Rose exceeds $1,404,000.00.

## COUNT XVI
### (Fraudulent Conveyance Against Rocky, Rose and Johnson – The Mortgage – § 24.005(a)(1))

150.    Under Section 24.005(a)(1) of UFTA, a transfer made by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or within a reasonable time after the transfer was made, if the debtor made the transfer with actual intent to hinder, delay or defraud any creditor of the debtor.

151.    As alleged above, Plaintiffs are creditors of Rocky and Rose pursuant to their claims in this case.

152.    As alleged above, the Kirby Condominium was purchased with the proceeds of Plaintiffs' subscription payments. Thereafter, pursuant to the power and authority purportedly granted to him under the terms of the POA, Rocky granted Johnson the Mortgage in the Kirby Condominium. The Mortgage was granted with the actual intent to hinder, delay and defraud Plaintiffs, as well as Rocky's and Rose's other creditors.

153.    Rocky's and Rose's actual intent to hinder, delay and defraud Plaintiffs and their other creditors is clearly demonstrated by the circumstances surrounding the transfer, including, without limitation, the following:

a.    The transfer was made to an insider (Johnson);

b.     Rocky and Rose concealed the circumstances and nature of the transfer from Plaintiffs and their other creditors;

c.    The transfer was made in exchange for inadequate consideration;

d.    Rocky and Rose were insolvent after the transfer was made;

e.    The transfer occurred after Rocky and Rose incurred a substantial debt to Plaintiffs and their other creditors pursuant to their unlawful conduct alleged above; and

f.    The transfer occurred after Rocky and Rose had been sued by Morris and the Mene IRA Trustee.

154.     The above-referenced actions of Rocky, Rose and Johnson violated Section 24.005(a)(1) of UFTA.

155.     As alleged above, the value of Plaintiffs' claims against Rocky exceeds $1,404,000.00.

## COUNT XVII
### (FRAUDULENT TRANSFER AGAINST ROCKY, ROSE AND JOHNSON – THE MORTGAGE – § 24.005(A)(2))

156.     Under Section 24.005(a)(2) of UFTA, a transfer made by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or within a reasonable time after the transfer was made, if the debtor made the transfer without receiving a reasonably equivalent value in exchange for the transfer and the debtor intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

157.     As alleged above, Plaintiffs are creditors of Rocky and Rose pursuant to the claims alleged in this case.

158.     The Mortgage was granted to Johnson without Rocky or Rose receiving a reasonably equivalent value in exchange for the transfer.

159.     At the time of the transfer, Rocky and Rose intended to incur, or believed or reasonably should have believed that they would incur, debts beyond their ability to pay as they became due.

160.     As alleged above, Rocky and Rose were rendered insolvent by the transfer. Yet, at the time, Rocky and Rose were incurring millions of dollars of debts to Plaintiffs and other victims of the fraudulent scheme detailed above.

161.     As alleged above, the value of Plaintiffs' claims against Rocky and Rose exceeds $1,404,000.00.

## COUNT XVIII
### (FRAUDULENT TRANSFER AGAINST ROCKY, ROSE AND JOHNSON– THE MORTGAGE - § 24.006(A))

162.    Under Section 24.006(a) of UFTA, a transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the debtor made the transfer without receiving a reasonably equivalent value in exchange for the transfer and the debtor was insolvent at the time or the debtor became insolvent as a result of the transfer.

163.    As alleged above, Plaintiffs are creditors of Rocky and Rose pursuant to the claims alleged herein.

164.    As alleged above, the Mortgage was granted to Johnson without Rocky or Rose receiving a reasonably equivalent value in exchange for the transfer.

165.    As alleged above, Rocky and Rose were insolvent at the time of the transfer.

166.    As alleged above, the value of Plaintiffs' claims against Rocky and Rose exceeds $1,404,000.00.

## COUNT XIX
### (FRAUDULENT TRANSFER AGAINST ROCKY, ROSE AND JOHNSON – THE MORTGAGE – § 24.006(B))

167.    Under § 6(b) of UFTA, a transfer made by a debtor is fraudulent as to a creditor with a claim that arose before the transfer was made if the transfer was made to an insider for antecedent debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe the debtor was insolvent.

168.    As alleged above, Plaintiffs are creditors of Rocky and Rose pursuant to the claims set forth above.

169.    As alleged above, Johnson is an insider with respect to Rocky and Rose.

170.    Johnson claims the Mortgage was for antecedent debt owed by Rocky to Johnson.

171.    As alleged above, Rocky and Rose were insolvent at the time the Mortgage was granted to Johnson.

172.    Johnson had reasonable cause to believe Rocky and Rose were insolvent at the time the Mortgage was granted to her.  In fact, Johnson specifically asked Rocky to grant her the Mortgage because of her knowledge that he was in the midst of divorce and being sued by disgruntled investors such as Morris and the Mene IRA Trustee.

173.    As alleged above, the value of Plaintiffs' claims against Rocky and Rose exceeds $1,404,000.00.

## COUNT XX
### (FEDERAL SECURITIES VIOLATIONS AGAINST ROCKY, BOTO, OCEAN HARVEST AND RBKL)

174.    The shares of stock in RBKL that Rocky, BOTO, Ocean Harvest and RBKL offered for sale to Plaintiffs were securities within the meaning of federal securities laws; therefore, they could not be sold or offered for sale to the public until a registration statement was filed with the Securities and Exchange Commission ("SEC").

175.    No such registration statement was ever filed for shares of stock in RBKL.

176.    Therefore, Rocky, BOTO, Ocean Harvest and RBKL violated federal securities laws by selling unregistered securities to Plaintiffs and others as alleged above.

177.    In addition, as alleged above, said securities were offered for sale by Rocky, BOTO, Ocean Harvest and RBKL in interstate commerce with a prospectus and oral communications which contained untrue statements of material fact and omissions of material fact.

## COUNT XXI
### (UNJUST ENRICHMENT AGAINST ROCKY, BOTO, OCEAN HARVEST, ROSE AND JOHNSON)

178.    As alleged above, Rocky, BOTO and Ocean Harvest obtained a benefit from Plaintiffs by fraud and taking undue advantage of them.

179.     As alleged above, Rose and Johnson wrongfully secured or passively received a benefit from Plaintiffs that would be unconscionable for them to retain.

## COUNT XXII
### (CONSPIRACY AGAINST ROCKY, ROSE, BOTO, OCEAN HARVEST AND RBKL)

180.     As alleged above, Rocky, Rose, BOTO, Ocean Harvest and RBKL conspired to defraud Plaintiffs of their subscription payments and the proceeds thereof.

181.     The object of the conspiracy was to be accomplished by falsely representing to Plaintiffs that they were investing in shares of stock in RBKL and that their investment would be used for productive economic and humanitarian purposes in Africa.

182.     Rocky, Rose, BOTO, Ocean Harvest and RBKL had a meeting of the minds with regard to the object of the conspiracy, as well as the means they would use to accomplish their object.

183.     As alleged above, numerous unlawful, overt acts were taken by the conspiring parties in furtherance of their conspiracy.

184.     As a result of the foregoing, Plaintiffs have suffered actual monetary damages in excess of $1,404,000.00.

185.     Rocky, Rose, BOTO, Ocean Harvest and RBKL committed the foregoing acts with the specific intent to cause substantial harm to Plaintiffs, or with at least the subjective awareness that their actions posed an extreme degree of risk of harm to Plaintiffs, considering the probability and magnitude of the potential harm to Plaintiffs, but nevertheless proceeded with conscious indifference to the rights, safety and welfare of Plaintiffs. Therefore, Plaintiffs are entitled to recover exemplary damages from Rocky, Rose, BOTO, Ocean Harvest and RBKL.

## COUNT XXIII
### (DECLARATORY JUDGMENT AGAINST ROCKY, ROSE, JOHNSON, THE MENE IRA TRUSTEE, MORRIS AND HARDIN)

186.    By reason of the foregoing, Plaintiffs have an interest in the proceeds of their subscription payments, including, without limitation, the Kirby Condominium.

187.    Plaintiffs' interest in the Kirby Condominium has priority over any right, title or interest Rocky, Rose or Johnson may have or claim in the Kirby Condominium by virtue of the claims set forth above.

188.    In addition, Plaintiffs interest in the Kirby Condominium has priority over any right, title or interest the Mene IRA Trustee, Morris or Hardin may have or claim in the Kirby Condominium because the proceeds of Plaintiffs' subscription payments were used to purchase the Kirby Condominium; whereas, the Mene IRA Trustee, Morris and Hardin cannot establish any funds or property belonging to them were used to purchase the Kirby Condominium.

189.    There is an actual, justiciable controversy regarding these matters as evidenced by this Complaint, the Deed, the Mortgage and the pleadings filed by the Mene IRA Trustee, Morris and Hardin in the divorce case of Rocky and Rose currently pending in the District Court of Harris County, Texas.

190.    The controversy will be resolved by the declaration requested below.

## CONDITIONS PRECEDENT

191.    All conditions precedent to Plaintiffs claims herein have been performed, occurred, and/or have been waived.

## DEMAND FOR JURY TRIAL

192.    Plaintiffs hereby demand a trial by jury and tender the required jury fee.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that each of the Defendants be cited to appear herein, and that this Court order the following equitable relief and/or upon trial on the merits on this cause, order that Plaintiffs recover from Defendants the following:

1.      The entry of a judgment in their favor against Rocky, Rose, BOTO, Ocean Harvest and RBKL, jointly and severally, for an amount equal to their actual damages plus exemplary damages, attorneys' fees and costs;

2.      The imposition of a constructive trust over all of the proceeds of the subscription payments Plaintiffs transmitted to BOTO's account, including, without limitation, the Kirby Condominium;

3.      The entry of a judgment against BOTO, Rocky and Rose avoiding the fraudulent transfers among them;

4.      The entry of a judgment against Johnson avoiding the Trust and Mortgage;

5.      The entry of a judgment against all Defendants granting Plaintiffs a first priority lien in excess of $1,404,000.00 against all assets traceable to Plaintiffs' subscription payments, including, without limitation, any right, title or interest any Defendant has or claims in the Kirby Condominium;

6.      An injunction prohibiting BOTO, Rocky and Rose from any further transfers of assets traceable to Plaintiffs' subscription payments, including, without limitation, any right, title or interest they have or claim in the Kirby Condominium;

7.      An injunction prohibiting Johnson from any further transfers of assets traceable to Plaintiffs' subscription payments, including, without limitation, any right, title or interest they have or claim in the Kirby Condominium, Mortgage or Trust;

8.      The entry of a judgment against Rocky, Rose, BOTO, Ocean Harvest and RBKL requiring them to account to Plaintiffs for the disposition of his subscription payments and the proceeds thereof;

9.      The entry of a judgment against all Defendants declaring that Plaintiffs' right, title and interest in the Kirby Condominium is superior to and has priority over any right, title or interest that any Defendant might have or claim in the Kirby Condominium and/or awarding Plaintiffs title to the Kirby Condominium;

10.     The entry of a judgment against Johnson declaring the Mortgage and Trust void;

11.     The entry of a judgment against the Mene IRA Trustee and Morris declaring their *lis pendens* notice(s) void; and

12.     The entry of a judgment against all Defendants for such other relief as this Court deems just.

November 2, 2018

Respectfully submitted,

**WILLIAM O'KANE, SYNERGY SOURCE, LLC, and AZKARTA CREST CORPORATION**

By:_____
            One of their Attorneys

Beau T. Greiman
Email:  bgreiman@grglegal.com
GREIMAN, ROME & GRIESMEYER, LLC
2 North LaSalle Street, Suite 1601
Chicago, Illinois 60602
Phone: (312) 428-2750
Fax: (312) 332-2781

Wm Bruce Stanfill
Federal ID Number:  8889
Texas Bar Number:  19034350

Email:  william.stanfill@akerman.com
AKERMAN LLP
1300 Post Oak Boulevard
Suite 2500
Houston, TX  77056
Phone:  (713) 871-6733
Fax:  (713) 960-1527

Sean M. Cichowski
Federal ID Number:  1076539
Texas Bar Number:   24062188
Email:  sean.cichowski@akerman.com
AKERMAN LLP
1300 Post Oak Boulevard
Suite 2500
Houston, TX  77056
Phone:   (713) 960-7363
Fax:  (713) 960-1527

# EXHIBIT 1

# Legal Description

UNIT L, LEVEL 26, TOGETHER WITH ITS APPURTENANT UNDIVIDED INTEREST IN AND TO THE GENERAL AND LIMITED COMMON ELEMENTS OF 2727 KIRBY CONDOMINIUMS, A CONDOMINIUM REGIME IN THE CITY OF HOUSTON, HARRIS COUNTY, TEXAS, ACCORDING TO THE FIRST AMENDED AND RESTATED DECLARATION OF CONDOMINIUM, RECORDED UNDER FILM CODE NO. 205251 OF THE CONDOMINIUM RECORDS OF HARRIS COUNTY, TEXAS, AND ALL AMENDMENTS AND SUPPLEMENTS THERETO.

EXHIBIT 2

RP-2017-191570

## NOTICE OF LIS PENDENS

State of Texas §
County of Harris §

NOTICE IS HEREBY GIVEN that an action was commenced in the 309th Judicial District Court of Harris County, Texas under Cause No. 2016-70236 styled *Quest IRA Inc. FBO Carolyn Mene Roth IRA and Malcolm Morris Roth IRA v. Verley "Rocky" Sembritzky, Jr. and Goldie Rose* on April 17, 2017 and is now pending in such Court. The real property which is a subject of the lawsuit includes the following:

    Unit L, Level 26, of 2727 KIRBY CONDOMINIUMS, a condominium Project in Harris County, Texas, together with the limited common elements and an undivided interest in and to the general common elements, as defined in that Declaration recorded in Film Code No. 206251, Condominium Records of Harris County, Texas and also known by the address of 2727 Kirby Drive, Unit 26L, Houston, Harris County Texas 77098.

    The above captioned matter is for current pending litigation involving the above referenced property. This action involves a dispute as to the ownership of such property and the improper use of proceeds used to purchase the property.

    EXECUTED this 26th day of April, 2017.

                                 Malcolm Morris, authorized representative of Plaintiff

STATE OF TEXAS }
COUNTY OF HARRIS }

    This instrument was acknowledged before me on this 26th day of April, 2017 by **Malcolm Morris, an authorized representative for Plaintiff** .

                          NOTARY PUBLIC, STATE OF TEXAS

**After recording return to:**
Mr. Allan D. Goldstein
Morris, Lendais, Hollrah & Snowden
1980 Post Oak Blvd., Suite 700
Houston, Texas 77056



VIVIAN THAMES
NOTARY PUBLIC, STATE OF TEXAS
MY COMMISSION EXPIRES
JUNE 30, 2017
ID #125324371

RP-2017-191570

RP-2017-191570

\# Pages 2

05/03/2017 09:37 AM

e-Filed & e-Recorded in the

Official Public Records of

HARRIS COUNTY

STAN STANART

COUNTY CLERK

Fees   $16.00

RECORDERS MEMORANDUM
This instrument was received and recorded electronically
and any blackouts, additions or changes were present
at the time the instrument was filed and recorded.

Any provision herein which restricts the sale, rental, or
use of the described real property because of color or
race is invalid and unenforceable under federal law.
THE STATE OF TEXAS
COUNTY OF HARRIS
I hereby certify that this instrument was FILED in
File Number Sequence on the date and at the time stamped
hereon by me; and was duly RECORDED in the Official
Public Records of Real Property of Harris County, Texas.

*Stan Stanart*

COUNTY CLERK
HARRIS COUNTY, TEXAS

# EXHIBIT 3

8/2/2018 1:26 PM
Chris Daniel - District Clerk Harris County
Envelope No. 26465906
By: Angellia Dozier
Filed: 8/2/2018 1:26 PM

**Cause No. 2016-70236**

| | | |
|---|---|---|
| IN THE MATTER OF THE MARRIAGE OF | § | IN THE DISTRICT COURT OF |
| | § | |
| VERLEY SEMBRITZKY, JR. | § | |
| | § | HARRIS COUNTY, TEXAS |
| - AND - | § | |
| | § | |
| GOLDIE ROSE | § | 309ᵗʰ  JUDICIAL DISTRICT |

## Intervenors' Third Amended Original Petition

TO THE HONORABLE JUDGE OF SAID COURT:

Intervenor Plaintiffs **Quest IRA Inc. FBO Carolyn Mene Roth IRA** and the **Malcolm Morris Roth IRA** complain of Intervenor Defendants **Bounty of the Ocean, Inc.** ("BOTO"), **Verley Sembritzky, Jr. a/k/a "Rocky" Sembritzky** ("Sembritzky") and **Goldie Rose** ("Rose") as follows:

### Discovery Control Plan

1. Intervenor Plaintiffs intend to conduct discovery under Level 2 of Tex.R.Civ.Proc. 190.3 and affirmatively plead that this suit is not governed by the expedited-actions process in Tex.R.Civ.Proc. 169 because Intervenor Plaintiffs seek monetary relief over $100,000.

### Claim for Relief

2. The damages sought are within the maximum jurisdictional limits of the Court. In accordance with Rule 47 of the Texas Rules of Civil Procedure, Intervenor Plaintiffs seek monetary relief over $1,000,000 and demand judgment for all other relief to which they are entitled.

### Parties and Service

3. Intervenor Plaintiff Quest IRA Inc. for the benefit of the Carolyn Mene Roth IRA does business in Harris County, Texas. Carolyn Mene is the authorized representative of Quest IRA Inc. for the benefit of the Carolyn Mene Roth IRA.

4.      Intervenor Plaintiff Malcolm Morris Roth IRA does business in Harris County, Texas. Malcolm Morris ("Morris") is the authorized representative of Malcolm Morris Roth IRA.

5.      Intervenor Defendant Bounty of the Ocean, Inc. is a Bahamian corporation doing business in Harris County, Texas and, because it has already entered an appearance in this action, can be served with this pleading by serving its counsel of record pursuant to Tex.R.Civ.Proc. 21a.

6.      Intervenor Defendant Verley Sembritzky, Jr. a/k/a "Rocky" Sembritzky is an individual who does business in Harris County, Texas and, because he has already entered an appearance in this action, can be served with this pleading by serving his counsel of record pursuant to Tex.R.Civ.Proc. 21a.

7.      Intervenor Defendant Goldie Rose is an individual who does business in Harris County, Texas and, because she has already entered an appearance in this action, can be served with this pleading by serving her counsel of record pursuant to Tex.R.Civ.Proc. 21a.

## Background Facts

8.      Since at least 1990, Morris has volunteered and been involved in creating more opportunities for cheaper and plentiful water supplies in Africa.   Morris was introduced to Sembritzky who had represented to Morris that he had developed a process to combine desalination of seawater with mineral extraction.  Subsequently, on a trip to Africa where Sembritzky observed a need for sufficient quantities of potable water, Sembritzky expressed a desire to apply this process in Kenya.  A Kenyan company, now known as Rasli Bahari Kenya Limited ("RBKL"), was created for the purpose of developing long term water solutions for Kenya and the Kenyan people. Sembritzky is an owner of RBKL and claims to be its developer.

9.      Thereafter, Sembritzky, on behalf of RBKL, embarked on a campaign to solicit funds from investors in the United States for investment in RBKL.  In exchange for their investments, the

Certified Document Number: 81074562 - Page 2 of 14

investors, including Intervenor Plaintiffs, were promised by Sembritzky that they would receive ownership shares in RBKL and that their initial funds raised on behalf of RBKL would be utilized solely for pre-construction and development costs for the proposed water and mineral extraction plant to be constructed in Kenya and owned by RBKL.  At no time did Sembritzky ever represent to the investors, including Intervenor Plaintiffs, that prior to overall funding he would utilize any of their investment funds for his own personal use and benefit.  Based on these material representations made by Sembritzky, over 17 investors, including Intervenor Plaintiffs, have invested over $7 million dollars which were contemplated for use as pre-construction and development costs and the investors were to receive ownership interest in approximately 41 shares of RBKL.

10.     Sembritzky took possession and control of the investment funds from investors, including Intervenor Plaintiffs, by instructing them to deposit their funds in an account he had set up with BBVA Compass Bank ("Compass").  Specifically, the initial investor funds for the pre-development costs for RBKL's proposed water and mineral extraction plant were to be made out to an entity known as "Ocean Harvest LLC" ("Ocean Harvest") and were to be deposited in Ocean Harvest's account with Compass.  Rose was a signatory on the account and apparently the operations manager for Ocean Harvest.  Although, on information and belief, Sembritzky is the sole shareholder and director of Ocean Harvest, he represented to investors that this account was the operating account for RBKL in the United States.  Based on the material representations of Sembritzky, Intervenor Plaintiff Malcolm Morris Roth IRA invested approximately $803,500 which was deposited in the Ocean Harvest account with Compass.  Apparently, almost immediately after this investment was deposited by Morris in the Ocean Harvest account, Sembritzky transferred $500,000 of such sum to his personal account without Morris' knowledge or consent.

Certified Document Number: 81074562 - Page 3 of 14

11.     Due to what is believed to be a conflict over the use of the name Ocean Harvest by another entity in Kenya, Sembritzky later instructed investors to wire funds for the pre-development costs for RBKL's proposed water and mineral extraction plant to BOTO's account with Compass. Again, although Sembritzky appears to be the sole shareholder and director BOTO, he represented to the investors, including Intervenor Plaintiffs, that this account was the operating account for RBKL in the United States.   Based on the material representations of Sembritzky, Intervenor Plaintiff Quest IRA Inc. FBO Carolyn Mene Roth IRA invested approximately $175,500 which was deposited in the BOTO account with Compass.

12.     In  2017, engineers retained by RBKL in Kenya requested that Sembritzky transfer the funds being held in the BOTO account to RBKL's account in Kenya in order to fund design and build out obligations incurred for RBKL.  The Kenyan engineers maintained that these funds were needed immediately to conclude engineering and legal work necessary to get to final close for the proposed RBKL project in Kenya.  At such time, Sembritzky did not send further funds in response to the engineers' requests.  Based on Morris' long time water and philanthropic activities in Kenya and Africa and because of his connection to RBKL, Morris received a call to see if he could contact Sembritzky and look into the situation.[1]  Soon thereafter, Morris discovered that almost all of the $7 million dollars in funds deposited by the investors into the BOTO and Ocean Harvest accounts with Compass to fund the pre-development costs for RBKL's water and mineral extraction plant had been transferred out of the BOTO account.  When Morris confronted Sembritzky about the whereabouts of the invested funds and for some accounting of the same, Sembritzky refused to respond to Morris' inquiry.

---

[1]Morris had introduced Sembritzky to an engineer in Kenya who was eventually placed on the board of RBKL and essentially runs the RBKL Kenya operations.

13.     Since that time, Morris has learned that investment funds deposited in accounts for RBKL's pre-development costs – funds that were being held for the investor's benefit in exchange for shares in RBKL – had been transferred out of the BOTO account by Sembritzky to the personal bank accounts of him and his wife, Rose.  These personal accounts of Sembritzky and Rose were also held by Compass.  Despite over $7 million dollars of investments for RBKL deposited into the accounts of Ocean Harvest and BOTO – the purported "operating accounts" of RBKL as represented by Sembritzky – as of March 31, 2017 there was only $3,523.14 remaining in the BOTO account.  Further, Morris discovered that, in November 2015, $2,106,000 was deposited into the BOTO account.  On or about November 30, 2015, a simultaneous transfer took place wherein BOTO transferred $2,000,000 to Sembritzky's account and Sembritzky immediately transferred this same $2,000,000 to Rose's account.  Thereafter, on or about December 17, 2015, Rose transferred $1,780,000 of the $2,000,000 she had received on November 30, 2015 back to Sembritzky which was immediately utilized by Sembritzky to fund the purchase of a luxury condominium in Rose's name ("Kirby Condominium").[2]  While the Kirby Condominium was purportedly purchased by Rose as her "sole and separate property," Sembritzky signed the deed as the agent and attorney in fact on Rose's behalf as grantee.

### Cause of Action for Breach of Fiduciary Duty and Fraud

14.     Based on the foregoing acts and conduct, Sembritzky and BOTO owed the investors, including Intervenor Plaintiffs, a fiduciary duty to properly manage, account for and use the funds invested for the sole purpose of advancing the mission of RBKL.  These fiduciary duties include duties of loyalty, due care, good-faith, integrity, fairness, candor, honesty, avoidance of self-dealing

---

[2]The Kirby Condominium is further described as - Unit L, Level 26, of 2727 KIRBY CONDOMINIUMS, a condominium Project in Harris County, Texas, together with the limited common elements and an undivided interest in and to the general common elements, as defined in that Declaration recorded in Film Code No. 206251, Condominium Records of Harris County, Texas.

Certified Document Number: 81074562 - Page 5 of 14

and full disclosure of all matters affecting RBKL, including a duty to account for expenditures of investor funds. BOTO, Ocean Harvest, Sembritzky and Rose as a signatory on the Ocean Harvest account were to hold the investor funds as the operating account of RBKL. Intervenor Defendants used the investor funds for their own personal use without any accounting to the investors or to RBKL. Sembritzky and Rose made unlawful misappropriations with the intent to deprive Intervenor Plaintiffs of the value of their investments in RBKL by leaving RBKL without any practical operating funds and using the investor funds for Intervenor Defendants' own personal uses and purposes, including the purchase of the Kirby Condominium.

15.     Rose was the operations manager for Ocean Harvest and a signatory on Ocean Harvest's account. On information and belief, she was also involved with BOTO. Sembritzky sent updates on the progress of the efforts to raise money from United States investors and how efforts were purportedly progressing towards establishing RBKL's pre construction and development activities. Rose was included in these updates either because she was an investor or because she was otherwise involved in a management role with BOTO, Ocean Harvest and/or RBKL. To the extent Rose was involved in the management of BOTO, Ocean Harvest and/or RBKL, she owed a fiduciary duty to Intervenor Plaintiffs and the other investors along with Sembritzky because the funds were essentially to be held in escrow for the benefit of the pre construction and development activities of RBKL. Rose knew or reasonably should have known that the funds that were provided to her or for her benefit for the purchase of the Kirby Condominiums came from funds that properly should have remained in escrow for the pre construction and development activities of RBKL. -

16.     Based on the foregoing acts and conduct, Sembritzky breached his fiduciary duty to Intervenor Plaintiffs. Rose conspired, aided and assisted Sembritzky in breaching such fiduciary duty by agreeing to accept money for the purchase of the Kirby Condominium purportedly in her

Certified Document Number: 81074562 - Page 6 of 14

name and other disbursements of funds from Sembritzky which she knew was from the BOTO account and intended for pre construction and development activities of RBKL. Such conduct has diluted Intervenor Plaintiffs investment in RBKL. Further, Rose and Sembritzky defrauded Intervenor Plaintiffs by using funds earmarked for the pre development and construction costs for the Kirby Condominium and other personal uses and expenses. Rose, Sembritzky and BOTO conspired together to commit fraud in using the invested funds for their own personal use rather than for the use of pre-development and operating expenses of RBKL as was represented to Intervenor Plaintiffs and the other investors by Sembritzky. Sembritzky made material representations which were not true and made misrepresentations with the intent to defraud Intervenor Plaintiffs. Intervenor Plaintiffs justifiably relied on the representations of Sembritzky which were false.

### Cause of Action for Conversion, Defalcation And Violation of Texas Theft Liability Act

17.     Conversion is the wrongful exercise of dominion or control over property. Defalcation is the civil form of the crime of embezzlement and is a proper claim when a fiduciary breaches his or her duty by inadequately accounting for funds held in a fiduciary capacity or misapplying those funds. The elements of a claim under the Texas Theft Liability Act are that: (i) a defendant unlawfully appropriated, secured, or stole the plaintiff's property or services as described by various sections of the Texas Penal Code, including the theft of invested funds for a specific purpose; (ii) the unlawful taking was made with the intent to deprive the plaintiff of the property; and (iii) the plaintiff sustained damages as a result of such theft.

18.     The proceeds of the various invested funds were for the benefit of RBKL and its investors. Based on the foregoing acts and conduct, Intervenor Defendants wrongfully exercised dominion and control over these proceeds and caused them to be transferred to or used for Intervenor Defendants' personal use. Intervenor Defendants inadequately accounted for those funds and their

Certified Document Number: 81074562 - Page 7 of 14

uses. Intervenor Defendants made unlawful appropriations with the intent to deprive the investors of the benefit of their investments and not for the benefit of RBKL, but rather the benefit of the Intervenor Defendants personally, and failed to account for such wrongful actions.

### Cause of Action for Violation of Texas Securities Act

19.     Based on the foregoing acts and conduct, Sembritzky has violated the Texas Securities Act, Tex. Rev. Civ. Stat. Ann. art. 581—33, by offering and selling shares of stock in RBKL to Intervenor Plaintiffs by means of untrue statements of material facts and/or by omitting to state material facts necessary in order to make the statements he made, in the light of the circumstances under which they are made, not misleading. Accordingly, Intervenor Plaintiffs are entitled to recover damages against Sembritzky as provided by the Texas Securities Act.

### Cause of Action for Aiding & Abetting

20.     Based on the foregoing acts and conduct, Rose had knowledge of the wrongful conduct of Sembritzky and BOTO and intended to assist them in such wrongful conduct to her own personal benefit. Further, Rose provided substantial assistance in Sembritzky's and BOTO's breach of their fiduciary duties to Intervenor Plaintiffs, as well as providing substantial assistance in allowing them to commit fraud against Intervenor Plaintiffs. Rose is therefore liable to Intervenor Plaintiffs for aiding and abetting their tortious conduct.

### Actual Damages

21.     The acts and omissions of Intervenor Defendants were the proximate and producing cause of direct, incidental, and consequential damages to Intervenor Plaintiffs within the minimum jurisdictional limits of this Court. Intervenor Defendants, jointly and severally, are liable to Intervenor Plaintiffs and on behalf of others similarly situated for actual direct, incidental, and consequential damages caused thereby including, without limitation, disgorgement of all money and

Certified Document Number: 81074562 - Page 8 of 14

property received by Intervenor Defendants in breach of fiduciary duty, damages in an amount of the funds and assets of RBKL diverted by Intervenor Defendants, and damages in the amount of the loss of the value of RBKL and Intervenor Plaintiffs' interest in RBKL as a result of Intervenor Defendants' wrongful conduct.  Intervenor Plaintiffs seek the recovery of their actual damages on all of the causes of action asserted herein.

22.     The amount of damages being sought are still a subject of some discovery.  At this time the amount of actual damages includes the amount of funds from investments in RBKL that was used for purposes other than for the pre construction and development costs of RBKL.  The amount of those investments include the amount used to purchase the Kirby Condominium and  the amounts of money transferred from the BOTO and Ocean Harvest accounts to or for benefit of Rose in the amount of $2,045,0000 and for Sembritzky in the amount of all funds improperly taken from the BOTA and Ocean Harvest accounts for purposes other than for the pre construction and development costs of RBKL in the amount of $3,907,042.66.

## Constructive and Resulting Trust

23.     The money invested in the BOTO and Ocean Harvest accounts were to be held in such accounts for the benefit of RBKL's development of the water and mineral extraction plant. Instead, based on the foregoing acts and conduct of Intervenor Defendants, they have wrongfully, and in violation of their fiduciary duties owed to Intervenor Plaintiffs, transferred and absconded with money rightfully representing the shares of investors in RBKL, including but not limited to, Intervenor Plaintiffs' investments in RBKL.  Without the availability of such funds to finance or assist RBKL in its pre construction and development activities, Intervenor Plaintiffs' shares in RBKL have been negatively impacted.  Indeed, despite repeated promises that financial funding to proceed with construction with the water plant should have occurred long ago, Sembritzky has not achieved

Certified Document Number: 81074562 - Page 9 of 14

such funding and continues to represent to investors that funding is always imminent.  Further, no shares of RBKL to date have actually been issued to investors.  The funds invested by Intervenor Plaintiffs were part of a fungible set of investment monies that was used to purchase items for which they were not intended and which directly benefitted both Sembritzky and Rose.  Further, Intervenor Defendants have used the funds they improperly took to purchase real estate and other items for their personal use.  These improper purchases include the purchase of the Kirby Condominium. Intervenor Plaintiffs seek the imposition of a constructive and resulting trust on all of the properties and assets purchased by Intervenor Defendants with the use of the funds invested in RBKL, including but not limited to, the Kirby Condominium.

24.     Based on the foregoing acts and conduct, the funds and investment basis belonging to Intervenor Plaintiffs were used to purchase the Kirby Condominium.  Accordingly, title to the Kirby Condominium should be awarded by the Court to Intervenor Plaintiffs to or for the benefit of RBKL or for RBKL for the benefit of the investors.  The Kirby Condominium was purchased with funds invested for the sole purpose of the pre financial close and development costs of the water and mineral extraction plant.  Only by providing title to the Kirby Condominium to the Intervenor Plaintiffs  – and/or for the benefit of RBKL and/or for the benefit of the investors – can the goal of the use of the investor funds be accomplished and the value of the investments be attempted to be restored to the funding of Intervenor Plaintiffs' investment in RBKL.  Intervenor Plaintiffs seek this equitable remedy under the causes of action of breach of fiduciary duty, fraud, defalcation and aiding and abetting.

**Quasi-Contract/Equitable Damages**

25.     Based on the foregoing acts and conduct, Sembritzky and BOTO are also liable to Intervenor Plaintiffs for the above described misconduct under quasi-contract theories and principles

Certified Document Number: 81074562 - Page 10 of 14

of equity including, without limitation, under the doctrine of quantum meruit, unjust enrichment, and for money had and received. Intervenor Plaintiffs seek this equitable remedy under the causes of action of breach of fiduciary duty, fraud, defalcation and aiding and abetting.

## Accounting

26.     Despite repeated requests, Sembritzky has failed to provide an accounting to RBKL or its investors, including Intervenor Plaintiffs, as to what became of their investment funds. Further, the investors, including Intervenor Plaintiffs, have yet to receive their shares of stock in RBKL as represented by Sembritzky. Intervenor Plaintiffs are entitled to an accounting from Intervenor Defendants for all funds misappropriated from RBKL and its investors. Intervenor Plaintiffs seek this equitable remedy under the causes of action of breach of fiduciary duty, fraud, defalcation and aiding and abetting.

## Attorneys' Fees

27.     Intervenor Plaintiffs seek to recover their reasonable and necessary attorneys' fees and other expenses of litigation from all Intervenor Defendants to the extent provided by law in an amount not to exceed the reasonable hourly rate charged by its attorneys, along with reasonable expenses incurred in connection with the attorney's representation. The specific amount at this time to be sought will be supplemented as the case progresses. The reasonable hourly rate is between $350.00 to $400.00. Intervenor Plaintiffs seek this remedy under the Texas Theft Liability Act and the Texas Securities Act.

## Exemplary Damages

28.     Intervenor Defendants conduct described above is so egregious and improper and made with specific intent to cause substantial injury or harm to Intervenor Plaintiffs. Accordingly, Intervenor Plaintiffs should be awarded exemplary damages in amount of not more than four times

Certified Document Number: 81074562 - Page 11 of 14

the actual damages found by the trier of fact.  Intervenor Plaintiffs seek this remedy under the causes of action of breach of fiduciary duty, fraud, conversion, defalcation, violations of the Texas Theft Liability Act and aiding and abetting.

## Conditions Precedent

29.     All conditions precedent for Intervenor Plaintiffs to maintain their claims against Intervenor Defendants have occurred or have been performed.

## Prayer

For these reasons, Intervenor Plaintiffs pray for judgment for all relief requested herein including, without limitation, as follows:

a.     Judgment against Intervenor Defendants, jointly and severally, for Intervenor Plaintiffs' actual damages;

b.     Judgment against Intervenor Defendants, jointly and severally, for exemplary damages;

c.     Judgment imposing a constructive trust on all proceeds of investor funds, and all real and personal property, including but not limited to the Kirby Condominium, acquired or improved with the proceeds of and monies deposited into the Ocean Harvest and Bounty on the Ocean BBVA Compass bank accounts which were not used or applied for the purpose of using the investor funds intended for the development of the water plant by RBKL;

d.     Judgment against Intervenor Defendants, jointly and severally, for Intervenor Plaintiffs' reasonable and necessary attorneys's fees and expenses of litigation;

e.     Judgment against Intervenor Defendants, jointly and severally, for all costs of court; and

f.     Judgment against Intervenor Defendants, jointly and severally, for all other relief, general or special, at law or in equity, to which Intervenor Plaintiffs may be entitled.

Certified Document Number: 81074562 - Page 12 of 14

Respectfully submitted,

MORRIS, LENDAIS, HOLLRAH & SNOWDEN

By: ___/s/ *Allan D. Goldstein*_____
    Allan D. Goldstein
    State Bar No. 08097950
    *allang@mlhs.net*
    James D. Salyer
    State Bar No. 17549690
    *jsalyer@mlhs.net*
1980 Post Oak Boulevard, Suite 700
Houston, Texas 77056
(713) 966-7200 telephone
(713) 966-7230 telecopier
Attorneys for Intervenor Plaintiffs

Certified Document Number: 81074562 - Page 13 of 14

**Certificate of Service**

I certify that on the ___2nd___ day of _____August_____, 2018, a true and correct copy of the foregoing **Intervenors' Third Amended Original Petition** was served on:

Angela Pence England, TINDALL ENGLAND PC, 1300 Post Oak Blvd., Suite 1550, Houston, Texas 77056 by:

_____ telefax (713) 622-8744

__x__ email: *apengland@tindallengland.com*; *cschwarz@tindallengland.com*; *service@tindallengland.com*

_____ hand delivery

_____ certified mail, return receipt requested

Robin M. Ziek, Attorney at Law, The Clocktower Building, 3401 Allen Parkway, Suite 101, Houston, Texas 77019 by:

_____ telefax (713) 754-4403

__x__ email: *rziek@sbcglobal.net*

_____ hand delivery

_____ certified mail, return receipt requested

Bobby K. Newman, LILLY, NEWMAN & VAN NESS, L.L.P., 3355 West Alabama, Suite 444, Houston, Texas 77098 by:

_____ telefax (713) 966-4466

__x__ email: *bknservice@Lnvlaw.com*; *bobby@Lnvlaw.com*

_____ hand delivery

_____ certified mail, return receipt requested

Alan B. Daughtry, 3355 West Alabama, Suite 444, Houston, Texas 77098 by:

_____ telefax (281) 404-4478

__x__ email: *alan@alandaughtrylaw.com*

_____ hand delivery

_____ certified mail, return receipt requested

Thomas F. Coleman, Attorney at Law, 2 Sawmill Grove Ct., The Woodlands, TX 77380 by:

_____ telefax (713) 523-2804

__x__ email: *coleman.tom@gmail.com*

_____ hand delivery

_____ certified mail, return receipt requested

                              ___/s/ *Allan D. Goldstein*_____
                              Allan D. Goldstein / James D. Salyer



I, Chris Daniel, District Clerk of Harris
County, Texas certify that this is a true and
correct copy of the original record filed and or
recorded in my office, electronically or hard
copy, as it appears on this date.
Witness my official hand and seal of office
this   August 8, 2018

Certified Document Number:       81074562 Total Pages:  14

Chris Daniel, DISTRICT CLERK
HARRIS COUNTY, TEXAS

**In accordance with Texas Government Code 406.013 electronically transmitted authenticated documents are valid. If there is a question regarding the validity of this document and or seal please e-mail support@hcdistrictclerk.com**

# EXHIBIT 4

7/13/2018 3:27 PM
Chris Daniel - District Clerk Harris County
Envelope No. 25977746
By: Alvera Zamora
Filed: 7/13/2018 3:27 PM

CAUSE NO. 2016-70236

| | | |
|---|---|---|
| IN THE MATTER OF | § | IN THE DISTRICT COURT |
| THE MARRIAGE OF | § | |
| | § | |
| VERLEY SEMBRITZKY, JR. | § | 309TH JUDICIAL DISTRICT |
| AND | § | |
| GOLDIE ROSE | § | HARRIS COUNTY, TEXAS |

### INTERVENOR CHRISTINA R. HARDIN'S ORIGINAL PETITION

TO THE HONORABLE JUDGE OF SAID COURT:

Pursuant to Rule 60 of the Texas Rules of Civil Procedure, Intervenor Christina R. Hardin complains of Defendants, Verley "Rocky" Sembritzky, Jr. and Goldie Rose ("Defendants") and shows:

#### Discovery Control Plan

1.      Intervenor intends to conduct discovery in this action under Level 2, in accordance with Tex. R. Civ. P. 190.3. Intervenor, however, reserves the right to request entry of an order establishing a Level 3 discovery control plan.

#### Parties

2.      Intervenor, Christina R. Hardin is located in and does business in Montgomery County, Texas.

3.      Defendant, Verley Sembritzky, Jr. a/k/a "Rocky" Sembritzky, is an individual who does business in Harris County, Texas. Sembritzky may be served with service of process by serving him through his attorney of record, or at his residence located at 722 Buckingham Dr., Houston, Texas 77024; or wherever he may be found.

Certified Document Number: 80782647 - Page 1 of 11

-1-

4.     Defendant, Goldie Rose is an individual who does business in Harris County, Texas. Rose may be served with service of process by serving her attorney of record, or at her residence located at 2727 Kirby Drive, Unit 26L; or wherever she may be found.

**Basis for Intervention**

5.     This action arises out of a claim to property of the marital estate between Defendants. Intervenor seeks to impose a constructive trust on the condominium described as – Unit L, Level 26, of 2727 KIRBY CONDOMINIUMS, a condominium Project in Harris County, Texas, together with the limited common elements and an undivided interest in and to the general common elements, as defined in that Declaration recorded in Film Code No. 206251, Condominium Records of Harris County, Texas.

6.     The condominium unit was purchased with funds distributed to Sembritzky from the water desalination project managed by Rasli Bahari Kenya Limited ("Rasli Bahari"). Sembritzky controlled access to the funds which were deposited in a BBVA Compass bank account held for the benefit of Rasli Bahari by a Bahama company, Bounty of the Ocean, Inc. which is believed to be owned and controlled by Sembritzky. In late November 2015 Sembritzky commenced his harvest from the Bounty of the Ocean, Inc. and distributed to himself $2,500,000 dollars of funds paid by Intervenors and other investors to him for the Bounty of the Ocean, Inc. and Rasli Bahari desalination project. Two weeks later the 2727 Kirby condominium was purchased for cash by Rose, purportedly as her sole and separate property. Sembritzky, however, signed the deed as the agent and attorney in fact on Rose's behalf as grantee.

7.     Intervenor has a justiciable interest in this lawsuit, in that Intervenor has a claim to real property of the marital estate and a claim against any ownership interest the Defendants may have in Bounty of the Ocean, Inc. and Rasli Bahari. Any disposition of the real property or other properties acquired by the parties of the marital estate funds intended for use of Rasli Bahari

Certified Document Number: 80782647 - Page 2 of 11

for the benefit of the investors will impact Intervenor's ability to recoup her interest in the funds raised by, and/or distributed to Sembritzky, as a result of Intervenor Christina Hardin's efforts pursuant to, and in reliance upon, her verbal contract with Sembritzky made during October, 2014. The Intervenor's claims against properties of  the marital estate arise out of this contract between Sembritzky and Hardin, which provides the following terms. (1) Hardin would receive five (5%) of all funds generated as a result of her contact with Morris, and a five (5%) equity interest in  any company formed by Sembritzky to construct and operate the Zero Discharge Desalination and Mineral Recovery plant designed by him. (2) Hardin was promised employment in the operation of the desalination plant during development and after construction. (3) In exchange for these promises by Sembritzky, Hardin was to present the water project to Malcolm Morris, an active investor interested in water projects, and introduce Sembritzky to Morris if he expressed interest in investing in the project.  (4) Sembritzky promised Hardin that this verbal contract would be reduced to writing and he would sign it. In reliance on these promises by Sembritzky, in and about October, 2014, Hardin presented the project to Malcolm Morris, and upon indication of his interest, introduced Sembritzky to Malcolm Morris at a meeting on December 23, 2014.   Mr. Morris shortly thereafter funded the project with at least $6,000,000 initially. Hardin was entitled to 5% of the funds invested as a fee, and 5% of the distributions from the company to Sembritzky as her on-going equity interest. Based on the investment amounts known to her, Hardin's fee is $300,000.00 and her on-going interest in the distributions to Sembritzky amount to an additional $300,000. Subsequent accounting will show the entire amount of other funds raised by Sembritzky, and/or distributed to him, on which Hardin is entitled to recover her fee. Hardin's contract as set out above, was in fact reduced to writing, and agreed and approved in all its terms by Sembritzky.  The contract, with Sembritzky's approval and agreement, is attached as Exhibit A. Sembritzky recognizes and acknowledges his obligations to Hardin arising out of the above contract to which they had agreed. See Exhibit B.

## Background Facts

### *Rasli Bahari Formed to Raise Money to Build a Water Desalination Plant in Kenya*

8.      Intervenor Christina R. Hardin has been aware since at least 1990 that Malcolm

Certified Document Number: 8078264 7 - Page 3 of 11

Morris has volunteered and been involved in creating more opportunities for cheaper and plentiful water supplies in Africa. In 2003 he was a co- founder of the Millennium Water Alliance (MWA) to bring together organizations to work collaboratively to help meet the United States commitment to the goals for Sustainable Development. One goal was to "reduce by half, the proportion of people without access to safe and affordable drinking water and sanitation" by the year 2015. To help reach this goal, in 2003 the leading US-based non-governmental organizations working in water and sanitation formed the MWA as a 501(c)(3) organization to offer sustainable solutions through advocacy, shared knowledge, and collaborative programming. Malcolm Morris is chairman of MWA.

9.       Malcolm Morris was introduced to Sembritzky by Intervenor, Christina Hardin. Sembritzky solicited Hardin's assistance in marketing to Malcolm Morris the process he had developed to combine desalination of seawater with mineral extraction without injecting concentrated brine back into the ocean and adversely affecting marine life. Sembritzky observed a need for sufficient quantities of potable water, and Sembritzky expressed  a desire to apply this process in Kenya.  He then created  a Kenyan company named Rasli Bahari Kenya Limited ("Rasli Bahari"), which would develop long term water solutions for the Kenya and the Kenyan people.

Sembritzky obtain a patent for the desalination process jointly with Stanley Murage, and was raising funds to build a Zero Discharge Desalination and Mineral Recovery plant in Kenya. In addition to the jointly owned patent, Murage and Sembritzky purchased in their individual names, but for the company business certain real estate in Kenya described as Adak House, Land Reference Number 209/1761/3 Milimani Road, Kenya -72. To the extent funds are distributed to Sembritzky from the royalties or sale of the patent or the real estate in Kenya, Hardin is entitled

Certified Document Number: 8078264 7 - Page 4 of 11

to her fee based on such distributions.

### *Over 6 Million Dollars from Texas Investors Raised for Benefit of Rasli Bahari*

10.    Malcolm Morris' Roth IRA invested in Rasli Bahari to begin with initial engineering and site assessments and Sembritzky set out raising money to fund the building of the water plant to be constructed and owned by Rasli Bahari but leaving a legacy and charitable benefits to the nation of Kenya. Kenyan engineers have been working to make the necessary arrangements to take bids to arrange for the design and building of the water plant. Sembritzky, has been in the United States seeking investors for Rasli Bahari to raise funds for the building of the water plant and allowing for minority ownership shares in Rasli Bahari.

11.    Over 17 investors, including Intervenors, have invested funds totaling over 6 million dollars and ownership interest in approximately 37 shares of Rasli Bahari to fund the preconstruction expenses for the proposed water plant. The initial investor funds were to be made out to Ocean Harvest LLC and to be deposited in a BBVA Compass Bank account. Due to what is believed to be a conflict to the use of the name Ocean Harvest by another entity, later investors were instructed to wire funds for pre-development costs of Rasli Bahari to Bounty of the Ocean, Inc.'s bank account at BBVA Compass Bank.   More specifically Sembritzky represented to investors that funding should be made out to Bounty of the Ocean Inc., RBKL's (Rasli Bahari Kenya Limited's) operating account in the United States. The Morris Roth IRA invested approximately $803,500 which was believed to be deposited in the Ocean Harvest LLC account at BBVA Compass Bank. The Quest IRA Inc. FBO Carolyn Mene Roth IRA invested approximately $175,500 which is believed to have been deposited in the Bounty of the Ocean account at BBVA Compass Bank.

### *Sembritzky Distributed to Himself Funds Invested*

12.    Very recently, engineers requested from Sembritzky that necessary funds be transferred to Rasli Bahari's account in Kenya to pay for design and build out obligations

Certified Document Number: 8078264 7 - Page 5 of 11

incurred for Rasli Bahari. Sembritzky did not respond to the engineer's requests and Malcolm Morris received a call to see if he could contact Sembritzky about the situation. Almost all of the 6 million dollars in funds deposited into the Bounty by the Ocean Account (less any amounts in the Ocean Harvest account) have been distributed to Sembritzky. Kenyan engineers assert that the funds were needed immediately to complete plans to close on the financing to further the water plant project of Rasli Bahari.

13.    Funds deposited in accounts for Rasli Bahari's pre-development costs and being held for the equity holder's benefit as their investments in Rasli Bahari have been distributed to personal accounts of Sembritzky and his wife, Goldie Rose. Despite over 6 million dollars of investments for Rasli Bahari deposited into the accounts of Ocean Harvest and Bounty of the Ocean, as of March 31, 2017 there was only $3,523.14 remaining in the bank account of Bounty of the Ocean.                    Further, during November 2015, $2,106,000 was deposited into the bank account of Bounty of the Ocean and at the end of November 2015 $2,000,000 was distributed to Sembritzky. This occurred shortly after Intervenor, Christina Hardin, introduced Sembritzky to Malcolm Morris pursuant to, and in reliance on Sembritzy's several promises, including his promise to pay a 5% fee on all funds distributed to Sembritzky from and as a result of the desalination project.

### *2727 Kirby Condominium Purchased with Misappropriated Investor Funds*

14.    Even more troublesome, on or about December 14, 2015 after Goldie Rose, purchased a condominium located at 2727 Kirby Drive, Unit 26L, Houston, Harris County Texas 77098. It is believed that the purchase price for the condominium was $2,450,000 cash and that funds in Rasli Bahari were distributed to Sembritzky and used to purchase the condominium.    Accepting the deed on behalf of the grantee, Goldie Rose, was her agent and attorney in fact, Sembritzky.

-6-

### *Cause of Action for Constructive and Resulting Trust*

17.     Defendant was to pay distributions to Christina Hardin that equaled 5% of the distributions made to Sembritzky in the water desalination project, including Rasli Bahari, Ltd. Instead, Defendants have wrongfully, and in violation of their duties owed to Christina Hardin, absconded with money rightfully belonging to her as a result of Intervenor's investments in Rasli Bahari. Defendants have used the funds they improperly took in violation of their duties and purchased real estate and other items for their personal use. These improper purchases include the purchase of the condominium at 2727 Kirby. Intervenor seeks the imposition of a constructive and resulting trust on all of the properties purchased by Defendants with the use of the funds Rasli Bahari distributed, including but not limited to, Unit 26L of the condominium at 2727 Kirby.

### *Cause of Action for Conversion, Defalcation*
### *And Violation of Texas Theft Liability Act*

19.     Conversion is the wrongful exercise of dominion or control over property. Defalcation is the civil form of the crime of embezzlement and is a proper claim when a fiduciary breaches his or her duty by inadequately accounting for funds held in a fiduciary capacity or misapplying those funds. The elements of a claim under the Texas Theft Liability Act are that: (i) a defendant unlawfully appropriated, secured, or stole the plaintiff's property or services as described by various sections of the Texas Penal Code, including the theft of invested funds for a specific purpose; (ii) the unlawful taking was made with the intent to deprive the plaintiff of the property; and (iii) the plaintiff sustained damages as a result of such theft.

20.     The proceeds of the various invested funds were for the benefit of Rasli Bahari and its investors. Defendants exercised dominion and control over these proceeds and caused them to be distributed to or used for Defendants' personal use. Defendants inadequately accounted

Certified Document Number: 80782647 - Page 7 of 11

for those funds and their uses. Christina Hardin is entitled to 5% of all funds raised by, and or distributed to Sembritzky.

### *Misapplication of Fiduciary Property*

21.     Section 32.45 of the Texas Penal Code provides that a person who "intentionally, knowingly, or recklessly misapplies property held as a fiduciary...in a manner that involves substantial risk of loss to the owner of the property" commits the offense of misapplication of fiduciary property.

22.     A "fiduciary" is defined to include an officer or manager carrying on fiduciary functions on behalf of fiduciary. Sembritzky was an officer or manager of Rasli Bahari. Sembritzky was a fiduciary of Rasli Bahari and its investors and owners, one of whom was Hardin.

23.     To "misapply" means to "deal with property contrary to (A) an agreement under which the fiduciary holds the property or (B) a law prescribing the custody or disposition of the property."

24.     The law proscribing the custody or disposition of the property includes, without limitation, common law fiduciary duties of loyalty, due care, good-faith, integrity, fairness, candor and honesty, avoidance of self-dealing, full disclosure of all matters affecting Rasli Bahari and its investors, including all material information concerning transactions involving Rasli Bahari, and a duty to account for all funds invested for the purpose of building the Rasli Bahari water plant.

25.     Hardin is entitled to an accounting for the funds invested in the project and for the funds distributed to, or for the benefit of, Sembritzky, in order to determine and recover that portion of the funds belonging to Hardin.

### *Contract Damage Claims*

-8-

26.     Defendants are also liable to Intervenor Hardin for breach of the above described conduct under contract theories and principles of equity including, without limitation, under the doctrine of quantum meruit, unjust enrichment, and for money had and received.

### *Actual Damages*

27.     The acts and omissions of Defendants were the proximate and producing cause of direct, incidental, and consequential damages to Intervenor within the minimum jurisdictional limits of this Court. Defendants, jointly and severally, are liable to Intervenor and on behalf of others similarly situated for actual direct, incidental, and consequential damages caused thereby including, without limitation, disgorgement of all money and property owed to Christina Hardin and received by Defendants.

### *Cause of Action for Accounting*

28.     Intervenor is entitled to an accounting from Defendants for all funds distributed from Bounty of the Ocean, and Rasli Bahari to Sembritzky, or for his benefit.

### *Attorneys' Fees*

29.     Intervenor seeks to recover her reasonable and necessary attorneys' fees and other expenses of litigation from all Defendants to the extent provided by law.

### *Exemplary Damages*

30.     Defendants conduct described above is so outrageous, egregious and improper and made with specific intent to cause substantial injury or harm to Intervenor. Accordingly, Intervenor should be awarded exemplary damages.

### *Prayer*

For these reasons, Intervenor Christina R. Hardin prays for judgment for all relief requested

-9-

herein including, without limitation, as follows:

    a.       Judgment against Defendants, jointly and severally, for actual and exemplary damages and for reasonable and necessary attorney's fees;

    b.       Judgment imposing a constructive trust on all minerals recovered, proceeds of projects made possible by receipt investor funds, and all real and personal property, including but not limited to the 2727 Kirby condominium, acquired or improved with the proceeds of and monies distributed to Sembritzky.

    c.       Judgment for attorneys' fees and expenses of litigation and all other relief, general or special, at law or in equity, to which Intervenors may be entitled.

Respectfully submitted,

By: /s/ *Tom F. Coleman*
    Tom F. Coleman
State Bar No. 04572000
2 Sawmill Grove Ct.
The Woodlands, Texas 77380
(918) 760-9438 telephone
(713) 523-2804 telecopier
Attorney for Christina R. Hardin

Certified Document Number: 80782647 - Page 10 of 11

-10-

**Certificate of Service**

I certify that on the __13th__ day of ____July___, 2018, a true and correct copy of the foregoing was served on:

Angela Pence England, TINDALL ENGLAND PC, 1300 Post Oak Blvd., Suite 1550, Houston, Texas 77056 by:

    __x__ telefax   (713)   622-8744   and/or   email   *apengland@tindallengland.com* / *cschwarz@tindallengland.com* / *service@tindallengland.com*

Patricia N. Carter, 1177 West Loop South, Suite 700, Houston, Texas 77027 by:
    __x__ telefax_____and/or email *scmservice@shortcartermorris.com*

Allan D. Goldstein/James D. Salyer, 1980 Post Oak Boulevard, Suite 700, Houston, Texas 77056 by
    __x__ telefax_____ (713) 966-7230 and/or email *allang@mlhs.net* / *jsalyer@mlhs.net*

          *s/ Tom F. Coleman___*
          Tom F. Coleman

Certified Document Number: 80782647 - Page 11 of 11

-11-



I, Chris Daniel, District Clerk of Harris
County, Texas certify that this is a true and
correct copy of the original record filed and or
recorded in my office, electronically or hard
copy, as it appears on this date.
Witness my official hand and seal of office
this   July 27, 2018

Certified Document Number:        80782647 Total Pages:  11

Chris Daniel, DISTRICT CLERK

HARRIS COUNTY, TEXAS

**In accordance with Texas Government Code 406.013 electronically transmitted authenticated documents are valid. If there is a question regarding the validity of this document and or seal please e-mail support@hcdistrictclerk.com**

Employment and Confidentiality Agreement

# Employment and Confidentiality Agreement

This Agreement is made as of this _____ day of October, 2014 (hereinafter, the "Effective Date").

### By and between

1. Ms. Christina R. Hardin, on behalf of CRCH, Inc., a company incorporated and registered in Texas whose registered office is at 9950 Westpark Dr., Suite 518, Houston, Texas 77063 (hereafter "CRCH") and

2. Rocky Sembritzky, on behalf of Azul Development, LLC, a company incorporated and registered in Delaware whose registered office is at 1135 Sugar Creek Blvd, Sugar Land, Texas 77478, (hereinafter, "Azul").

CRCH and Azul are referred to hereinafter individually as "Party" or collectively as "Parties".

### Whereas

I. The Parties wish to enter into negotiations in order to establish a commercial relationship in connection with the development of a seawater reverse osmosis desalination facility in or near Mauritania, Africa (hereinafter, the "Project");

II. Azul Development, LLC desires to hire and retain CRCH and Christina R. Hardin as the Administrative Manager for project implementation and co-ordination for the Project;

III. The Parties believe that during such implementation and co-ordination, the Parties may disclose information, data, analysis, computer designs, marketing plans and other specific related documents about the Parties' businesses they may seek to keep confidential and proprietary; and,

IIII. The Parties desire to provide for confidential and proprietary treatment of such information disclosed.

Wherefore, in consideration of these premises, the sufficiency of which is hereby acknowledged by each of the Parties, the Parties hereby agree as follows:

### Employment Agreement

**One**
Hardin, for herself and CRCH, Inc. agrees to be employed by Azul, and any successors or assigns, in the capacity of Administrative Manager. Hardin will be directed as to duties and responsibilities solely by Rocky Sembritzky on behalf of Azul, and shall report solely

Certified Document Number: 80782648 - Page 1 of 4


PLAINTIFF'S EXHIBIT
A

Two

Hardin shall receive as consideration for the services rendered hereunder assignment of an undivided five (5%) percent equity ownership in Azul, its successors and assigns and of any company to-be-created for the implementation of the Project. From and after initial funding of the Project, Hardin will received and by paid the sum of $2,500.00 on the 1st and 15th of each month as a non-refundable draw against the expected income from distributions attributable to the undivided five (5%) percent equity ownership in Azul, its successors and/or assigns. In addition, Hardin will be reimbursed for all expenses incurred and approved by Azul and payment for such approved expenses shall be made on the dates of each draw.

Three

This employment contract may be terminated, with or without cause, by Azul, its successors and/or assigns upon 30 days notice in writing to Hardin. Such termination shall not affect or relieve Azul, its successors and/or assigns from the payment obligations set out herein, and such payments and draw shall continue to be made and the equity ownership shall be retained, and owned, by Hardin. Hardin shall be entitled to terminate this employment contract in writing for cause, to be determined in Hardin's sole discretion, and the payment obligations set out herein shall not be affected or diminished. Hardin may terminate this employment contract in writing without cause, and in such case, the draw against distributions attributable to the equity ownership shall cease. Ownership of the five (5%) undivided interest shall remain in Hardin.

Confidentiality Agreement

One

For the purpose of this Agreement, the term "Proprietary Information" shall mean any information, whether disclosed or submitted in writing or orally, store on paper, disk, tape, or other device, provided by the disclosing party (hereinafter, the "Disclosing Party") to the other Party (hereinafter, the "Receiving Party") concerning any and all non-public, confidential or Proprietary Information distributed or made available by the Parties, each of their respective directors, officers, partners, members, employees and other professional representatives or agents (collectively, "Representatives"), successors and permitted assigns, concerning data, know-how, drawings, reports, specifications, processes procedures, integration data system and other concepts, business plans, financial conditions, operation results, properties, assets, customers, suppliers, costs, liabilities, future prospects or technical data of the Project.

Two

Any Proprietary Information disclosed by the Disclosing Party shall be under this Agreement and the following requirements:

a. The Receiving Party shall limit to other agents directly involved in supporting and evaluating the Project and who have a specific need to know the access to Proprietary Information;

b. The Receiving Party shall advise all persons with access to Proprietary Information of the requirements for non-disclosure contained in this Agreement and agree to be responsible for any unauthorized disclosure of Proprietary Information by its Representatives;

c. No Proprietary Information may be used by the Receiving Party except to the extent necessary to evaluate and in furtherance of the Project; and

d. The Receiving Party shall not disclose any Proprietary Information without the prior written consent of the Disclosing Party except to if the extent Proprietary Information is:

Certified Document Number: 80782648 - Page 2 of 4

1. Required by to comply with any requirement of the Court or State Authorities (the Receiving Party will make its best efforts to notify to the Disclosing Party prior to its compliance with such requirement and to cooperate in its efforts to convince the Court or the State Authorities to restrict disclosure); or

2. Be known to or in the possession of the Receiving Party prior to the disclosure thereof as evidenced by its own records, files and any other manner; or

3. Be known or generally available to the public without any action or omission of the Receiving Party breaching this Agreement; or

4. Made available free of legal restriction to the Receiving Party by the Parties or by any third party.

Three

All information provided by the Disclosing Party shall be deemed as Proprietary Information unless the Parties shall declare otherwise in writing. Proprietary Information provided in any kind of physical form shall not be duplicated by the Receiving Party except to the purposes and in furtherance of this Agreement.

Upon the request of the Disclosing Party, the Receiving Party shall return or destroy, all the Proprietary Information received in written or tangible form, including copies reproductions or other media containing such Proprietary Information.

Four

This Confidentiality Agreement shall be effective as of its signature and for a term of 3 (three) years following the Effective Date. It may be extended by mutual express agreement through appropriate amendment. Notwithstanding the foregoing, and unless otherwise have been set in the previous clause, the duties contained herein, in particular the duties to keep the confidentiality of the Proprietary Information and neither use it, shall survive to any termination or expiry of the Agreement upon to five (5) years after such termination or expiry. Furthermore, the obligation of not disclosure shall not be affected by bankruptcy, receiverships, assignment, attachment, or seizure proceedings, initiated by or against the Receiving Party, nor by the rejection of any proposal between the Parties, by a trustee of the Receiving Party in bankruptcy, or by a receiver or the equivalent of any of the foregoing under the local law.

General Provisions

One

The Parties hereby covenant and agree not to circumvent, avoid, bypass, or obviate each other, directly or indirectly, at any time and for any reason and in particular agree not to do so to avoid payment of fees, commissions, or any other form of compensation in any transaction with any corporation, partnership, or individual revealed by either party to the other in connection with the Project.
The Parties further covenant and agree not to directly or indirectly initiate, solicit, negotiate, contract or enter into any business transactions, agreements or undertakings with any person or entity revealed by either party to the other without the express prior written consent and approval of the party revealing the person or entity in question.

Two

The Disclosing Party does not make any warranty or representation as to the suitability, accuracy or completeness of any Proprietary Information disclosed under this Agreement and nothing contained herein shall be construed as granting or conferring any rights by license or about any Proprietary Information. Proprietary Information may pertain to prospective or unannounced products or opportunities relating to the Project. Furthermore the Disclosing Party shall not be responsible for the use that the other Party may make of the Proprietary Information provided, and for the decisions it might take based thereon.

Certified Document Number: 80782648 - Page 3 of 4

No Party shall be liable to any other Party for any consequential indirect, special or punitive losses or damages, whether arising in contract, warranty, tort (including negligence) and strict liability or otherwise, including but not limited to, losses of use, profits, business, reputation or financing, that may arise out of breach of the Confidentiality Agreement.

Four

This Agreement represents the entire Agreement between the Parties with respect to the subject matter herein mentioned. Neither Party may assign any of its rights or delegate any of its obligations hereunder without the prior written consent of the other Party, which shall not unreasonably be withheld. Neither this Agreement nor any of the terms hereof may be amended, supplemented, waived or discharged unless both Parties so agree in writing. This Agreement shall be binding on the Parties' successors and permitted assigns.

Five

Any provision of this Agreement that would be prohibited or unenforceable in any jurisdiction shall, as to such provision and such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions of this Agreement or affecting the validity or enforceability of such provision in any other jurisdiction.

Six

This Agreement shall be governed by, and construed in accordance with, the laws of the State of Texas.

Any dispute, controversy or disagreement arising hereunder or any dispute with respect to validity of this Agreement (the "Dispute") which is not settled by the Parties by mutual discussions within 30 (thirty) days or within a mutually extended period, from the date of receiving the notice of Dispute by a Party from the other Party then such Dispute shall be referred to arbitration in accordance with the Rules Of Arbitration of the International Chamber of Commerce (ICC) by three (3) arbitrators appointed in accordance with the said Rules. The seat, or legal place, of arbitration shall be the City of Houston, Texas. The language of the arbitration shall be English. The award passed by the arbitral tribunal shall be final and binding on the Parties.

Seven

This Agreement may be executed in two (2) counterparts and when executed by the Parties shall constitute a single binding agreement.

By Azul Development, LLC


Rocky Sembritzky
Managing Partner, Azul Development, LLC


CRCH, Inc.

by:_____
Christina Hardin, individually and as President of
CRCH, Inc.

2

Certified Document Number: 80782648 - Page 4 of 4



I, Chris Daniel, District Clerk of Harris
County, Texas certify that this is a true and
correct copy of the original record filed and or
recorded in my office, electronically or hard
copy, as it appears on this date.
Witness my official hand and seal of office
this   July 27, 2018

Certified Document Number:        80782648 Total Pages:  4

Chris Daniel, DISTRICT CLERK

HARRIS COUNTY, TEXAS

**In accordance with Texas Government Code 406.013 electronically transmitted authenticated
documents are valid. If there is a question regarding the validity of this document and or seal
please e-mail support@hcdistrictclerk.com**

From: **Christina Hardin** hardinchristina@me.com
Subject: **Fwd:**
Date: **Mar 7, 2016 at 12:00:43 PM**
To: **Tom Coleman** coleman.tom@gmail.com

**Begin forwarded message:**

**From:** "Christina Hardin" <hardinchristina@me.com>
**Date:** November 06, 2014 12:12:29 PM
**To:** "Tom Coleman" <coleman.tom@hotmail.com>
**Subject:** Fwd:

**Begin forwarded message:**

**From:** rocky@azul-development.com
**Date:** October 28, 2014 2:48:53 PM
**To:** hardinchristina@me.com
**Subject:**

Christina,

I am fine with everything except Azul being referenced.  I also changed the address.

Press On,

Rocky Sembritzky

713-382-8068

Certified Document Number: 80782649 - Page 1 of 2



From: Christina Hardin hardinchristina@me.com
Subject: Fwd: Going forward - Rocky's intent
Date: Feb 20, 2016 at 8:54:20 AM
To: Tom Coleman coleman.tom@gmail.com

I have more

Begin forwarded message:

**From:** rocky@azul-development.com
**Date:** December 20, 2014 12:10:37 PM
**To:** hardinchristina@me.com
**Subject:** Going forward

Christina,

My intent has always been for us to work together and for you to have a direct ownership interest. Neither of us would be in this position without the other.

I did not finalize forming Rubicon because I did not have much faith in the Mauritania project. Once we know that Malcolm is fully on board, I will push the buttons and you will be an owner and a officer.

I hope this removes any doubts you may have regarding my intentions and us being a team going forward.

Have fun with Emma and have a great Christmas.

Press On,

Rocky Sembritzky

713-382-8068

Certified Document Number: 80782649 - Page 2 of 2



I, Chris Daniel, District Clerk of Harris
County, Texas certify that this is a true and
correct copy of the original record filed and or
recorded in my office, electronically or hard
copy, as it appears on this date.
Witness my official hand and seal of office
this   July 27, 2018

Certified Document Number:        80782649 Total Pages:  2

Chris Daniel, DISTRICT CLERK

HARRIS COUNTY, TEXAS

**In accordance with Texas Government Code 406.013 electronically transmitted authenticated documents are valid. If there is a question regarding the validity of this document and or seal please e-mail support@hcdistrictclerk.com**

# EXHIBIT 5

 **RASLI BAHARI KENYA LTD.** | The Stables, 2ⁿᵈ Floor, Suite No. 68, Karen Road, Karen, Kenya

**Private Placement Memorandum**
**Confidential Information dated October 14, 2015**

**This document is the Regulation D, Rule 506 Private Placement Letter Offering for Rasli Bahari Kenya Limited (RBKL), offered to accredited investors.**

**RBKL is in the process of raising $175,500,000.00 for the first of two desalination - mineral recovery facilities in Kenya (Mombasa and Lamu). The company anticipates raising these funds from US accredited investors and from Kenyan accredited investors. The proceeds from the sale of the stock can be found on page twenty-nine of this offering document.**

**Currently RBKL is offering U.S. accredited investors in order to raise the initial $20,000,000.00**

**Interested investors can contact Rocky Sembritzky for further information or backup documentation.**

rocky@vbkl.org or rocky@rbkl.org

www.vbkl.org

 Mobile 713-382-8068

Thank you for your interest.

**Thank you for your interest in RBKL.**

# *CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM*

# RASLI BAHARI KENYA LIMITED

# $175,500,000.

*1,000 Shares of Common Stock at $175,500. per Share*

*Minimum Investment: 5 Shares ($877,500.)*



**FOR ACCREDITED INVESTORS ONLY**

**RASLI BAHARI KENYA LIMITED**

**The Stables,**

**2nd Floor Suite 68**

**Karen Road, Karen**

**PO BOX 27970-00100**

**Nairobi, Kenya**

5

Creativity is just connecting things. When you ask creative people how they did something, they feel a little guilty because they didn't really do it, they just saw something. It seemed obvious to them after a while. That's because they were able to connect experiences they've had and synthesize new things. And the reason they were able to do that was that they've had more experiences or they have thought more about their experiences than other people. Unfortunately, that's too rare a commodity. A lot of people in our industry haven't had very diverse experiences. So they don't have enough dots to connect, and they end up with very linear solutions without a broad perspective on the problem. The broader one's understanding of the human experience, the better design we will have.

Steve Jobs

## *WATER DESALINATION INTEGRATED WITH MINERALS RECOVERY*

A SUSTAINABLE AND ECONOMIC SOLUTION FOR THE GLOBAL WATER PROBLEM

6

**OFFERING
SUMMARY**

**RASLI BAHARI KENYA
LIMITED**

**"RBKL"**

**October 14,
2015**

**$175,500,000.**

**1,000 Shares of Common Stock**

**Offering Price: $175,500. Per
Share**

**Minimum Investment: 5 Shares ($877,500.)**

7

## FOR ACCREDITED INVESTORS ONLY

The following executive summary is qualified in its entirety by the more detailed information appearing in the exhibits to this Offering Summary and related business information and documents regarding the Company and its management.

**ISSUER:**  RBKL is a Kenya LLC (the "Company") and was formed in March 2015.  The Company's executive offices are located at The Stables, 2nd Floor, Suite 68, Karen Road, Karen, P.O. Box 27970-00100 Nairobi, Kenya.

**SECURITIES OFFERED:**  A maximum of 1,000 Shares of Common stock of RBKL (the "Shares") for a purchase price of $175,500. per Share. The Shares will be sold only to Accredited Investors, as that term is defined in Regulation D promulgated under the Securities Act of 1933, as amended.

**SALES TERMINATION DATE:**  October 31, 2015, unless extended for up to an additional 30 days.

**PLAN OF DISTRIBUTION:**  The Shares will be offered on a "best efforts" basis by RBKL.

**RISK FACTORS:**  Any forward-looking statements or financial projections made by the Company's management are estimates only. There is no assurance that the Company will actually achieve the results indicated in forward-looking statements, estimates or financial projections.  See Exhibit B to this Executive Summary for additional risk factors.

**ADDITIONAL INFORMATION:**  Additional information regarding the business, management, contracts and financial condition of the Company is attached to this Executive Summary as Exhibits and or available upon request.  Executive officers and directors of the Company are available to answer questions and provide additional information to any requesting prospective investor.

Attached to this Executive Summary are the following exhibits:

| | |
|---|---|
| Expanded Business Summary | Exhibit A |
| Risks | Exhibit B |
| Supporting Documents | Exhibit C |

8

ONLY INFORMATION OR REPRESENTATIONS CONTAINED HEREIN MAY BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE COMPANY.  NO PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATIONS OTHER T H A N  THOSE CONTAINED IN THIS EXECUTIVE SUMMARY AND THE EXHIBITS THERTO IN CONNECTION WITH THE OFFER BEING MADE HEREBY, AND IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATIONS MUST NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE COMPANY.   INVESTORS ARE CAUTIONED NOT TO RELY UPON ANY INFORMATION NOT EXPRESSLY SET FORTH IN THIS EXECUTIVE SUMMARY AND THE EXHIBITS THERTO.   THE INFORMATION PRESENTED IS AS OF THE DATE ON THE COVER HEREOF UNLESS ANOTHER DATE IS SPECIFIED, AND NEITHER THE DELIVERY OF THIS EXECUTIVE SUMMARY AND THE EXHIBITS THERETO NOR ANY SALE HEREUNDER SHALL CREATE ANY IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE INFORMATION PRESENTED SUBSEQUENT TO SUCH DATE(S).





10

EXHIBIT A

# EXPANDED BUSINESS SUMMARY
## OF

# RASLI BAHARI KENYA
## LIMITED

11

# Change the World

### An introduction by the founder of RBKL, Rocky Sembritzky

The process you will be reading about started in 2009 while developing a project for Dow Chemical in Texas. At the time we were developing a $2 billion dollar gasification-petrochemical project and we were concerned about future water constraints. Since we were next to the ocean we began to consider the option of desalination. Like many before us, we looked at available desalination technology and our original conclusion was that desalination was too expensive. However, once we began to study the brine reject stream, we discovered we would be throwing millions of dollars away. To add insult to injury, we would also be harming fragile marine life. This was the "aha" moment, harvest the minerals and change the world.

I take great pride in the fact that every project I have developed has been more than 92% efficient and they have all been "green". My approach to development runs counter to most if not all energy developers. My approach has always been the same, look at the worst first. I began by a careful study of the environmental issues first to determine what the options were to protect the environment. Secondly, how can efficiency be maximized? Once these have been optimized, the economic solutions present themselves clearly. I have found that by maximizing efficiency and minimizing environmental impacts, the economics are typically quite robust. Unfortunately many projects waste millions of dollars before they ever get off the ground by trying to contest them rather than putting environmental impacts first. Further resolution of the water shortages becomes even more acute during the delays. It takes fifty barrels of water to refine one barrel of oil. In any energy complex, water is the biggest consumer. Water is the new global currency.

The Rasli Bahari process eliminates all reject streams by harvesting the minerals, eliminating polluting discharges and thus protecting marine life. The process also lowers the cost of unsubsidized produced water making RBKL the low cost provider of drinking water or demineralized water around the world. By processing minerals from the waste and with the infrastructure in place to sell our minerals, we can actually provide water at $2.50 per 1,000 gallons, representing only about 6% of the project's revenue.

This project will not only change Kenya but will become a cost effective and eco-friendly model for the world and obsoleting older desalination facilities in the world. In addition, we will become the low cost provider of the highest purity minerals, which command the best prices. Since most minerals are mined, the Opex cost of production is vastly higher. We will be able to provide discounts for our minerals FOB in country at 20% below global commodity prices and still yield large profits. (Please see the attached proforma and mineral history pricing)

It is important to note that each component used in the process has years of proven operational history and has been financed numerous times. The biggest risk for Kenya is to not act, resulting in a situation similar to that currently being experienced in California or choosing a plant design with high operating costs and high costs to the environment. Water companies focus on water and mineral companies typically focus on one or two minerals leaving large economic gaps and environmental issues. RBKL's design utilizes everything and wastes nothing.

You should read the entire document to ensure that you understand the risks associated with our investment opportunity and the rewards that come with them.

Your investment in RBKL is designed to yield outstanding returns from its mineral processing facilities while providing all revenue from water sales of about $20 million annually to our JV partner Millennium Water Alliance Kenya which is helping to bring safe drinking water for all of Kenya under Kenya's Vision 2030.

Sincerely,

*Rocky*

Rocky Sembritzky

Confidential

12

## EXECUTIVE SUMMARY

Rasli Bahari Kenya Limited was formed in March of 2015 to design, construct and own 3 0 MGD desalination with mineral recovery facilities for Mombasa and in the Lamu area. Both facilities are being designed from inception with expansion capability to 90 MGD in order to meet Kenya's current and growing water demand. The current demand in and around the Mombasa coastal region is 92 MGD. The forecasted demand by the Coast Water Service Board for 2035 is 165 MGD. The forecasted demand for Lamu is 67 MGD by 2035 according to LAPSSET, Lamu Port-Southern Sudan-Transport.

The map below reflects a very common situation found around the world. Most coastal areas are reliant on receiving all of their water from inland sources.



In the case of Mombasa, water flows 220 Km (137 miles) from Mzima Springs, Barichio Intake 90 Km (56 miles) and 30 Km (18 miles) from Marere Water Works to Mombasa. By utilizing the natural source of seawater in Mombasa, the inland areas could make use of the water being piped to Mombasa to reduce the strain on existing inland water sources. The increase of production of seawater can be coordinated to offset inland supplies. RBKL will be able to provide clean drinking water and demineralized water in high demand for industry use. According to the Kenya Association of Manufacturers, the lack of consistent water delivery has caused some manufacturers to move.

Confidential

13

There are two extreme differences between RBKL's process and conventional desalination facilities. The first is maximum efficiency, RBKL's zero discharge plant designed for 30MGD of desalinated water production only consumes and processes 30 MGD of seawater. This stands in sharp contrast to conventional plants, where seawater-processing capacity must be more than doubled to generate a similar yield of desalinated water.

For example, a conventional desalination plant producing 30MGD of desalinated water bears the cost of processing approximately 70 MGD of seawater. The greater efficiency of a zero discharge plant affects the design and overall footprint of intake systems and greatly reduces the plant's energy requirements for the intake and pretreatment systems.

RBKL uses an enhanced pretreatment system to enable high purity mineral recovery. This reduces energy consumption in the reverse osmosis (RO) stage, where membranes designed with maximum flux allow the system to operate at lower pressures without any impact on water yield or purity.



RBKL's desalination produces ultra-pure water due in part to multi-stage filtering that enables high-quality mineral extraction. This increased purity will be a key differentiator, increasing the dollar value of water produced at a zero discharge plant. This water can be used as drinking water (premium bottled or blended into municipal supplies), used as industrial makeup water or used in high-intensity agriculture. As drinking water, RBKL's desalinated water can be used as is, remineralized (internally from minerals recovered during processing), or used to improve the quality of marginal ground water. Increasing the economic viability of existing water supplies is an important intervention in curbing the need to tap pristine or ecologically threatened sources.

14

This ultra-pure water is also well suited to use in industrial applications. Water free of solids and minerals is superior for use in cooling towers, boilers and plumbing as it eliminates issues with scaling, buildup and corrosion common with hard water. Industrial water reclamation or recycling processes will also benefit from this purity.

In agricultural applications, the single most important benefit is the fact that this water will not contribute to the widespread problem of soil salination. Soil salination is exacerbated by the use of pesticides and fertilizers in agricultural applications.

The net effect is that as salt levels increase in soil, crop yields fall and water demands increase. Using ultra pure water can alleviate this problem when combined with sound land management practices.



The second and the main economic driver for RBKL is Low-Cost Mineral Extraction while conventional plants focus on generating fresh water (everything else "lost" in processing is treated as waste brine), RBKL's zero discharge plant

Confidential

15

incorporates minerals recovery during the course of processing seawater. This supports the ultra-high water yield efficiencies stated above, but just as importantly, it creates additional revenue streams through the sustainable extraction of high-purity industrial minerals, including: Salt, Magnesia, Calcium Chloride, Gypsum, Potash, Bromine and Boric Acid, all in very high purity, pharmaceutical quality.

This built-in minerals recovery process is the key competitive advantage, with far-reaching economic rewards and very positive environmental implications.

- Profits increased by recovery of industrial/agricultural commodity minerals
- Recovery of these minerals eliminates the waste brine stream.
- Disposal costs are virtually eliminated Mineral recovery is more cost-effective and less destructive than traditional mining activities, and will eventually replace current extraction methods than traditional mining activities, and will supplant traditional expensive extraction methods.



**Notes**
1) Intake system may be remotely located from seawater source limiting seafront plot to 2-3 acres
2) Periodic brackish water (<5 ppt salinity) return occurs during low freshwater flow to enhance oyster reef health
3) Typically 8 hour brine storage – enabling offpeak operation

Confidential

16

## DESALINATION ECONOMICS

Financial models indicate that a zero discharge facility will generate between 85-90% of revenue from mineral by-products, and the remaining 10-15% from the ultra pure water produced. Conventional desalination facilities generate water at a cost of $4.00-7.00 per 1000 gallons, RBKL's price is $2.50. Revenue from the recovered minerals allows RBKL to produce desalinated water at a much lower cost.

This innovative value creation and the associated ongoing operational savings are key factors for understanding the economics of RBKL's zero discharge desalination facilities. By running at nominal capacity, 30MGD plant owners will have earnings before interest and tax (EBIT) of approximately $300+M* per year, capable of retiring capex financing in as little as three years.

RBKL's zero discharge desalination plants are also future-proof. Our 30MGD plant can easily be tripled in size (provided sufficient access to a reliable seawater source) because of its modular design and reliance on commercially available components. Projections for future needs can also be taken into consideration for establishing a phased growth plan for primary sites, or for additional desalination facilities.

Another distinct advantage RBKL has, is a lower to market cost of finished mineral products. Large established mineral companies such as the largest salt producer in the world and the fifth largest potash producer, mine the traditional way. Our COGS will typically be 30% less than that of traditional mineral mining companies.  Most of these mines are underground as pictured below.



Confidential

17



This type of mining is capital intensive and inefficient. A new potash mine in Canada is currently under development at a cost of $3.2 billion, which does not include the cost of material handling. Obviously this is a very large mine. RBKL can locate our harvesting process anywhere on the coast where the population demands it.  In simple terms, the mine comes to us.

Any minerals sold within Kenya will be priced 20% below market pricing. Exports will be increased reducing Kenya's current trade deficit and mineral raw materials will spawn new industries as well.

*Based upon salt pricing of $75.00 sTPD. Current high purity salt price is $155.00 sTPD.

## HUMANITARIAN IMPACT

While most offerings of this type are mainly focused on economics, RBKL's offering is quite unique. As previously mentioned above, all water revenues are by our JV partner, Millennium Water Alliance Kenya. In addition to providing lower than market cost water, Millennium Water Alliance Kenya will be able to assist in providing safe drinking water to the remote areas of Kenya that currently have no access to clean water.  Kenya Vision 2030 envisions clean safe water for all Kenyans by 2030. The Millennium Water Alliance Kenya provides a comprehensive approach called WASH – water and sanitation, health and hygiene training. HE Mwai Kibaki, Third President of Kenya is the Patron of our JV partner Millennium Water Alliance of Kenya.

Confidential

18



All investors in RBKL will know that in addition to economic returns, the humanitarian impact will be immense. It can also be said that from an environmental standpoint, our projects will be clean and not harm the environment.

Confidential

19

## MINERAL HARVESTING AND MINERAL MARKETS

Mineral harvesting allows RBKL to provide a low cost source of new, dependable and predictable water supply in addition to high purity minerals. Annual production is calculated at 345 days per year to allow for proper servicing and maintenance of equipment. Normal seawater composition has been used for the mineral calculations.

In addition to 30 MGD of new water, the facility will produce seven minerals and reclaimed top soil. The daily and annual production numbers along with current the current pricing are as follows:

Salt (NaCl) vacuum grade, 4450 metric tons per day (MTPD) or 1,535,250 MTPY @ $180.00 per metric ton

Potash (KCl) high purity fertilizer, 125 MTPD or 43,125 MTPY @ $350.00 per metric ton

Gypsum (CaSO4) high purity fertilizer, 645 MTPD or 222,525 MTPY @ $200.00 per metric ton

Bromine (Br2) flame retardant, 13 MTPD or 4,485 MTPY @ $3,500.00 per metric ton

Boric Acid (B2O3) agriculture and industrial grade, 2.5 MTPD or 862 MTPY @ $1,000.00 per metric ton

Calcium Chloride (CaCl2) agriculture and industrial grade, 644 MTPD or 222,180 MTPY @ $250.00 per mt

Magnesium Hydroxide (MgO) industrial grade, 664 MTPD or 602 MTPY @ $1,000.00 per metric ton

Organic Top Soil, 15 MTPD or 5,175 MTPY @ $25.00 per metric ton.

The mineral market demand numbers are as follows:

SALT

Worldwide demand for salt is forecast to climb 1.5 percent annually through 2018 to 324 million metric tons. Salt consumption growth in the Asia/Pacific region is projected to outpace the global average and offset flat trends expected in North America and Western Europe. Ongoing expansion in China's chemical manufacturing industry will underpin overall advances. Salt suppliers are also projected to benefit from increases in North America's chlor-alkali output, spurred by low natural gas prices in the region. The annual world production of salt exceeds 200 million tons. Approximately one third of the total is produced by solar evaporation of seawater or inland brines. Another one third is obtained by mining of rock salt deposits, both underground and on the surface. The balance is obtained as brines, mainly by solution mining.

POTASH

Worldwide, the increasing demand for potash is expected to exceed the current supply. Over the last decade, the potash industry has experienced rapid growth mostly as a result of higher demands for food, feed and fuel. Potash production is limited to only 12 countries around the world. The vast majority of global production comes from 3 producing nations: Canada, Russia and Belarus. Canada is the world's largest producer with the province of Saskatchewan hosting the country's epicenter of global potash production. Encompassing three of the world's leading producers---Mosaic Co., Potash Corp., and Agrium, Saskatchewan offers the resources, infrastructure, government policies and labor force needed to flourish in the industry.

Confidential

20

Production costs typically depend on the grade of the deposit, ore depth, consistency, thickness, continuity and the amount of insoluble material contained in the ore body. Mining costs increase as the potash beds become twisted or folded. Potash is used as a major agricultural component in 150 countries. The largest importers of potash are the heavily populated countries of China, India and Brazil. Asian nations produce only 3.1 million tons while consuming 23.1 million tons. The state of potash producing infrastructure is in decline as about 85% of the world's facilities are more than 25 years old.

GYPSUM

The gypsum market is forecast to grow at a compound annual growth rate (CAGR) of 9.9% to reach approximately US $2.4bn by 2018, and US $3.8bn by 2023, according to a new report by analysts Smithers Apex. 'The Future of Gypsum: Market Forecasts to 2023' reports that 252 mt of gypsum is expected to be consumed in the year 2013, with 31.9% and 62.5% being consumed in the plasterboard and cement industries respectively.

The gypsum market study reports that about 75% of gypsum is used in wallboard manufactured in the US and Western Europe. Outside of these regions, Smithers Apex reports that one of the major factors driving gypsum consumption is population growth, particularly in India and China, as developing countries move from traditional wet construction techniques towards dry construction using materials such as prefabricated wallboard. Countries such as China are also encouraging wallboard usage through government policies.

The report also describes how a large portion of the world's gypsum is produced from a very large number of small operations in developing countries. For example, there are as many as 400 mines in Iran and probably more in China.

BROMINE

The global bromine market has grown significantly during the last few years, and it is expected to grow at a rapid pace in the next five years, mainly driven by a growing consumption in the Asia-Pacific region.

Asia-Pacific is the largest and fastest growing consumer of bromine and its derivatives across the world. The bromine derivatives market in Asia-Pacific is expected to grow with a CAGR of 3.27% from 2013 to 2018. China, Japan, South Korea, and India are the major markets for bromine & its derivatives in Asia-Pacific. Other markets in Asia-Pacific include Taiwan, Australia, Singapore, Indonesia, and Thailand. The demand for bromine & its derivatives in these markets is fueled by demand from end-user industries such as oil & gas, construction, pharmaceutical, automotive, textiles, electronics, agricultural, and water treatment.

Flame-retardants are currently the biggest application for bromine and its derivatives market. Its consumption is expected to increase to 729,536.78 tons by 2018. Brominated flame retardants are appropriate for use in industries such as textile, construction, automotive, furnishing, and electronics to protect commodities from fire hazards.

BORIC ACID

Boric acid is the fastest growing, large volume borate material worldwide. Over the past five years, global sales of boric acid have grown by approximately 100,000 metric tons per year to over 600,000 mt and are forecast to grow another 150,000 mt over the next five years. Overall economic growth, new applications, and the substitution of minerals are three fundamental reasons for increasing demand. The global economy is projected to grow over 3% per year in the next few years leading to increasing boric acid demand, particularly in certain geographical regions such as Asia. In North America and Europe, the substitution of CCA with alternative wood preservatives is creating significant new demand for boric acid. The global trend of replacing cathode ray tube (CRT) televisions and monitors, which are made without borates, with flat panel monitors such as liquid crystal displays (LCD) and thin film transistors (TFT), both of which are made with boric acid has created another major new market.

Confidential

21

## CALCIUM CHLORIDE

Increasing demand from the de-icing and dust control application are driving the growth of the calcium chloride market, which is expected to reach $ 1,205.8 million by 2020 from $ 817.4 million in 2013, according to a report from Transparency Market Research (TMR). The market is anticipated to grow at a CAGR of 5.8 percent from 2014 to 2020, added the report. In terms of volume, the global calcium chloride market stood at 3,058.7 kilo tonnes in 2013.

Developing economies in Asia Pacific are expected to be the second fastest growing markets for calcium chloride and accounted for more than 23 percent share in 2013. Growth in end-user industries such as construction in the region is anticipated to boost demand for calcium chloride during the forecast period.

## MAGNESIUM HYDROXIDE

The global consumption of magnesium hydroxide increased by about 13% from 2009 to 2013. The largest end use for magnesium hydroxide, accounting for about 62% of consumption, is in environmental uses—flue gas desulfurization and wastewater treatment. Ease of handling, increasing environmental markets and the high price of caustic soda have spurred demand in these applications. Following the earthquake and tsunami in Japan in 2011, the country has shifted from nuclear power to increased use of more conventional, fossil fuel–based power plants, which has led to increased consumption of magnesium hydroxide for desulfurization. This end-use market is forecast to increase by more than 4% per year in Japan and grow globally by just over 2% per year over the forecast period.

The use of magnesium hydroxide in flame retardants is a fast-growing application (forecast at about 5% per year during 2013–2018), and accounts for about 8% of magnesium hydroxide consumption. Magnesium hydroxide is the second-most-important mineral flame retardant after alumina trihydrate (ATH).

Confidential

22

SAMPLE MINERAL REPORT

## SALT

(Data in thousand metric tons unless otherwise noted)

**Domestic Production and Use:** Domestic production of salt increased by 9% in 2014 to 44.1 million tons. The total value was estimated to be about $2.2 billion. Twenty-eight companies operated 61 plants in 16 States. Five of the seven leading States were, in descending order of total salt sold or used, Louisiana with 33%; Texas, 18%; New York, 17%; Kansas, 6%; and Utah, 5%. Ohio and Michigan were among the top seven leading States in total salt sold or used but their rankings are withheld to protect proprietary data. The estimated percentage of salt sold or used was, by type, rock salt, 42%; salt in brine, 40%; vacuum pan, 10%; and solar salt, 8%.

Highway deicing consumed about 43% of total salt. The chemical industry accounted for about 38% of total salt sales with salt in brine accounting for 91% of the salt used for chemical feedstock. The chlorine and caustic soda manufacturing sector was the main consumer within the chemical industry. The remaining markets for salt were, in declining order, distributors, 8%; food processing, 4%; agricultural, 3%; general industrial, 2%; and other uses combined with exports and primary water treatment, 1% each.

| **Salient Statistics—United States:**[1] | 2010 | 2011 | 2012 | 2013 | 2014[e] |
|---|---|---|---|---|---|
| Production | 43,300 | 45,000 | 37,200 | 40,300 | 44,100 |
| Sold or used by producers | 43,500 | 45,500 | 34,900 | 43,400 | 44,500 |
| Imports for consumption | 12,900 | 13,800 | 9,880 | 11,900 | 18,000 |
| Exports | 595 | 846 | 809 | 525 | 850 |
| Consumption: | | | | | |
| Reported | 48,600 | 48,000 | 36,900 | 47,600 | 54,000 |
| Apparent[2] | 55,800 | 58,500 | 44,000 | 54,800 | 61,600 |
| Price, average value of bulk, pellets and packaged salt, dollars per ton, f.o.b. mine and plant: | | | | | |
| Vacuum and open pan salt | 180.08 | 174.00 | 169.93 | 178.65 | 180.00 |
| Solar salt | 57.41 | 51.19 | 71.87 | 81.36 | 83.00 |
| Rock salt | 35.67 | 38.29 | 36.89 | 47.24 | 55.00 |
| Salt in brine | 7.49 | 8.14 | 8.44 | 8.49 | 8.50 |
| Employment, mine and plant, number[e] | 4,100 | 4,100 | 4,100 | 4,100 | 4,200 |
| Net import reliance[3] as a percentage of apparent consumption | 24 | 22 | 22 | 21 | 28 |

**Recycling:** None.

**Import Sources (2010–13):** Canada, 38%; Chile, 36%; Mexico, 11%; The Bahamas, 5%; and other, 10%.

**Tariff: Item Number Normal Trade Relations**
**12–31–14**
Salt (sodium chloride) 2501.00.0000 Free.

**Depletion Allowance:** 10% (Domestic and foreign).

**Government Stockpile:** None.

**Events, Trends, and Issues:** The 2013–14 winter was colder than the 2012–13 winter, and the amount of frozen precipitation and the number of winter weather events were above normal in many parts of the United States, requiring more salt for highway deicing. Rock salt production and imports in 2014 increased significantly from the levels in 2013 because many municipalities and local and State transportation departments reported low levels of rock salt inventories at the end of the last winter season. Many contracts between salt suppliers and consumers require that the customer take delivery of at least 80 percent of its order, and because of the greatly increased demand for deicing salt, many buyers were experiencing double-digit percentage increases in rock salt prices in these contracts. Salt purchasers without contracts are subject to substantial spikes in pricing if they require an emergency salt allocation.

Prepared by **Wallace P. Bolen [(703) 648–7727, wbolen@usgs.gov**

Confidential

23

## CONSTRUCTION

RBKL will use ACCIONA Agua or Abengoa Water for the EPC (engineering, procurement and construction.)  Both companies will provide a full overall "wrap "for the project which will include all process guarantees and a not to exceed construction price.

## DESALINATION

Abengoa's global resume in desalination includes a total installed capacity that produces more than 320 million gallons of desalinated water per day. Twice in the past five years (2008 and 2013), Abengoa has been recognized for its unique expertise in desalination by being awarded Desalination Company of the Year by the Global Water Intelligence.

ACCIONA Agua is one of the few companies with a considerable background in the application of reverse osmosis technology in the desalination of sea water and brackish water, as is demonstrated by more than 75 installations, in production of potable water is over 710 million gallons per day.

## INTEGRATED PROJECT DELIVER

Combined, both companies have successfully designed and constructed desalination facilities, which produce a total of over 1 billion gallons per day. The typical schedule is six to nine months pre-close activities and a thirteen-month construction period.

# WATER IN KENYA

"Investments in the water sector are geared to support the Vision 2030 goal of improving access to better water and sanitation services for all Kenyans through efficient management of Kenya's scarce water resources."
- World Bank -

Confidential

24

## FINANCING

The water contract for Mombasa with the Coast Water Service Board will have a twenty five year value in excess of $600 million which will be the basis for the debt financing and further supported by additional mineral contracts. The mineral contracts will range anywhere from two to ten years.

The facility is estimated to have a capital cost of $500,000,000.00 which includes very conservative contingencies. The typical financing structure would be 30% equity and 70% debt. RBKL plans to raise $50,000,000 of equity from US investors and the remainder from Kenyan investors.

The RBKL model is based upon intellectual property licensing by country. The IP is a trade secret much like that of Coca-Cola.

The International Finance Corporation (IFC) is currently working in Kenya and is very active in water and sanitation. RBKL is currently working with the IFC and they will be the lead regarding the financing.

The term of the debt will be somewhere between seven to ten years, however using a Capex of $500,000,000, a term of ten years and an interest rate of 7%, the facility would still have a pretax cash flow of $400,000,000. Obviously, the facilities debt could be retired much sooner.

Debt and equity partners:

DEBT
EIB – European Investment Bank - $150,000,000
Proparco/French Investment Bank - $50,000,000
PTA – East African Development Bank - $75,000,000
IFC – International Finance Corporation - $75,000,000
Total debt pledged $350,000,000 100%

EQUITY
IFC – International Finance Corporation - $50,000,000
ADB – African Development Bank - $20,000,000
KFW – German Development Bank - $40,000,000
PTA – East African Development Bank - $30,000,000
Total equity pledged $140,000,000 80%   -$35,500,000

Confidential

25

## PROFORMA

The attached proforma contains mineral sales prices twenty percent below the current market wholesale prices. In the case of salt, it is about fifty percent below market price in order to demonstrate how robust the model is. However, we intend to sell at global prices. The Opex is seven percent of Capex, which is conservative. The proforma is shown this way in order give an idea of how robust this facility should be. Contingencies have been built into equipment pricing and in the EPC as well. An after-tax IRR in excess of 30% can be identified in cell B 60 of the attached proforma. It is important to note that the proforma is a cash on cash calculation and assumes no debt.

## CURRENT MANAGEMENT AND PLAN FORWARD

Founder will have control over all engineering and construction until commercial operation of the facility. Once the plant is in operation, day to day operations will be turned over to professional executives selected by the board.

The board will originally consist of the founder, company directors and initial investors.

# Rocky Sembritzky
## Founder & Managing Director

Rocky is a proven executive with over 25 years of diverse experience in energy project design, project development, project execution, senior management, finance and insurance.

In 2001, after a very successful career in finance, Rocky raised twenty million dollars in private equity to fund an energy company in the power sector in Houston Texas. Rocky became enamored with the potential of the energy markets and made the decision to start his own company in the power sector. In February of 2002 Rocky founded the Equus Group, Equus Power and Equus Energy. Shortly thereafter, Equus Power won a bid from the Long Island Power Authority for a thirteen-year power purchase agreement ($131 million) to supply power to Freeport, NY. Rocky negotiated all contracts including, power purchase, EPC and with the labor unions. The ($50 million) project went into commercial operation in April of 2004 and is still in operation today with an IRR exceeding 30%.

The project was sold to a power fund later in 2004 and the company was sold in 2006. In 2006 Rocky co-founded Hunton Energy in Houston, Texas. Hunton was formed to develop an integrated gasification combined cycle (IGCC) 1200 MW power plant. The $2.3 billion plant was designed to gasify petroleum coke into synthetic natural gas and produce power through gas-fired turbines. The facility was fully permitted in March of 2009 and fully developed for Dow Chemical in Freeport, Texas. While at Hunton, the team developed and designed a "green" refinery. The process was completely tested and validated by Axens. Rocky holds the rights to the process, which can refine the heaviest oils and bitumen and provides a 120% yield from a barrel of typical oil.

In November of 2009 Rocky founded Katana Energy LLC to develop another facility for Dow to gasify petroleum coke to methanol and convert the methanol to olefins. The project was 60% developed when the financial crisis struck and the project was canceled. During the development, the team developed a zero discharge desalination process with mineral harvesting.

Confidential

26

Prior to energy and water, Rocky spent sixteen years in finance and insurance. While in the financial Sector he was a private money manager managing a $100 million dollar portfolio of equity, debt and commodities. He developed a proprietary software program for managing a portfolios risk exposure based upon market dynamics and negative correlation. The program was a big factor in Rocky's clients never having a negative year.

Rocky's main areas of focus and strength are efficiency and environmental stewardship. While in energy, every development he was involved in was at least 92% efficient and green. The Hunton IGCC environmental permit reset the "best available control technology" in Texas for coal and petroleum coke. This track record for efficiency and environmental stewardship will be implemented with every future development and for the Rasli Bahari project.

## Alma I. Rodarte
## Chief Technology Officer

Alma's educational qualifications are a BS/MS/PhD Chemical Engineering/Virginia Polytechnic Institute & State University. The PHD Dissertation Topic was "Predispersed Solvent Extraction of Heavy Metals from Dilute Aqueous Solutions" She is currently, a Business Development Consultant engaged in the development of leads, preparation of preliminary information packages and engagement with developers and companies that are interested in gasification projects. In 2011 served as the Managing Director of Katana Energy and was part of the team that developed desalination process with mineral recovery. The role encompassed the management of the firm's development process, overall patent process, supported technology and commercial efforts. In 2008 she served as the Vice President Project Development at Hunton Energy. Was a member of the team that developed a petroleum coke to olefins gasification project in Freeport, Texas with Dow Chemicals as the olefins off-taker and project host. Prior to this engagement, Alma served in various roles for Chevron Texaco and GE, which included; Licensing Manager (GE Energy): Licensing manager of General Electric Energy's gasification division (GE acquired the former Texaco Gasification Technology from ChevronTexaco in July 2004). The position provided for the management of
the group responsible for licensing GE's gasification technology in the Americas, the region's licensing strategic plan, sales projections and operating budget for the division. One notable gasification license and agreement was the first Canadian Oil Sands GE gasification license. The revenues from these licenses exceeded $80million.In the same position, managed the relationships with existing licensees i.e. operating gasification plants that use GE's gasification technology. Manager North American Licensing (ChevronTexaco Worldwide Power & Gasification), led the North American gasification-licensing group for ChevronTexaco. Responsibilities included developing the business plan for North America and sales projections and yearly budgets. The position also required the negotiation of several gasification license agreements and disputes that arose, technical service agreements and study agreements.

Business Developer – North America (Texaco Power and Gasification): Worked with a team of five project developers who identified potential gasification and power plant projects for further development.

## Stanley Karuthai Murage, CBS, EBS,
## Executive Director

Educational Qualifications include; PHD (Candidate); MSc (IT); MSc (Eng. Management);A (Building Econ), Hons;

Stanley's professional career started in the Ministry of Public Works of the Government of the Republic of Kenya in May 1974, as a graduate quantity surveyor, rising to the position of a group quantity surveyor in 1976. In July 1977 joined Armstrong and Duncan a firm of Quantity Surveyors and Project Managers, becoming a Partner in 1978. Thereafter remained in private practice as a consultant quantity surveyor and engineering project manager during which time he was involved in the design and construction of many building and civil engineering projects both in Kenya and abroad. He broadened career boundaries in 1994 in the private sector by commencing IT studies and practical training in information technology, including design and implementation of projects. Set up one of the early ISPs in Kenya, Insight Technologies Limited, including formation of its team of infrastructure and software developers which implemented several projects.

1994-2000 he was Permanent Secretary in 4 government ministries namely; Labour, Transport and Communications, Roads and Public Works. During this time was involved in major government policy reforms, and privatization of parastatals in the labour and manpower development sector, transport and communications

27

sector, and the roads sector in the country. Some of the reforms executed included: Development of labour and manpower development sector, inclusion of Productivity gains in Wage Guidelines, National foreign employment policy, Child labour policy, National balance between manpower supply, mix and requirements; creation of Kenya Civil Aviation Authority the development and implementation of the Telecommunication Sector Policy and infrastructure, and the creation of Roads Board, including transport and road policies.

Privatizations executed included the Kenya Airways/ KLM Partnership and launch; and the split of the Kenya Posts & Telecommunications to form CCK, Telkom Kenya, and Postal Corporation of Kenya. He was Chairman of the Steering Committee responsible for the overhaul of Kenya Posts and Telecommunication Corporation, was instrumental in the formulation of the Kenya Communications Act, 1999, and the subsequent formation of the Communication Commission of Kenya, and the Kenya Communications Secretariat. He was instrumental, in the policy formulation and subsequent implementation of the information technology policy, including the Leyland Initiative Program in Kenya through USAID. This program led to the establishment of the Kenya Internet backbone, Jambonet, and the Kennet. Between 2004 and 2008, he served as Permanent Secretary, and Advisor on Policy and Strategy, to His Excellency President Kibaki, the third president of Kenya. This responsibility entailed improving the Government capacity to address strategic policy, cross cutting issues, promotion of innovation in government development and the delivery of government objectives. This encompassed strategic policy reviews and design of solutions, elaboration on policy initiatives, monitoring of policy implementation, and Results Based Management. Was key member of the Results for Kenya Program design and its implementation. In 2008, he was joint founder member of the Results for Africa Institute (RAI). Have since been responsible for the design of several results concepts, strategies, and methodologies for several projects, among them are: Judiciary Transformation Framework (2011-2012), the Agribusiness Transformation Framework for Kenya (2012-2013), and the Market Place Transformation Framework, a vision 2030 Project (2012-2013). Experience in public sector has been insightful and daunting in many respects. Although there has been achievement of stated goals and objectives, particularly the delivery of quantifiable results, the challenge of public sector reform and service delivery remains daunting. Although the pursuit of reform and delivery of 'quantifiable results we can see and sustain' remains a passion, it is the development of the demand side capacity as equal partners with the state that remains a challenge and target. He continues to serve in the private sector as a Director in key companies in insurance, information technology, transportation, real estate; and as consultant in building and civil engineering, computer networks design and software development. Some related projects done include being project manager and quantity surveyor of 75MW Power Generation plant in Kipevu for Kenya Power and Lighting Company.

The Rasli Team has proven financial, technical and management experience of like size and much larger projects. The desalination and mineral recovery facility's team is implementing an integration of proven technologies to treat brine and waste streams. These systems are a product of the management team's deep insight and experience in the related fields of desalination, water treatment, gasification and minerals extraction. Gasification technology includes water treatment processes (settling, filtration, membrane separation, vapor recompression and calcium precipitation).

28



## The Future

By 2050, the world's population is estimated to grow by three billion and 90% will be in the developing world. The UN projects Kenya's population to grow by one million people annually and to reach about eighty five million in 2050. Such a situation is expected to over-stretch the meager water resources available.

It is imperative that Government and Counties engage in sustainable water solutions today; aside from sinking boreholes, that can be scaled through tapping aquifers and desalination initiatives. Such is the case in drier nations such as Saudi Arabia and Israel among others.

29

## USE OF PROCEEDS AND PROJECTED SPENDING:

| Gross Proceeds | | $175,500,000 |
|---|---|---|
| Facility Equity | $(150,000,000) | $25,500,000 |
| Company Expenses 3 years | $(5,500,000) | $20,000,000 |
| IP License Payment* | $(15,000,000) | $5,000,000 |
| Placement and Legal Fees | $(5,000,000) | $0 |

**Company Expenses Three Years:**

| | |
|---|---|
| General & Administrative | $2,500,000 |
| Engineering | $1,800,000 |
| Travel | $225,000 |
| Miscellaneous Expenses | $108,000 |
| Legal | $120,000 |
| Sub Total | $4,752,000 |
| Contingency 15% | $712,800 |
| **Total** | **$5,464,800** |

**Company books will be audited quarterly and results made available to all shareholders. Any funds not used (placement & legal) will be allocated to the company operating account.**

*IP License Payment will be offset by future royalties and contributed to the company during the first full calendar year of operations. The license covers all of Africa.

## VALUATION

Based upon the attached proforma, the twenty seven year NPV of one project is $1.852 billion using a 15% discount rate, which includes the non-income producing construction period. RBKL is offering 45% of the company for the $175,500,000 equity investment, which should equate to approximately $1,685,000,000 during the first five years of operation after debt service.

30

*This page intentionally left blank*

31

## STRATEGIC PARTNERS OF NOTE:

**Abengoa Water**

**ACCIONA Agua**

**Mwai Kibaki Institute**

**University of Nairobi**

**Millennium Water Alliance Kenya**

**Kenyatta University**

32

EXHIBIT B

## RISK DISCLOSURES
## OF

## RASLI BAHARI KENYA LIMITED

33

Prospective investors should carefully consider all of the information contained in this Memorandum and, in particular, the following risk section, before making a decision to purchase the Shares.

25



Source: United Nations Economic Commission for Africa (UNECA), Addis Ababa; Global Environment Outlook 2000 (GEO), UNEP Earthscan, London, 1999; Population Action International.

34

RISKS

**First Mover**

The international finance community prefers to invest in projects where someone, typically an engineering company, guarantees the project will work as specified, and that the investment firm will make a profit. The other requirement is that the engineering company needs to have a large enough balance sheet to be able to write a check for damages if the project doesn't work as planned. This is called a process guarantee, and the company that provides it is taking the technology risk. It is a must have to get the project built with institutional investors, banks, or government loans. In our case these guarantees will come from Abengoa Water (EPC) and from technology providers such as General Electric, Veolia or Siemens. Additionally, Abengoa will operate the plants for the first one to two years while training graduate students from the University of Nairobi to take over the operations of the facility in the future and they will be full time employees of RBKL.

**Securities laws require us to disclose any known issues that could impact our business.**

**Competition:** Currently there is only one company that is processing minerals from seawater, Israel Chemicals LTD (ICL). They process magnesium, bromine, salt and potash from the Dead Sea. However this is their only seawater-based operation and the rest of their operations are traditional mines. Additionally, ICL evaporates the water they extract from the Dead Sea. Based upon their track record, they would be a potential acquirer of RBKL because of our geographic location and the impact we will have on their mineral business. An example of the impact can be seen in the COGS of potash. ICL's lowest COGS for potash is $146.00 a metric ton, RBKL's COGS for potash will be $45.00 a metric ton.

The traditional seawater desalination companies have yet to embrace mineral extraction, which is RBKL's process is so impactful. It will be **The Standard** for desalination, period. In terms of economics, the impact will be comparable to that of Rockefeller and Standard Oil. Once our facilities come into full operation, our process will make most desalination plants obsolete.

The simple facts are that mineral companies want only minerals and water companies want only water. Our process is integrating the two into a highly efficient machine that will lower both our mineral costs and the cost of our produced water.

**Potential Market Saturation:** A potential area of concern is that of market saturation of minerals. Using salt as an example, and because it will be our largest export, it is of key importance. Global demand for salt is forecast to climb 1.5 percent annually through 2018 to 357 million short tons. In order for RBKL to reach 10% of the global salt demand, we would have to have six 90 MGD plants in operation (540 MGD). That would equate to our company having an annual pre tax cash flow $7.2 billion. Once again, we have the ability to locate anywhere it makes sense and we can scale down to 10 MGD, which will give us tremendous flexibility.

**Government Regulation:** RBKL is working with the highest levels of the Kenyan Government to make sure that we are focused on the need, the cost, and the environment and that our goals are perfectly aligned. We see no major issues what so ever. **It is imperative to obtain all appropriate governmental approvals.**

**Limited Operating History - New Business:** The Company was formed to develop, construct, own and operate desalination facilities with mineral recovery. However, the company has no current operations.

35

**Intellectual Property Rights:** Neither the Company nor I have filed any patent applications on the intellectual property the Company plans to use. These intellectual property rights are currently held as a Trade Secret.

**External Threats:** The threat of or actual acts of terrorism may affect the Company's planned operations in unpredictable ways and may cause changes in the insurance markets, force the Company to increase security measures and cause disruptions of power markets necessary to our operations. If any of the Facilities were to be a direct target, or an indirect casualty, of an act of terrorism, the Company's operations could be adversely affected.

**Cautionary Statements:** The discussions and information in this Memorandum may contain both historical and forward-looking statements. To the extent that the Memorandum contains forward-looking statements regarding the financial condition, operating results, business prospects or any other aspect of the Company, please be advised that the Company's actual financial condition, operating results and business performance may differ materially from that projected or estimated by the Company in forward-looking statements.

**Financial Projections:** Financial projections concerning the estimated operating results of RBKL may be included with the Memorandum. If such projections are provided, only prospective purchasers of Shares may rely on those in writing and authorized by RBKL. Any projections would be based on certain assumptions stated therein.

**Uninsured Losses:** The Company plans to maintain insurance coverage for the Facilities and its operations in amounts and with deductibles that the Company considers appropriate. In addition, some risks, such as weather related casualties, may not be insurable. In the case of loss or damage to property, plant or equipment, the Company cannot assure that the insurance proceeds, if any, received will be sufficient to cover the entire cost of replacement or repair.

**No Market for the Securities - Lack of Liquidity:** The Common Stock is not registered under the Securities Act of 1933, as amended, and may not be sold or otherwise transferred except pursuant to registration or qualification under applicable federal and state securities laws or evidence satisfactory to the Company (which may require an opinion of counsel to be provided at the investor's expense) that such registration or qualification is not required. There are nor egistration rights associated with the Preferred Stock. Consequently, the investors may not be able to liquidate their investment in the Company if such liquidation should become necessary or desired. The Shares are being offered pursuant to Rule 506 promulgated under Section 4(2) of the Securities Act of 1933, as amended. There is no assurance that any public market for the Shares will develop. There is no assurance that the Company's stock will eventually be accepted for trading on the pink sheets, the OTC Bulletin Board, a NASDAQ market or on any other stock exchange. The Company will not initially be a public reporting company under the Securities Exchange Act of 1934, as amended, and there is no assurance as to if or when it will become a public reporting company. In order to become a public reporting company, the Company must have audited financial statements and must file a Form 10 with the Securities Exchange Commission. The Company must become a public reporting company in order to be listed for trading on the OTC Bulletin Board, and must satisfy additional financial standards to be listed on the NASDAQ Small Capital Market. The Company may eventually attempt to have its stock traded on the "pink sheets." Nevertheless, shareholders may not be able to liquidate their investments in the event of emergency or for any other reason. The Shares may not be acceptable as collateral for a loan. A purchase of Shares should be considered only as a long-term investment.

36

EXHIBIT C

Supporting Documents Attached:

Proforma

Subscription agreement

37



GWI DesalData's long-range desalination market forecast

Source: DesalData.com



38

## Global Water Market Demand



[Source: OECD, BoA Merril Lynch Global Research]

• The global water market has huge demand, with about 783 million people globally have no access to clean drinking water and about 2.6 Bn having no access to sanitation.

• There is manifold increase in fresh water demand across industries ranging from Agriculture, Manufacturing to Domestic uses which is likely to further strain the availability of scarce resource.

• Not withstanding the global slowdown the global water market represents USD500 Bn growing at 7% well above the global growth rates across various sectors.

• By 2020,the water industry could be worth USD one trillion marked by robust growth coming out of water treatment, water management, water infrastructure and supply segments.

" Specialists in discovering Multibagger stocks "   HBJ Capital

# Rasil Bahari Water Project Proforma

|  | Price | CM/D | Cash Flow |
|---|---|---|---|
| 2019 |  | 4 | 1 |
| 2020 |  | 5 | 2 |
| 2021 | 113,500 | 6 | 3 |
| 2022 | 113500 | 7 | 4 |
|  | 113500 | | |
|  | 113500 | | |

Prices: 1, 1, 1.5, 1.75

## Availability

| | |
|---|---|
| Planned Outage Factor (CT Limited) | 0.0% |
| Forced Outage Factor NGCC | 0.0% |
| Forced Outage Factor Desal | 1.0% |
| Forced Outage Factor Offsites | 0.5% |
| Total Outage Factor | 1.5% |
| Feed and Product Availability | 98.5% |

## Capital Cost

| Pre-Close 2015 $MM | |
|---|---|
| Development | $15.0 |
| - Test/Initial Design/Permit/MOUs | $20.0 |
| - Prelim Eng/Comm Develop | |
| - Land | $5.0 |
| Subtotal Preclose | $40.0 |

| EPC Capital Expenditure 2014 $MM | |
|---|---|
| Desal $MM | $264.3 |
| Chlor-Alkali Pkg $MM | $0.0 |
| EPC | $158.6 |
| Contingency | $31.7 |
| Subtotal EPC | $454.5 |
| Startup 2015 $MM | $5.0 |

**Total capex 2015 $MM** $499.5

30 acres

| | Capex | Feed/Prod | Water |
|---|---|---|---|
| Escalation Factors %/y | 1% | 3% | 1% |

Total As Spent $514.4

| First Year Onstream | 58% |
|---|---|

| Year | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|
| Capital Expenditure Year | 0 | 1 | 2 | 3 | 4 | 5 |
| Operating Year | | | | | 1 | 2 |
| Capital Expenditure $MM | ($20.0) | $0.0 | ($66.8) | ($327.8) | ($99.8) | |

## Revenue

| | SD Quantity | 2015 Price | | 2014$ SD Basis $MM/y |
|---|---|---|---|---|
| Desal Water MGD | 30 | $2.50 | /1000 gal | $24.38 |
| | sTPD | | | |
| Calcium chloride (CaCl2 dry basis) | 710.0 | $250.00 | /ston | $57.69 |
| Sodium chloride (NaCl dry basis) | 4906.0 | $75.00 | /ston | $119.58 |
| Gypsum (CaSO4 dry basis) | 712.0 | $75.00 | /ston | $17.36 |
| Magnesium Hydroxide (contained MgO) | 732.0 | $1,000.00 | /ston | $237.90 |
| Potash (KCl dry basis) | 138.0 | $250.00 | /ston | $11.21 |
| Bromine (Br2 dry basis) | 14.0 | $3,000.00 | /ston | $13.65 |
| Boric Acid (contained B2O3) | 2.6 | $1,000.00 | /ston | $0.85 |
| Soil Suppliment (dry solids basis) | 15.0 | $30.00 | /ston | $0.16 |
| Plant Sale/Salvage Value | | | h | |

## Expense

| | | | | 2014$ SD Basis | |
|---|---|---|---|---|---|
| Dolime (contained CaO+MgO) | 882.0 | $120.00 | /ston | ($38.63) | ($115.89) |
| Hematite (contained Fe2O3) | 4.0 | $300.00 | /ston | ($0.44) | ($1.31) |
| Sodium Bisulfite (contained NaHSO3) | 2.0 | $300.00 | /ston | ($0.22) | ($0.66) |
| HCl | | | | | |
| Caustic NaOh | | | | ($17.89) | ($53.66) |
| | | | | ($36.01) | ($108.02) |
| Nat Gas MMSCFD | 7.0 | $7.00 | /MSCF | | |
| O&M Expense %capexy | 7.0% | | | | |
| SD Profit | | | | $389.59 | ($270.54) |

Total

| Item | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|---|---|---|
| Desal Water MGD | | | | | $14.6 | $25.2 | $25.5 | $25.7 |
| Calcium chloride | | | | | $37.3 | $65.9 | $67.8 | $69.9 |
| Sodium chloride | | | | | $77.3 | $136.6 | $140.6 | $144.9 |
| Gypsum | | | | | $11.2 | $19.8 | $20.4 | $21.0 |
| Magnesium Hydroxide | | | | | $153.8 | $271.7 | $279.8 | $288.2 |
| Potash | | | | | $7.3 | $12.8 | $13.2 | $13.6 |
| Bromine | | | | | $8.8 | $15.6 | $16.1 | $16.5 |
| Boric Acid | | | | | $0.5 | $1.0 | $1.0 | $1.0 |
| Soil Suppliment | | | | | $0.1 | $0.2 | $0.2 | $0.2 |
| Plant Sale/Salvage Value | | | | | $0.0 | $0.0 | $0.0 | $0.0 |
| Dolime | | | | | ($26.0) | ($44.1) | ($45.4) | ($46.8) |
| Hematite | | | | | ($0.3) | ($0.5) | ($0.5) | ($0.5) |
| Sodium Bisulfite | | | | | ($0.1) | ($0.5) | ($0.5) | ($0.5) |
| | | | | | ($0.1) | ($0.3) | ($0.3) | ($0.3) |
| Nat Gas | | | | | ($11.6) | ($20.4) | ($21.0) | ($21.7) |
| O&M | | | | | ($23.3) | ($41.1) | ($42.3) | ($43.6) |
| **Pre-Tax Cash Flow** | ($20.0) | $0.0 | ($66.8) | ($327.8) | $151.0 | $442.3 | $455.0 | $468.2 |

| Pre-Tax Cash Flow | |
|---|---|
| Pretax IRR (2015 to 2042) % | 64.6% |
| Pretax NPV (2015 to 2042) @ 15% $2014 $MM | $1,517 |

| | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|---|---|---|
| Depreciation Schedule 20 yr MACRS 100.0% Total | | | | | 3.75% | 7.22% | 6.68% | 6.18% |
| Depreciation ($514.4) Total | | | | | ($19.3) | ($37.1) | ($34.3) | ($31.8) |
| Taxable Income | | | | | $231.5 | $405.1 | $420.7 | $436.4 |
| Income Tax 35.0% Rate | | | | | ($81.0) | ($141.8) | ($147.2) | ($152.7) |
| **Project Cash Flow** | ($20.0) | $0.0 | ($66.8) | ($327.8) | $69.9 | $300.5 | $307.8 | $315.4 |

| Project Cash Flow | |
|---|---|
| IRR (2015 to 2043) % | 48.2% |
| NPV (2015 to 2043) @ 8% $2014 $MM | $2,432 |

**CM**

| | |
|---|---|
| 113500 | $ 37,455,000 |
| 227000 | $ 74,910,000 |
| 170250 | $ 56,182,500 |
| 198625 | $ 65,546,250 |

**ws $MM**

| | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | 2033 | 2034 | 2035 | 2036 | 2037 | 2038 | 2039 | 2040 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 8 | 9 | 10 | 11 | | | | | | | | | | | | | | |
| | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| | $26.0 | $26.3 | $26.5 | $26.8 | $27.1 | $27.3 | $27.6 | $27.9 | $28.2 | $28.4 | $28.7 | $29.0 | $29.3 | $29.6 | $29.9 | $30.2 | $30.5 | $30.8 |
| | $72.0 | $74.1 | $76.4 | $78.7 | $81.0 | $83.4 | $85.9 | $88.5 | $91.2 | $93.9 | $96.7 | $99.6 | $102.6 | $105.7 | $108.9 | $112.1 | $115.5 | $119.0 |
| | $149.2 | $153.7 | $158.3 | $163.0 | $167.9 | $173.0 | $178.2 | $183.5 | $189.0 | $194.7 | $200.5 | $206.5 | $212.7 | $219.1 | $225.7 | $232.5 | $239.4 | $246.6 |
| | $21.7 | $22.3 | $23.0 | $23.7 | $24.4 | $25.1 | $25.9 | $26.6 | $27.4 | $28.3 | $29.1 | $30.0 | $30.9 | $31.8 | $32.8 | $33.7 | $34.7 | $35.8 |
| | $296.8 | $305.7 | $314.9 | $324.4 | $334.1 | $344.1 | $354.4 | $365.1 | $376.0 | $387.3 | $398.9 | $410.9 | $423.2 | $435.9 | $449.0 | $462.5 | $476.3 | $490.6 |
| | $17.0 | $14.4 | $14.8 | $15.3 | $15.7 | $16.2 | $16.7 | $17.2 | $17.7 | $18.3 | $18.8 | $19.4 | $19.9 | $20.5 | $21.2 | $21.8 | $22.5 | $23.1 |
| | $17.0 | $17.5 | $18.1 | $18.6 | $19.2 | $19.7 | $20.3 | $20.9 | $21.6 | $22.2 | $22.9 | $23.6 | $24.3 | $25.0 | $25.8 | $26.5 | $27.3 | $28.2 |
| | $1.1 | $1.1 | $1.1 | $1.2 | $1.2 | $1.2 | $1.3 | $1.3 | $1.3 | $1.4 | $1.4 | $1.5 | $1.5 | $1.5 | $1.6 | $1.6 | $1.6 | $1.7 |
| | $0.2 | $0.2 | $0.2 | $0.2 | $0.2 | $0.2 | $0.2 | $0.3 | $0.3 | $0.3 | $0.3 | $0.3 | $0.3 | $0.3 | $0.3 | $0.3 | $0.3 | $0.3 |
| | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 |
| | ($48.2) | ($49.6) | ($51.1) | ($52.7) | ($54.3) | ($55.9) | ($57.6) | ($59.3) | ($61.1) | ($62.9) | ($64.8) | ($66.7) | ($58.7) | ($70.8) | ($72.9) | ($75.1) | ($77.4) | ($79.7) |
| | ($0.5) | ($0.6) | ($0.6) | ($0.6) | ($0.6) | ($0.6) | ($0.7) | ($0.7) | ($0.7) | ($0.7) | ($0.7) | ($0.8) | ($0.8) | ($0.8) | ($0.8) | ($0.9) | ($0.9) | ($0.9) |
| | ($0.3) | ($0.3) | ($0.3) | ($0.3) | ($0.3) | ($0.3) | ($0.3) | ($0.3) | ($0.3) | ($0.4) | ($0.4) | ($0.4) | ($0.4) | ($0.4) | ($0.4) | ($0.4) | ($0.4) | ($0.5) |
| | ($22.3) | ($23.0) | ($23.7) | ($24.4) | ($25.1) | ($25.9) | ($26.6) | ($27.4) | ($28.3) | ($29.1) | ($30.0) | ($30.9) | ($31.8) | ($32.8) | ($33.8) | ($34.8) | ($35.8) | ($36.9) |
| | ($44.9) | ($46.3) | ($47.7) | ($49.1) | ($50.6) | ($52.1) | ($53.6) | ($55.3) | ($56.9) | ($58.6) | ($60.4) | ($62.2) | ($64.1) | ($66.0) | ($68.0) | ($70.0) | ($72.1) | ($74.3) |
| | $481.7 | $495.6 | $510.0 | $524.7 | $540.0 | $555.6 | $571.7 | $588.3 | $605.4 | $623.0 | $641.2 | $659.8 | $679.0 | $698.8 | $719.2 | $740.2 | $761.8 | $784.0 |
| | 5.71% | 5.29% | 4.89% | 4.52% | 4.46% | 4.46% | 4.46% | 4.46% | 4.46% | 4.46% | 4.46% | 4.46% | 4.46% | 4.46% | 4.46% | 4.46% | 2.23% | 0.00% |
| | ($29.4) | ($27.2) | ($25.1) | ($23.3) | ($22.9) | ($22.9) | ($22.9) | ($22.9) | ($22.9) | ($22.9) | ($22.9) | ($22.9) | ($22.9) | ($22.9) | ($22.9) | ($22.9) | ($11.5) | $0.0 |
| | $452.3 | $468.5 | $484.8 | $501.5 | $517.0 | $532.7 | $548.8 | $565.4 | $582.5 | $600.1 | $618.2 | $636.9 | $656.1 | $675.9 | $696.2 | $717.2 | $750.3 | $784.0 |
| | ($158.3) | ($164.0) | ($169.7) | ($175.5) | ($181.0) | ($186.4) | ($192.1) | ($197.9) | ($203.9) | ($210.0) | ($216.4) | ($222.9) | ($229.6) | ($236.6) | ($243.7) | ($251.0) | ($262.6) | ($274.4) |
| | $323.4 | $331.7 | $340.3 | $349.2 | $359.0 | $369.2 | $379.7 | $390.5 | $401.6 | $413.0 | $424.8 | $436.9 | $449.4 | $462.3 | $475.5 | $489.1 | $499.2 | $509.6 |

| 2041 | 2042 | 2043 | 2044 | 2045 | 2046 | 2047 | 2048 |
|---|---|---|---|---|---|---|---|
| 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 |
| $31.1 | $31.4 | $31.7 | $32.0 | $32.4 | $32.7 | $33.0 | $33.3 |
| $122.5 | $126.2 | $130.0 | $133.9 | $137.9 | $142.1 | $146.3 | $150.7 |
| $254.0 | $261.6 | $269.5 | $277.6 | $285.9 | $294.5 | $303.3 | $312.4 |
| $36.9 | $38.0 | $39.1 | $40.3 | $41.5 | $42.7 | $44.0 | $45.3 |
| $505.4 | $520.5 | $536.1 | $552.2 | $568.8 | $585.8 | $603.4 | $621.5 |
| $23.8 | $24.5 | $25.3 | $26.0 | $26.8 | $27.6 | $28.4 | $29.3 |
| $29.0 | $29.9 | $30.8 | $31.7 | $32.6 | $33.6 | $34.6 | $35.7 |
| $1.8 | $1.8 | $1.9 | $2.0 | $2.0 | $2.1 | $2.1 | $2.2 |
| $0.3 | $0.4 | $0.4 | $0.4 | $0.4 | $0.4 | $0.4 | $0.4 |
| $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 |
| ($82.1) | ($84.5) | ($87.1) | ($89.7) | ($92.4) | ($95.1) | ($98.0) | ($100.9) |
| ($0.9) | ($1.0) | ($1.0) | ($1.0) | ($1.0) | ($1.0) | ($1.1) | ($1.1) |
| ($0.5) | ($0.5) | ($0.5) | ($0.5) | ($0.5) | ($0.5) | ($0.6) | ($0.6) |
| ($38.0) | ($39.1) | ($40.3) | ($41.5) | ($42.8) | ($44.0) | ($45.4) | ($46.7) |
| ($76.5) | ($78.8) | ($81.1) | ($83.6) | ($86.1) | ($88.7) | ($91.3) | ($94.1) |
| $806.9 | $830.5 | $854.8 | $879.8 | $905.5 | $932.1 | $959.4 | $987.5 |
| 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 |
| $806.9 | $830.5 | $854.8 | $879.8 | $905.5 | $932.1 | $959.4 | $987.5 |
| ($282.4) | ($290.7) | ($299.2) | ($307.9) | ($316.9) | ($326.2) | ($335.8) | ($345.6) |
| $524.5 | $539.8 | $555.6 | $571.9 | $588.6 | $605.8 | $623.6 | $641.9 |

STOCK SUBSCRIPTION AGREEMENT

The undersigned hereby offers to subscribe for the number of shares of Preferred Stock (the "Shares") of RASLI BAHARI KENYA LIMITED (the "Company") set forth on the signature page of this Subscription Agreement at a price of $175,500 per Share.

By execution of this Subscription Agreement, the undersigned hereby acknowledges that the undersigned understands that the Company is relying upon the accuracy and completeness hereof in complying with its obligations under applicable federal and state securities laws. The undersigned further acknowledges and certifies that the undersigned received and read the Private Placement Memorandum of the Company dated _____ and any supplements thereto (the "Private Placement Memorandum"), and the undersigned is familiar with the terms and provisions thereof.

The undersigned agrees and represents as follows:

    1.      Representations, Warranties and Agreements.

The undersigned hereby represents and warrants to, and agrees with, the Company, as follows:

    (a)    That the undersigned is aware of the following:

    (1)    The Shares are speculative investments which involve a substantial degree of risk of loss by the undersigned of the undersigned's entire investment in the Company and that the undersigned understands and takes full cognizance of the risk factors related to the purchase of the Shares, including, but not limited to those set forth in the Private Placement Memorandum;

    (2)    The Company is newly formed.

    (3)    There are significant restrictions on the transferability of the Shares; the Shares will not be, and the investors will have no rights to require that the Shares be registered under the Securities Act of 1933 (the "Act") or any state securities laws; there is no public market for the Shares and none is expected to develop; and, accordingly, it may not be possible for the undersigned to liquidate the undersigned's investment in the Company;

    (4)    No federal or state agency has made any findings as to the fairness of the terms of the offering; and

    (5)    Any projections or predictions that may have been made available to investors are based on estimates, assumptions and

forecasts which may prove to be incorrect; and no assurance is given that actual results will correspond with the results contemplated by the various projections;

(b)     That at no time has it been explicitly or implicitly represented, guaranteed or warranted to the undersigned by the Company, the agents and employees of the Company, or any other person: (1) That the undersigned will or will not have to remain as owner of the Shares an exact or approximate length of time; (2) That a percentage of profit and/or amount or type of consideration will be realized as a result of this investment; (3) That any cash dividends from Company operations or otherwise will be made to shareholders by any specific date or will be made at all; or (4) That any specific tax benefits will accrue as a result of an investment in the Company;

(c)     That the undersigned is financially responsible, able to meet all obligations hereunder, and acknowledges that this investment will be long-term and is by nature speculative;

(d)     That the undersigned has received and carefully read and is familiar with the Private Placement Memorandum, this Subscription Agreement, and all other documents in connection therewith, and the undersigned confirms that all documents and records, if applicable pertaining to the investment in the Company have been made available to the undersigned and/or to the undersigned's personal investment, tax and legal advisers, if such advisers were utilized by the undersigned;

(e)     That the undersigned has relied only on the information contained in the Private Placement Memorandum and that no written or oral representation or information that is in any way inconsistent with the Private Placement Memorandum and has been made or furnished to the undersigned or to the undersigned's purchaser representative in connection with the offering of the Shares, and if so made, has not been relied upon;

(f)     That the undersigned is capable of bearing the high degree of economic risks and burdens of this venture including, but not limited to, the possibility of complete loss of investment and the lack of a public market which may make it impossible to readily liquidate the investment whenever desired;

(g)     That the undersigned is an "accredited investor" as that term is defined in Regulation D under the Act or is otherwise a sophisticated, knowledgeable investor (either alone or with the aid of a purchaser representative) with adequate net worth and income for this investment;

(h)     That the undersigned has knowledge and experience in financial and business matters (either alone or with the aid of a purchaser

representative), is capable of evaluating the merits and risks of an investment in the Company and its proposed activities and has carefully considered the suitability of an investment in the Company for the undersigned's particular financial situation, and has determined that the Shares are a suitable investment;

(i)     That the offer to sell Shares was communicated to the undersigned by the Company in such a manner that the undersigned was able to ask questions of and receive answers from the Company concerning the terms and conditions of this transaction and that at no time was the undersigned presented with or solicited by any leaflet, public promotional meeting, newspaper or magazine article, radio or television advertisement or any other form of advertising or general solicitation;

(j)     That the Shares for which the undersigned hereby subscribes are being acquired solely for the undersigned's own account, for investment, and are not being purchased with a view to or for the resale, distribution, subdivision or fractionalization thereof; and the undersigned agrees that such Shares will not be sold without registration under the Act or an exemption therefrom. In furtherance thereof, the undersigned will not sell, hypothecate or otherwise transfer the undersigned's Shares unless the Shares are registered under the Act and qualified under applicable state securities laws or unless, in the opinion of the Company, an exemption from the registration requirements of the Act and such laws is available;

(k)     That the undersigned has had prior personal or business relationships with the Company or its affiliates, or by reason of the undersigned's business or financial experience (either alone or with the aid of a purchaser representative), the undersigned has the capacity to protect the undersigned's own interest in connection with this transaction;

(l)     That the undersigned has been advised to consult with the undersigned's own attorney regarding legal matters concerning an investment in the Company and has done so to the extent the undersigned considers necessary;

(m)     That the undersigned certifies, under penalty of perjury, (i) that the social security or Tax Identification Number set forth herein is time, correct and complete, and (ii) that the undersigned is not subject to backup withholding either because the undersigned has not been notified that the undersigned is subject to backup withholding as a result of a failure to report all interest or dividends, or the Internal Revenue Service has notified the undersigned that the undersigned is no longer subject to backup withholding; and

(n)     That the undersigned acknowledges that the Private Placement Memorandum reflects the Company's current intentions and estimates at

the current time, and as with any developing company, the precise elements of the Company's plans can be expected to change from time to time.

2.      Indemnification. The undersigned shall indemnify, defend and hold harmless the Company, and any officers, employees, shareholders, partners, agents, directors or controlling persons of the Company (collectively the "Indemnified Parties" and individually an "Indemnified Party") who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative, against losses, liabilities and expenses of each Indemnified Party (including attorneys' fees, judgments, fines and amounts paid in settlement, payable as incurred) incurred by such person or entity in connection with such action, arbitration, suit or proceeding, by reason of or arising from (i) any misrepresentation or misstatement of facts or omission to represent or state facts made by the undersigned, including, without limitation, the information in this Subscription Agreement, or (ii) litigation or other proceeding brought by the undersigned against one or more Indemnified Party wherein the Indemnified Party is the prevailing party.

3.      Entity Investors. If the undersigned is an entity, trust, pension fund or IRA account (an "Entity"), the Entity and the person signing on its behalf represent and warrant that: (i) such Entity is an existing entity, and has not been organized or reorganized for the purpose of making this investment (or if not true, such fact shall be disclosed to the Company in writing along with information concerning the beneficial owners of the Entity), (ii) the undersigned has the authority to execute this Subscription Agreement, and any other documents in connection with an investment in the Shares, on the Entity's behalf, (iii) the Entity has the power, right and authority to invest in the Shares and enter into the transactions contemplated thereby, and that the investment is suitable and appropriate for the Entity and its beneficiaries (given the risks and illiquid nature of the investment) and (iv) all documents executed by the entity in connection with the Company are valid and binding documents or agreements of the Entity enforceable in accordance with their terms.

4.   Revocation. The undersigned agrees that the undersigned may not cancel, terminate or revoke the offer to subscribe for shares for a period of 10 days or any agreement hereunder at any time and that this Agreement shall survive the death or disability of the undersigned and shall be binding upon the undersigned's heirs, executors, administrators, beneficiaries, successors and assigns.

5.   Certain Securities Law Matters.

(a)      The Shares shall not be sold, assigned, transferred or pledged except upon satisfaction of the conditions specified in this Section 5, which conditions are intended to ensure compliance with the provisions of the Act. The undersigned will cause any proposed purchaser, assignee,

transferee or pledgee of the Shares held by the undersigned to agree to take and hold such securities subject to the provisions and conditions of this Section 5.

(b)     Each certificate representing (i) the Shares and (ii) any other securities issued in respect of the Shares upon any stock split, stock dividend, recapitalization, merger, consolidation or similar event, shall (unless otherwise permitted by the provisions of Section 5(c) below) be stamped or otherwise imprinted with a legend substantially in the following form (in addition to any legend required under applicable state securities laws):

> THE SHARES REPRESENTED BY THIS CERTIFICATE HAVE BEEN ACQUIRED FOR INVESTMENT AND HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933. SUCH SHARES MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF SUCH REGISTRATION OR UNLESS THE COMPANY RECEIVES AN OPINION OF COUNSEL OR OTHER EVIDENCE REASONABLY ACCEPTABLE TO IT STATING THAT SUCH SALE OR TRANSFER IS EXEMPT FROM THE REGISTRATION AND PROSPECTUS DELIVERY REQUIREMENTS OF SAID ACT. COPIES OF THE AGREEMENT COVERING THE PURCHASE OF THESE SHARES AND RESTRICTING THEIR TRANSFER MAY BE OBTAINED AT NO COST BY WRITTEN REQUEST MADE BY THE HOLDER OF RECORD OF THIS CERTIFICATE TO THE SECRETARY OF THE CORPORATION AT THE PRINCIPAL EXECUTIVE OFFICES OF THE CORPORATION.

The undersigned consents to the Company making a notation on its records and giving instructions to any transfer agent of the Shares in order to implement the restrictions on transfer established in this Section 5.

(c)     The undersigned agrees to comply in all respects with the provisions of this Section 5. Prior to any proposed sale, assignment, transfer or pledge of any Shares, unless there is in effect a registration statement under the Act covering the proposed transfer, the undersigned thereof shall give written notice to the Company of the undersigned's intention to effect such transfer, sale, assignment or pledge. Each such notice shall describe the manner and circumstances of the proposed transfer, sale, assignment or pledge in sufficient detail, and shall be accompanied, at the undersigned's expense evidence satisfactory to the Company the effect that the proposed transfer of the Shares may be affected without registration under the Act or applicable state securities law.

6.   Investor Information

The Company may only accept subscriptions from persons who meet certain suitability standards. Therefore, certain information is requested below.

(a)     Name: _____

Age: _____

Social Security Number: _____

(b)     Home Address: _____

Home Telephone Number: _____

(c)     Firm Name: _____

Nature of Business: _____

Position/Title: _____

Length of Time in Position: _____

Business Address: _____

_____

_____ Zip Code: _____

Business Telephone Number: _____

(d)     Send Correspondence to: Home _____ Business _____

(e)     List each prior employment position or occupation during the last five years, giving dates: _____

_____

_____

(f)     List any business or professional education, indicating degrees received, if any: _____

_____

_____

(g)     (1)     My net worth (together with my spouse's net worth), is in

excess of $_____

(2)    In order for the Company to determine if I qualify as an "accredited investor" under Regulation D of the Securities Act of 1993, the reasonable fair market value of my personal home, home furnishings, and automobile is in excess of $_____.

(3)    My estimated annual gross income was or is (do not include your spouse's income):

Last Year:            Two Years Ago:        Projected for Current Year:

$_____        $_____        $_____

(4)    My spouse's actual gross income was or is:

Last Year:            Two Years Ago:        Projected for Current Year:

$_____        $_____        $_____


(h)    Previous Investment Experience in Other Private Offerings of Securities or Other Relevant Experience:

Name of Program        1._____
Or Company
                              2._____

                              3._____

Amount Invested         1._____

                              2._____

                              3._____

(i)    In which state do you currently

(a)    Maintain your primary residence? _____

(b)    Maintain your secondary residence? _____

(c)    Vote? _____

(d)    File income tax returns? _____

(e)    Maintain a driver's license? _____

(j)     List any other information you believe is relevant in showing that you are able to adequately evaluate the risks and merits of this investment:

_____

_____

In furnishing the above information, I acknowledge that the Company will be relying thereon in determining, among other things, whether there are reasonable grounds to believe that I qualify as a purchaser under applicable securities laws for the purposes of the proposed investment.

7.   Miscellaneous.

(a)     All notices or other communications given or made hereunder shall be in writing and shall be delivered or mailed by registered or certified mail, return receipt requested, postage prepaid, to the Company at the address set forth on the instructions page hereof and to the undersigned at the address set forth on the signature page hereof.

(b)     This Agreement shall be governed by and construed in accordance with the laws of the State of California, without reference to conflict of law principles.

(c)     This Agreement constitutes the entire agreement among the parties hereto with respect to the subject matter hereof and supersedes any prior or contemporaneous understandings, representations, warranties or agreements (whether oral or written) and may be amended only by a writing executed by all parties.

(d)     The undersigned acknowledges that the Company may, in its sole and absolute discretion, accept or reject this subscription offer in whole or in part.

(e)     Checks should be made out to Ocean Harvest LLC, a Delaware Corporation and RBKL's operating account in the U.S.

8.    Certification.

The undersigned represents to you that (i) the information contained herein is complete and accurate on the date hereof and may be relied upon by you and (ii) the undersigned will notify you immediately of any change in any of such information occurring prior to the acceptance of the subscription and will promptly send you written confirmation of such change. The undersigned hereby certifies that he has read and understands the Private Placement Memorandum and this Subscription Agreement.

IN WITNESS WHEREOF, the undersigned has executed this Subscription Agreement this_____ day of_____, 2015.

_____
Number of Shares Subscribed for

at $175,500 per share

$_____
Total Purchase Price

_____
NAME OF PURCHASER

_____
Signature

_____
Title of Authorized Signatory if Purchaser
Is a corporation, partnership or other entity

_____
Signature of Spouse or Co-owner

THE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT") AND MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED UNLESS THE SECURITIES ARE REGISTERED UNDER THE ACT OR AN EXEMPTION THEREFROM IS AVAILABLE.

Accepted by Company,

RASLI BAHARI KENYA LIMITED

By: _____

Title: _____

Date: _____

EXHIBIT 6

STOCK SUBSCRIPTION AGREEMENT

The undersigned hereby offers to subscribe for the number of shares of Preferred Stock (the "Shares") of RASLI BAHARI KENYA LIMITED (the "Company") set forth on the signature page of this Subscription Agreement at a price of $175,500 per Share.

By execution of this Subscription Agreement, the undersigned hereby acknowledges that the undersigned understands that the Company is relying upon the accuracy and completeness hereof in complying with its obligations under applicable federal and state securities laws. The undersigned further acknowledges and certifies that the undersigned received and read the Private Placement Memorandum of the Company dated _____ and any supplements thereto (the "Private Placement Memorandum"), and the undersigned is familiar with the terms and provisions thereof.

The undersigned agrees and represents as follows:

    1.    Representations, Warranties and Agreements.

The undersigned hereby represents and warrants to, and agrees with, the Company, as follows:

    (a)    That the undersigned is aware of the following:

    (1)    The Shares are speculative investments which involve a substantial degree of risk of loss by the undersigned of the undersigned's entire investment in the Company and that the undersigned understands and takes full cognizance of the risk factors related to the purchase of the Shares, including, but not limited to those set forth in the Private Placement Memorandum;

    (2)    The Company is newly formed.

    (3)    There are significant restrictions on the transferability of the Shares; the Shares will not be, and the investors will have no rights to require that the Shares be registered under the Securities Act of 1933 (the "Act") or any state securities laws; there is no public market for the Shares and none is expected to develop; and, accordingly, it may not be possible for the undersigned to liquidate the undersigned's investment in the Company;

    (4)    No federal or state agency has made any findings as to the fairness of the terms of the offering; and

    (5)    Any projections or predictions that may have been made available to investors are based on estimates, assumptions and

forecasts which may prove to be incorrect; and no assurance is given that actual results will correspond with the results contemplated by the various projections;

(b)     That at no time has it been explicitly or implicitly represented, guaranteed or warranted to the undersigned by the Company, the agents and employees of the Company, or any other person: (1) That the undersigned will or will not have to remain as owner of the Shares an exact or approximate length of time; (2) That a percentage of profit and/or amount or type of consideration will be realized as a result of this investment; (3) That any cash dividends from Company operations or otherwise will be made to shareholders by any specific date or will be made at all; or (4) That any specific tax benefits will accrue as a result of an investment in the Company;

(c)     That the undersigned is financially responsible, able to meet all obligations hereunder, and acknowledges that this investment will be long-term and is by nature speculative;

(d)     That the undersigned has received and carefully read and is familiar with the Private Placement Memorandum, this Subscription Agreement, and all other documents in connection therewith, and the undersigned confirms that all documents and records, if applicable pertaining to the investment in the Company have been made available to the undersigned and/or to the undersigned's personal investment, tax and legal advisers, if such advisers were utilized by the undersigned;

(e)     That the undersigned has relied only on the information contained in the Private Placement Memorandum and that no written or oral representation or information that is in any way inconsistent with the Private Placement Memorandum and has been made or furnished to the undersigned or to the undersigned's purchaser representative in connection with the offering of the Shares, and if so made, has not been relied upon;

(f)     That the undersigned is capable of bearing the high degree of economic risks and burdens of this venture including, but not limited to, the possibility of complete loss of investment and the lack of a public market which may make it impossible to readily liquidate the investment whenever desired;

(g)     That the undersigned is an "accredited investor" as that term is defined in Regulation D under the Act or is otherwise a sophisticated, knowledgeable investor (either alone or with the aid of a purchaser representative) with adequate net worth and income for this investment;

(h)     That the undersigned has knowledge and experience in financial and business matters (either alone or with the aid of a purchaser

representative), is capable of evaluating the merits and risks of an investment in the Company and its proposed activities and has carefully considered the suitability of an investment in the Company for the undersigned's particular financial situation, and has determined that the Shares are a suitable investment;

(i)     That the offer to sell Shares was communicated to the undersigned by the Company in such a manner that the undersigned was able to ask questions of and receive answers from the Company concerning the terms and conditions of this transaction and that at no time was the undersigned presented with or solicited by any leaflet, public promotional meeting, newspaper or magazine article, radio or television advertisement or any other form of advertising or general solicitation;

(j)     That the Shares for which the undersigned hereby subscribes are being acquired solely for the undersigned's own account, for investment, and are not being purchased with a view to or for the resale, distribution, subdivision or fractionalization thereof; and the undersigned agrees that such Shares will not be sold without registration under the Act or an exemption therefrom. In furtherance thereof, the undersigned will not sell, hypothecate or otherwise transfer the undersigned's Shares unless the Shares are registered under the Act and qualified under applicable state securities laws or unless, in the opinion of the Company, an exemption from the registration requirements of the Act and such laws is available;

(k)     That the undersigned has had prior personal or business relationships with the Company or its affiliates, or by reason of the undersigned's business or financial experience (either alone or with the aid of a purchaser representative), the undersigned has the capacity to protect the undersigned's own interest in connection with this transaction;

(l)     That the undersigned has been advised to consult with the undersigned's own attorney regarding legal matters concerning an investment in the Company and has done so to the extent the undersigned considers necessary;

(m)     That the undersigned certifies, under penalty of perjury, (i) that the social security or Tax Identification Number set forth herein is time, correct and complete, and (ii) that the undersigned is not subject to backup withholding either because the undersigned has not been notified that the undersigned is subject to backup withholding as a result of a failure to report all interest or dividends, or the Internal Revenue Service has notified the undersigned that the undersigned is no longer subject to backup withholding; and

(n)     That the undersigned acknowledges that the Private Placement Memorandum reflects the Company's current intentions and estimates at

the current time, and as with any developing company, the precise elements of the Company's plans can be expected to change from time to time.

2.      Indemnification. The undersigned shall indemnify, defend and hold harmless the Company, and any officers, employees, shareholders, partners, agents, directors or controlling persons of the Company (collectively the "Indemnified Parties" and individually an "Indemnified Party") who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative, against losses, liabilities and expenses of each Indemnified Party (including attorneys' fees, judgments, fines and amounts paid in settlement, payable as incurred) incurred by such person or entity in connection with such action, arbitration, suit or proceeding, by reason of or arising from (i) any misrepresentation or misstatement of facts or omission to represent or state facts made by the undersigned, including, without limitation, the information in this Subscription Agreement, or (ii) litigation or other proceeding brought by the undersigned against one or more Indemnified Party wherein the Indemnified Party is the prevailing party.

3.      Entity Investors. If the undersigned is an entity, trust, pension fund or IRA account (an "Entity"), the Entity and the person signing on its behalf represent and warrant that: (i) such Entity is an existing entity, and has not been organized or reorganized for the purpose of making this investment (or if not true, such fact shall be disclosed to the Company in writing along with information concerning the beneficial owners of the Entity), (ii) the undersigned has the authority to execute this Subscription Agreement, and any other documents in connection with an investment in the Shares, on the Entity's behalf, (iii) the Entity has the power, right and authority to invest in the Shares and enter into the transactions contemplated thereby, and that the investment is suitable and appropriate for the Entity and its beneficiaries (given the risks and illiquid nature of the investment) and (iv) all documents executed by the entity in connection with the Company are valid and binding documents or agreements of the Entity enforceable in accordance with their terms.

4.   Revocation. The undersigned agrees that the undersigned may not cancel, terminate or revoke the offer to subscribe for shares for a period of 10 days or any agreement hereunder at any time and that this Agreement shall survive the death or disability of the undersigned and shall be binding upon the undersigned's heirs, executors, administrators, beneficiaries, successors and assigns.

5.   Certain Securities Law Matters.

        (a)      The Shares shall not be sold, assigned, transferred or pledged except upon satisfaction of the conditions specified in this Section 5, which conditions are intended to ensure compliance with the provisions of the Act. The undersigned will cause any proposed purchaser, assignee,

transferee or pledgee of the Shares held by the undersigned to agree to take and hold such securities subject to the provisions and conditions of this Section 5.

(b)      Each certificate representing (i) the Shares and (ii) any other securities issued in respect of the Shares upon any stock split, stock dividend, recapitalization, merger, consolidation or similar event, shall (unless otherwise permitted by the provisions of Section 5(c) below) be stamped or otherwise imprinted with a legend substantially in the following form (in addition to any legend required under applicable state securities laws):

> THE SHARES REPRESENTED BY THIS CERTIFICATE HAVE BEEN ACQUIRED FOR INVESTMENT AND HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933. SUCH SHARES MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF SUCH REGISTRATION OR UNLESS THE COMPANY RECEIVES AN OPINION OF COUNSEL OR OTHER EVIDENCE REASONABLY ACCEPTABLE TO IT STATING THAT SUCH SALE OR TRANSFER IS EXEMPT FROM THE REGISTRATION AND PROSPECTUS DELIVERY REQUIREMENTS OF SAID ACT. COPIES OF THE AGREEMENT COVERING THE PURCHASE OF THESE SHARES AND RESTRICTING THEIR TRANSFER MAY BE OBTAINED AT NO COST BY WRITTEN REQUEST MADE BY THE HOLDER OF RECORD OF THIS CERTIFICATE TO THE SECRETARY OF THE CORPORATION AT THE PRINCIPAL EXECUTIVE OFFICES OF THE CORPORATION.

The undersigned consents to the Company making a notation on its records and giving instructions to any transfer agent of the Shares in order to implement the restrictions on transfer established in this Section 5.

(c)      The undersigned agrees to comply in all respects with the provisions of this Section 5. Prior to any proposed sale, assignment, transfer or pledge of any Shares, unless there is in effect a registration statement under the Act covering the proposed transfer, the undersigned thereof shall give written notice to the Company of the undersigned's intention to effect such transfer, sale, assignment or pledge. Each such notice shall describe the manner and circumstances of the proposed transfer, sale, assignment or pledge in sufficient detail, and shall be accompanied, at the undersigned's expense evidence satisfactory to the Company the effect that the proposed transfer of the Shares may be affected without registration under the Act or applicable state securities law.

6. Investor Information

The Company may only accept subscriptions from persons who meet certain suitability standards. Therefore, certain information is requested below.

(a)   Name: _WILLIAM  O'KANE_

Age: ████

Social Security Number: ████████

(b)   Home Address: ████████████

Home Telephone Number: ████████

(c)   Firm Name: _GROUP FOX_

Nature of Business: _REAL ESTATE DEV,_

Position/Title: _OWNER_

Length of Time in Position: _30 +_

Business Address: _401 W. FULLERTON_
_CHICAGO IC_
_____ Zip Code: _____

Business Telephone Number: _SAME_

(d)   Send Correspondence to: Home _X_ Business _____

(e)   List each prior employment position or occupation during the last five years, giving dates: _____
_SAME_

(f)   List any business or professional education, indicating degrees received, if any: _____
_NA_

(g)   (1)   My net worth (together with my spouse's net worth), is in

excess of $ █████████

(2)     In order for the Company to determine if I qualify as an "accredited investor" under Regulation D of the Securities Act of 1993, the reasonable fair market value of my personal home, home furnishings, and automobile is in excess of $ ██████

(3)     My estimated annual gross income was or is (do not include your spouse's income):

| Last Year: | Two Years Ago: | Projected for Current Year: |
|---|---|---|
| $ ██████████ | $ ██████████ | $ ██████████ |

(4)     My spouse's actual gross income was or is:

| Last Year: | Two Years Ago: | Projected for Current Year: |
|---|---|---|
| $ ██████████ | $ ██████████ | $ ██████████ |

(h)     Previous Investment Experience in Other Private Offerings of Securities or Other Relevant Experience:

Name of Program
Or Company

1. ████████████
2. ██████████████████
3. _____

Amount Invested

1. ██████████
2. █████████
3. _____

(i)     In which state do you currently

(a)     Maintain your primary residence?     / L

(b)     Maintain your secondary residence?     _____

(c)     Vote?     / L

(d)     File income tax returns?     / L

(e)     Maintain a driver's license?     / L

(j)    List any other information you believe is relevant in showing that you are able to adequately evaluate the risks and merits of this investment:

*I TRUST MALCOLM MORRIS*

In furnishing the above information, I acknowledge that the Company will be relying thereon in determining, among other things, whether there are reasonable grounds to believe that I qualify as a purchaser under applicable securities laws for the purposes of the proposed investment.

7.  Miscellaneous.

(a)    All notices or other communications given or made hereunder shall be in writing and shall be delivered or mailed by registered or certified mail, return receipt requested, postage prepaid, to the Company at the address set forth on the instructions page hereof and to the undersigned at the address set forth on the signature page hereof.

(b)    This Agreement shall be governed by and construed in accordance with the laws of the State of California, without reference to conflict of law principles.

(c)    This Agreement constitutes the entire agreement among the parties hereto with respect to the subject matter hereof and supersedes any prior or contemporaneous understandings, representations, warranties or agreements (whether oral or written) and may be amended only by a writing executed by all parties.

(d)    The undersigned acknowledges that the Company may, in its sole and absolute discretion, accept or reject this subscription offer in whole or in part.

(e)    Checks should be made out to Ocean Harvest LLC, a Delaware Corporation and RBKL's operating account in the U.S.

8.    Certification.

The undersigned represents to you that (i) the information contained herein is complete and accurate on the date hereof and may be relied upon by you and (ii) the undersigned will notify you immediately of any change in any of such information occurring prior to the acceptance of the subscription and will promptly send you written confirmation of such change. The undersigned hereby certifies that he has read and understands the Private Placement Memorandum and this Subscription Agreement.



IN WITNESS WHEREOF, the undersigned has executed this Subscription Agreement this _20ᵗʰ_ day of _November_, 2015.

_5_
Number of Shares Subscribed for

at $175,500 per share

$ _875,000 —_
Total Purchase Price

_WILLIAM O'KANE_
NAME OF PURCHASER
_AS NOMINEE_

_[signature]_
Signature

_____
Title of Authorized Signatory if Purchaser
Is a corporation, partnership or other entity

_____
Signature of Spouse or Co-owner

_ACCEPTED By_
_ROCKY SEMBRITZKY_
_EXECUTIVE CHAIRMAN &_
_FOUNDER_

_11·20·2015_

# EXHIBIT 7

STOCK SUBSCRIPTION AGREEMENT

The undersigned hereby offers to subscribe for the number of shares of Preferred Stock (the "Shares") of RASLI BAHARI KENYA LIMITED (the "Company") set forth on the signature page of this Subscription Agreement at a price of $175,500 per Share.

By execution of this Subscription Agreement, the undersigned hereby acknowledges that the undersigned understands that the Company is relying upon the accuracy and completeness hereof in complying with its obligations under applicable federal and state securities laws. The undersigned further acknowledges and certifies that the undersigned received and read the Private Placement Memorandum of the Company dated October 14, 2015 and any supplements thereto (the "Private Placement Memorandum"), and the undersigned is familiar with the terms and provisions thereof.

The undersigned agrees and represents as follows:

1.  Representations, Warranties and Agreements.

The undersigned hereby represents and warrants to, and agrees with, the Company, as follows:

(a)  That the undersigned is aware of the following:

(1)  The Shares are speculative investments which involve a substantial degree of risk of loss by the undersigned of the undersigned's entire investment in the Company and that the undersigned understands and takes full cognizance of the risk factors related to the purchase of the Shares, including, but not limited to those set forth in the Private Placement Memorandum;

(2)  The Company is newly formed.

(3)  There are significant restrictions on the transferability of the Shares; the Shares will not be, and the investors will have no rights to require that the Shares be registered under the Securities Act of 1933 (the "Act") or any state securities laws; there is no public market for the Shares and none is expected to develop; and, accordingly, it may not be possible for the undersigned to liquidate the undersigned's investment in the Company;

(4)  No federal or state agency has made any findings as to the fairness of the terms of the offering; and

(5)  Any projections or predictions that may have been made available to investors are based on estimates, assumptions and



forecasts which may prove to be incorrect; and no assurance is given that actual results will correspond with the results contemplated by the various projections;

(b)   That at no time has it been explicitly or implicitly represented, guaranteed or warranted to the undersigned by the Company, the agents and employees of the Company, or any other person: (1) That the undersigned will or will not have to remain as owner of the Shares an exact or approximate length of time; (2) That a percentage of profit and/or amount or type of consideration will be realized as a result of this investment; (3) That any cash dividends from Company operations or otherwise will be made to shareholders by any specific date or will be made at all; or (4) That any specific tax benefits will accrue as a result of an investment in the Company;

(c)   That the undersigned is financially responsible, able to meet all obligations hereunder, and acknowledges that this investment will be long-term and is by nature speculative;

(d)   That the undersigned has received and carefully read and is familiar with the Private Placement Memorandum, this Subscription Agreement, and all other documents in connection therewith, and the undersigned confirms that all documents and records, if applicable pertaining to the investment in the Company have been made available to the undersigned and/or to the undersigned's personal investment, tax and legal advisers, if such advisers were utilized by the undersigned;

(e)   That the undersigned has relied only on the information contained in the Private Placement Memorandum and that no written or oral representation or information that is in any way inconsistent with the Private Placement Memorandum and has been made or furnished to the undersigned or to the undersigned's purchaser representative in connection with the offering of the Shares, and if so made, has not been relied upon;

(f)   That the undersigned is capable of bearing the high degree of economic risks and burdens of this venture including, but not limited to, the possibility of complete loss of investment and the lack of a public market which may make it impossible to readily liquidate the investment whenever desired;

(g)   That the undersigned is an "accredited investor" as that term is defined in Regulation D under the Act or is otherwise a sophisticated, knowledgeable investor (either alone or with the aid of a purchaser representative) with adequate net worth and income for this investment;

(h)   That the undersigned has knowledge and experience in financial and business matters (either alone or with the aid of a purchaser



representative), is capable of evaluating the merits and risks of an investment in the Company and its proposed activities and has carefully considered the suitability of an investment in the Company for the undersigned's particular financial situation, and has determined that the Shares are a suitable investment;

(i)     That the offer to sell Shares was communicated to the undersigned by the Company in such a manner that the undersigned was able to ask questions of and receive answers from the Company concerning the terms and conditions of this transaction and that at no time was the undersigned presented with or solicited by any leaflet, public promotional meeting, newspaper or magazine article, radio or television advertisement or any other form of advertising or general solicitation;

(j)     That the Shares for which the undersigned hereby subscribes are being acquired solely for the undersigned's own account, for investment, and are not being purchased with a view to or for the resale, distribution, subdivision or fractionalization thereof; and the undersigned agrees that such Shares will not be sold without registration under the Act or an exemption therefrom. In furtherance thereof, the undersigned will not sell, hypothecate or otherwise transfer the undersigned's Shares unless the Shares are registered under the Act and qualified under applicable state securities laws or unless, in the opinion of the Company, an exemption from the registration requirements of the Act and such laws is available;

(k)     That the undersigned has had prior personal or business relationships with the Company or its affiliates, or by reason of the undersigned's business or financial experience (either alone or with the aid of a purchaser representative), the undersigned has the capacity to protect the undersigned's own interest in connection with this transaction;

(l)     That the undersigned has been advised to consult with the undersigned's own attorney regarding legal matters concerning an investment in the Company and has done so to the extent the undersigned considers necessary;

(m)     That the undersigned certifies, under penalty of perjury, (i) that the social security or Tax Identification Number set forth herein is time, correct and complete, and (ii) that the undersigned is not subject to backup withholding either because the undersigned has not been notified that the undersigned is subject to backup withholding as a result of a failure to report all interest or dividends, or the Internal Revenue Service has notified the undersigned that the undersigned is no longer subject to backup withholding; and

(n)     That the undersigned acknowledges that the Private Placement Memorandum reflects the Company's current intentions and estimates at



the current time, and as with any developing company, the precise elements of the Company's plans can be expected to change from time to time.

2.      Indemnification. The undersigned shall indemnify, defend and hold harmless the Company, and any officers, employees, shareholders, partners, agents, directors or controlling persons of the Company (collectively the "Indemnified Parties" and individually an "Indemnified Party") who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative, against losses, liabilities and expenses of each Indemnified Party (including attorneys' fees, judgments, fines and amounts paid in settlement, payable as incurred) incurred by such person or entity in connection with such action, arbitration, suit or proceeding, by reason of or arising from (i) any misrepresentation or misstatement of facts or omission to represent or state facts made by the undersigned, including, without limitation, the information in this Subscription Agreement, or (ii) litigation or other proceeding brought by the undersigned against one or more Indemnified Party wherein the Indemnified Party is the prevailing party.

3.      Entity Investors. If the undersigned is an entity, trust, pension fund or IRA account (an "Entity"), the Entity and the person signing on its behalf represent and warrant that: (i) such Entity is an existing entity, and has not been organized or reorganized for the purpose of making this investment (or if not true, such fact shall be disclosed to the Company in writing along with information concerning the beneficial owners of the Entity), (ii) the undersigned has the authority to execute this Subscription Agreement, and any other documents in connection with an investment in the Shares, on the Entity's behalf, (iii) the Entity has the power, right and authority to invest in the Shares and enter into the transactions contemplated thereby, and that the investment is suitable and appropriate for the Entity and its beneficiaries (given the risks and illiquid nature of the investment) and (iv) all documents executed by the entity in connection with the Company are valid and binding documents or agreements of the Entity enforceable in accordance with their terms.

4.   Revocation. The undersigned agrees that the undersigned may not cancel, terminate or revoke the offer to subscribe for shares for a period of 10 days or any agreement hereunder at any time and that this Agreement shall survive the death or disability of the undersigned and shall be binding upon the undersigned's heirs, executors, administrators, beneficiaries, successors and assigns.

5.   Certain Securities Law Matters.

(a)      The Shares shall not be sold, assigned, transferred or pledged except upon satisfaction of the conditions specified in this Section 5, which conditions are intended to ensure compliance with the provisions of the Act. The undersigned will cause any proposed purchaser, assignee,



transferee or pledgee of the Shares held by the undersigned to agree to take and hold such securities subject to the provisions and conditions of this Section 5.

(b)      Each certificate representing (i) the Shares and (ii) any other securities issued in respect of the Shares upon any stock split, stock dividend, recapitalization, merger, consolidation or similar event, shall (unless otherwise permitted by the provisions of Section 5(c) below) be stamped or otherwise imprinted with a legend substantially in the following form (in addition to any legend required under applicable state securities laws):

> THE SHARES REPRESENTED BY THIS CERTIFICATE HAVE BEEN ACQUIRED FOR INVESTMENT AND HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933. SUCH SHARES MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF SUCH REGISTRATION OR UNLESS THE COMPANY RECEIVES AN OPINION OF COUNSEL OR OTHER EVIDENCE REASONABLY ACCEPTABLE TO IT STATING THAT SUCH SALE OR TRANSFER IS EXEMPT FROM THE REGISTRATION AND PROSPECTUS DELIVERY REQUIREMENTS OF SAID ACT. COPIES OF THE AGREEMENT COVERING THE PURCHASE OF THESE SHARES AND RESTRICTING THEIR TRANSFER MAY BE OBTAINED AT NO COST BY WRITTEN REQUEST MADE BY THE HOLDER OF RECORD OF THIS CERTIFICATE TO THE SECRETARY OF THE CORPORATION AT THE PRINCIPAL EXECUTIVE OFFICES OF THE CORPORATION.

The undersigned consents to the Company making a notation on its records and giving instructions to any transfer agent of the Shares in order to implement the restrictions on transfer established in this Section 5.

(c)      The undersigned agrees to comply in all respects with the provisions of this Section 5. Prior to any proposed sale, assignment, transfer or pledge of any Shares, unless there is in effect a registration statement under the Act covering the proposed transfer, the undersigned thereof shall give written notice to the Company of the undersigned's intention to effect such transfer, sale, assignment or pledge. Each such notice shall describe the manner and circumstances of the proposed transfer, sale, assignment or pledge in sufficient detail, and shall be accompanied, at the undersigned's expense evidence satisfactory to the Company the effect that the proposed transfer of the Shares may be affected without registration under the Act or applicable state securities law.



6.  Investor Information

The Company may only accept subscriptions from persons who meet certain suitability standards. Therefore, certain information is requested below.

(a)  Name: __Synergy Source, LLC_____

Age: _____

Social Security Number: _____

(b)  Home Address: _____

Home Telephone Number: _____

(c)  Firm Name: __Synergy Source, LLC_____

Nature of Business: __Investing_____

Position/Title: _____

Length of Time in Position: _____

Business Address: __11715 Fox Road, Suite #400-132_____

_____Indianapolis, IN_____

_____Zip Code: __46236_____

Business Telephone Number: __317-371-3772_____

(d)  Send Correspondence to: Home_____Business ___X_____

(e)  List each prior employment position or occupation during the last five years, giving dates: _____

_____

_____

(f)  List any business or professional education, indicating degrees received, if any: _____

__Members hold a wide variety of college degrees (including__

__post graduate - MBA / Law Degree)__

(g)  (1)  My net worth (together with my spouse's net worth), is in

 

excess of $. █████████████

(2)     In order for the Company to determine if I qualify as an "accredited investor" under Regulation D of the Securities Act of 1993, the reasonable fair market value of my personal home, home furnishings, and automobile is in excess of $_█████████

(3)     My estimated annual gross income was or is (do not include your spouse's income):  █████████████

Last Year:          Two Years Ago:          Projected for Current Year:

$_____          $_____          $_____

(4)     My spouse's actual gross income was or is:

Last Year:          Two Years Ago:          Projected for Current Year:

$_____          $_____          $_____


(h)     Previous Investment Experience in Other Private Offerings of Securities or Other Relevant Experience:

Name of Program          1.___**Have invested in other PPM's**___
Or Company
                         2._____

                         3._____

Amount Invested          1._____

                         2._____

                         3._____

(i)     In which state do you currently

    (a)     Maintain your primary residence? ___**Indiana**___

    (b)     Maintain your secondary residence? ___**N/A**___

    (c)     Vote? __**Yes**_____

    (d)     File income tax returns? _____**Yes**_____

    (e)     Maintain a driver's license? _____**Yes - for individual members**__



(j)     List any other information you believe is relevant in showing that you are able to adequately evaluate the risks and merits of this investment:

**Multiple prior PPM investments by members**

In furnishing the above information, I acknowledge that the Company will be relying thereon in determining, among other things, whether there are reasonable grounds to believe that I qualify as a purchaser under applicable securities laws for the purposes of the proposed investment.

7.   Miscellaneous.

(a)     All notices or other communications given or made hereunder shall be in writing and shall be delivered or mailed by registered or certified mail, return receipt requested, postage prepaid, to the Company at the address set forth on the instructions page hereof and to the undersigned at the address set forth on the signature page hereof.

(b)     This Agreement shall be governed by and construed in accordance with the laws of the State of Texas, without reference to conflict of law principles.

(c)     This Agreement constitutes the entire agreement among the parties hereto with respect to the subject matter hereof and supersedes any prior or contemporaneous understandings, representations, warranties or agreements (whether oral or written) and may be amended only by a writing executed by all parties.

(d)     The undersigned acknowledges that the Company may, in its sole and absolute discretion, accept or reject this subscription offer in whole or in part.

(e)     Checks should be made out to Bounty of the Ocean Inc., RBKL's operating account in the U.S.

8.     Certification.

The undersigned represents to you that (i) the information contained herein is complete and accurate on the date hereof and may be relied upon by you and (ii) the undersigned will notify you immediately of any change in any of such information occurring prior to the acceptance of the subscription and will promptly send you written confirmation of such change. The undersigned hereby certifies that he has read and understands the Private Placement Memorandum and this Subscription Agreement.



IN WITNESS WHEREOF, the undersigned has executed this Subscription Agreement this __5th__ day of ___November___, 2015.

__2 (Two)__
Number of Shares Subscribed for

at $175,500 per share

$ __351,000__
Total Purchase Price

Synergy Source, LLC
NAME OF PURCHASER

Signature   Matthew C. Hy___

Member
Title of Authorized Signatory if Purchaser
Is a corporation, partnership or other entity

Signature of Spouse or Co-owner

Susan R. Jones, Member

___ E. Jones, Member

Rocky Sembritzky

THE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES
ACT OF 1933, AS AMENDED (THE "ACT") AND MAY NOT BE OFFERED, SOLD
OR OTHERWISE TRANSFERRED UNLESS THE SECURITIES ARE REGISTERED
UNDER THE ACT OR AN EXEMPTION THEREFROM IS AVAILABLE.

Accepted by Company,

RASLI BAHARI KENYA LIMITED

By: _Rocky  Sembritzky_

Title: _Executive Chairman & Founder_

Date: _11/17/2015_

# EXHIBIT 8

## STOCK SUBSCRIPTION AGREEMENT

The undersigned hereby offers to subscribe for the number of shares of Preferred Stock (the "Shares") of RASLI BAHARI KENYA LIMITED (the "Company") set forth on the signature page of this Subscription Agreement at a price of $175,500 per Share.

By execution of this Subscription Agreement, the undersigned hereby acknowledges that the undersigned understands that the Company is relying upon the accuracy and completeness hereof in complying with its obligations under applicable federal and state securities laws. The undersigned further acknowledges and certifies that the undersigned received and read the Private Placement Memorandum of the Company dated _DEC 1, 2015_ and any supplements thereto (the "Private Placement Memorandum"), and the undersigned is familiar with the terms and provisions thereof.

The undersigned agrees and represents as follows:

    1.    Representations, Warranties and Agreements.

The undersigned hereby represents and warrants to, and agrees with, the Company, as follows:

    (a)    That the undersigned is aware of the following:

        (1)    The Shares are speculative investments which involve a substantial degree of risk of loss by the undersigned of the undersigned's entire investment in the Company and that the undersigned understands and takes full cognizance of the risk factors related to the purchase of the Shares, including, but not limited to those set forth in the Private Placement Memorandum;

        (2)    The Company is newly formed.

        (3)    There are significant restrictions on the transferability of the Shares; the Shares will not be, and the investors will have no rights to require that the Shares be registered under the Securities Act of 1933 (the "Act") or any state securities laws; there is no public market for the Shares and none is expected to develop; and, accordingly, it may not be possible for the undersigned to liquidate the undersigned's investment in the Company;

        (4)    No federal or state agency has made any findings as to the fairness of the terms of the offering; and

        (5)    Any projections or predictions that may have been made available to investors are based on estimates, assumptions and

forecasts which may prove to be incorrect; and no assurance is given that actual results will correspond with the results contemplated by the various projections;

(b)     That at no time has it been explicitly or implicitly represented, guaranteed or warranted to the undersigned by the Company, the agents and employees of the Company, or any other person: (1) That the undersigned will or will not have to remain as owner of the Shares an exact or approximate length of time; (2) That a percentage of profit and/or amount or type of consideration will be realized as a result of this investment; (3) That any cash dividends from Company operations or otherwise will be made to shareholders by any specific date or will be made at all; or (4) That any specific tax benefits will accrue as a result of an investment in the Company;

(c)     That the undersigned is financially responsible, able to meet all obligations hereunder, and acknowledges that this investment will be long-term and is by nature speculative;

(d)     That the undersigned has received and carefully read and is familiar with the Private Placement Memorandum, this Subscription Agreement, and all other documents in connection therewith, and the undersigned confirms that all documents and records, if applicable pertaining to the investment in the Company have been made available to the undersigned and/or to the undersigned's personal investment, tax and legal advisers, if such advisers were utilized by the undersigned;

(e)     That the undersigned has relied only on the information contained in the Private Placement Memorandum and that no written or oral representation or information that is in any way inconsistent with the Private Placement Memorandum and has been made or furnished to the undersigned or to the undersigned's purchaser representative in connection with the offering of the Shares, and if so made, has not been relied upon;

(f)     That the undersigned is capable of bearing the high degree of economic risks and burdens of this venture including, but not limited to, the possibility of complete loss of investment and the lack of a public market which may make it impossible to readily liquidate the investment whenever desired;

(g)     That the undersigned is an "accredited investor" as that term is defined in Regulation D under the Act or is otherwise a sophisticated, knowledgeable investor (either alone or with the aid of a purchaser representative) with adequate net worth and income for this investment;

(h)     That the undersigned has knowledge and experience in financial and business matters (either alone or with the aid of a purchaser

representative), is capable of evaluating the merits and risks of an investment in the Company and its proposed activities and has carefully considered the suitability of an investment in the Company for the undersigned's particular financial situation, and has determined that the Shares are a suitable investment;

(i)     That the offer to sell Shares was communicated to the undersigned by the Company in such a manner that the undersigned was able to ask questions of and receive answers from the Company concerning the terms and conditions of this transaction and that at no time was the undersigned presented with or solicited by any leaflet, public promotional meeting, newspaper or magazine article, radio or television advertisement or any other form of advertising or general solicitation;

(j)     That the Shares for which the undersigned hereby subscribes are being acquired solely for the undersigned's own account, for investment, and are not being purchased with a view to or for the resale, distribution, subdivision or fractionalization thereof; and the undersigned agrees that such Shares will not be sold without registration under the Act or an exemption therefrom. In furtherance thereof, the undersigned will not sell, hypothecate or otherwise transfer the undersigned's Shares unless the Shares are registered under the Act and qualified under applicable state securities laws or unless, in the opinion of the Company, an exemption from the registration requirements of the Act and such laws is available;

(k)     That the undersigned has had prior personal or business relationships with the Company or its affiliates, or by reason of the undersigned's business or financial experience (either alone or with the aid of a purchaser representative), the undersigned has the capacity to protect the undersigned's own interest in connection with this transaction;

(l)     That the undersigned has been advised to consult with the undersigned's own attorney regarding legal matters concerning an investment in the Company and has done so to the extent the undersigned considers necessary;

(m)     That the undersigned certifies, under penalty of perjury, (i) that the social security or Tax Identification Number set forth herein is time, correct and complete, and (ii) that the undersigned is not subject to backup withholding either because the undersigned has not been notified that the undersigned is subject to backup withholding as a result of a failure to report all interest or dividends, or the Internal Revenue Service has notified the undersigned that the undersigned is no longer subject to backup withholding; and

(n)     That the undersigned acknowledges that the Private Placement Memorandum reflects the Company's current intentions and estimates at

the current time, and as with any developing company, the precise elements of the Company's plans can be expected to change from time to time.

2.    Indemnification. The undersigned shall indemnify, defend and hold harmless the Company, and any officers, employees, shareholders, partners, agents, directors or controlling persons of the Company (collectively the "Indemnified Parties" and individually an "Indemnified Party") who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative, against losses, liabilities and expenses of each Indemnified Party (including attorneys' fees, judgments, fines and amounts paid in settlement, payable as incurred) incurred by such person or entity in connection with such action, arbitration, suit or proceeding, by reason of or arising from (i) any misrepresentation or misstatement of facts or omission to represent or state facts made by the undersigned, including, without limitation, the information in this Subscription Agreement, or (ii) litigation or other proceeding brought by the undersigned against one or more Indemnified Party wherein the Indemnified Party is the prevailing party.

3.    Entity Investors. If the undersigned is an entity, trust, pension fund or IRA account (an "Entity"), the Entity and the person signing on its behalf represent and warrant that: (i) such Entity is an existing entity, and has not been organized or reorganized for the purpose of making this investment (or if not true, such fact shall be disclosed to the Company in writing along with information concerning the beneficial owners of the Entity), (ii) the undersigned has the authority to execute this Subscription Agreement, and any other documents in connection with an investment in the Shares, on the Entity's behalf; (iii) the Entity has the power, right and authority to invest in the Shares and enter into the transactions contemplated thereby, and that the investment is suitable and appropriate for the Entity and its beneficiaries (given the risks and illiquid nature of the investment) and (iv) all documents executed by the entity in connection with the Company are valid and binding documents or agreements of the Entity enforceable in accordance with their terms.

4.    Revocation. The undersigned agrees that the undersigned may not cancel, terminate or revoke the offer to subscribe for shares for a period of 10 days or any agreement hereunder at any time and that this Agreement shall survive the death or disability of the undersigned and shall be binding upon the undersigned's heirs, executors, administrators, beneficiaries, successors and assigns.

5.   Certain Securities Law Matters.

(a)    The Shares shall not be sold, assigned, transferred or pledged except upon satisfaction of the conditions specified in this Section 5, which conditions are intended to ensure compliance with the provisions of the Act. The undersigned will cause any proposed purchaser, assignee,



transferee or pledgee of the Shares held by the undersigned to agree to take and hold such securities subject to the provisions and conditions of this Section 5.

(b)     Each certificate representing (i) the Shares and (ii) any other securities issued in respect of the Shares upon any stock split, stock dividend, recapitalization, merger, consolidation or similar event, shall (unless otherwise permitted by the provisions of Section 5(c) below) be stamped or otherwise imprinted with a legend substantially in the following form (in addition to any legend required under applicable state securities laws):

> THE SHARES REPRESENTED BY THIS CERTIFICATE
> HAVE BEEN ACQUIRED FOR INVESTMENT AND HAVE
> NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF
> 1933. SUCH SHARES MAY NOT BE SOLD OR
> TRANSFERRED IN THE ABSENCE OF SUCH
> REGISTRATION OR UNLESS THE COMPANY RECEIVES
> AN OPINION OF COUNSEL OR OTHER EVIDENCE
> REASONABLY ACCEPTABLE TO IT STATING THAT SUCH
> SALE OR TRANSFER IS EXEMPT FROM THE
> REGISTRATION AND PROSPECTUS DELIVERY
> REQUIREMENTS OF SAID ACT. COPIES OF THE
> AGREEMENT COVERING THE PURCHASE OF THESE
> SHARES AND RESTRICTING THEIR TRANSFER MAY BE
> OBTAINED AT NO COST BY WRITTEN REQUEST MADE
> BY THE HOLDER OF RECORD OF THIS CERTIFICATE TO
> THE SECRETARY OF THE CORPORATION AT THE
> PRINCIPAL EXECUTIVE OFFICES OF THE CORPORATION.

The undersigned consents to the Company making a notation on its records and giving instructions to any transfer agent of the Shares in order to implement the restrictions on transfer established in this Section 5.

(c)     The undersigned agrees to comply in all respects with the provisions of this Section 5. Prior to any proposed sale, assignment, transfer or pledge of any Shares, unless there is in effect a registration statement under the Act covering the proposed transfer, the undersigned thereof shall give written notice to the Company of the undersigned's intention to effect such transfer, sale, assignment or pledge. Each such notice shall describe the manner and circumstances of the proposed transfer, sale, assignment or pledge in sufficient detail, and shall be accompanied, at the undersigned's expense evidence satisfactory to the Company the effect that the proposed transfer of the Shares may be affected without registration under the Act or applicable state securities law.



6. Investor Information

The Company may only accept subscriptions from persons who meet certain suitability standards. Therefore, certain information is requested below.

(a)     Name: _RIGOBERTO GIRON_

Age: ███

Social Security Number: ███████

(b)     Home Address: ████████████████████ GA

Home Telephone Number: ███████ ███

(c)     Firm Name: _AZKARTA CREST CORPORATION, INC._

Nature of Business: _SUPPLY CHAIN AND TECHNOLOGY SERVICES_

Position/Title: _CHAIRMAN AND CEO_

Length of Time in Position: _4 YEARS_

Business Address: _P.O. BOX 128_

_MONROVIA, MD_

_____ Zip Code: _21770_

Business Telephone Number: _1-877-264-8618_

(d)     Send Correspondence to: Home __X__ Business _____

(e)     List each prior employment position or occupation during the last five years, giving dates: _CARE - AUD SUPPLY CHAIN MGMT. (APR 2001 - AUG 20_ _AZKARTA CREST - CEO (AUG 2011 - PRESENT); EDWARD JONES INVESTMENTS - ADVISOR (JUN 2014 - NOV 2015)_

(f)     List any business or professional education, indicating degrees received, if any: _JOINT MECHANICAL - INDUSTRIAL ENGINEERING; MASTERS OF BUSINESS ADMINISTRATION; SERIES 7 AND 66 REGISTRATIONS_

(g)     (1)     My net worth (together with my spouse's net worth), is in

excess of $ ███████████

(2)    In order for the Company to determine if I qualify as an "accredited investor" under Regulation D of the Securities Act of 1993, the reasonable fair market value of my personal home, home furnishings, and automobile is in excess of $ ███████████

(3)    My estimated annual gross income was or is (do not include your spouse's income):

| Last Year: | Two Years Ago: | Projected for Current Year: |
|---|---|---|
| $ ██████████ | $ ██████████ | $ ██████████████ |

(4)    My spouse's actual gross income was or is:

| Last Year: | Two Years Ago: | Projected for Current Year: |
|---|---|---|
| $ | $ | $ |

(h)    Previous Investment Experience in Other Private Offerings of Securities or Other Relevant Experience:

| Name of Program Or Company | |
|---|---|
| | 1. AZKARTA CREST CORPORATION |
| | 2. EDWARD JONES INVESTMENTS |
| | 3. SUSTAIN GLOBAL PARTNERSHIP |
| Amount Invested | 1. ███████████████ |
| | 2. █████████████ |
| | 3. ██████████████ |

(i)    In which state do you currently

(a)    Maintain your primary residence? __GEORGIA__

(b)    Maintain your secondary residence? _____

(c)    Vote? __GEORGIA__

(d)    File income tax returns? __GEORGIA__

(e)    Maintain a driver's license? __GEORGIA__

(j)    List any other information you believe is relevant in showing that you are able to adequately evaluate the risks and merits of this investment:

*BUSINESS DEGREE ; CO FOUNDER OF MULTIPLE BUSINESSES;*

*SERIES 7 & 66 FINRA REGISTRATIONS ; FORMER FINANCIAL ADVISOR*

*CURRENT AND FORMER P&L RESPONSIBILITY.*

In furnishing the above information, I acknowledge that the Company will be relying thereon in determining, among other things, whether there are reasonable grounds to believe that I qualify as a purchaser under applicable securities laws for the purposes of the proposed investment.

7.  Miscellaneous.

(a)    All notices or other communications given or made hereunder shall be in writing and shall be delivered or mailed by registered or certified mail, return receipt requested, postage prepaid, to the Company at the address set forth on the instructions page hereof and to the undersigned at the address set forth on the signature page hereof.

(b)    This Agreement shall be governed by and construed in accordance with the laws of the State of Texas, without reference to conflict of law principles.

(c)    This Agreement constitutes the entire agreement among the parties hereto with respect to the subject matter hereof and supersedes any prior or contemporaneous understandings, representations, warranties or agreements (whether oral or written) and may be amended only by a writing executed by all parties.

(d)    The undersigned acknowledges that the Company may, in its sole and absolute discretion, accept or reject this subscription offer in whole or in part.

(e)    Checks should be made out to Bounty of the Ocean Inc., RBKL's operating account in the U.S.

8.    Certification.

The undersigned represents to you that (i) the information contained herein is complete and accurate on the date hereof and may be relied upon by you and (ii) the undersigned will notify you immediately of any change in any of such information occurring prior to the acceptance of the subscription and will promptly send you written confirmation of such change. The undersigned hereby certifies that he has read and understands the Private Placement Memorandum and this Subscription Agreement. 

IN WITNESS WHEREOF, the undersigned has executed this Subscription Agreement this _5th_ day of _DECEMBER_ , 2015.

_ONE_
Number of Shares Subscribed for

at $175,500 per share

$ _175,500.00_
Total Purchase Price

_AZKARTA CREST CORPORATION_
NAME OF PURCHASER

Signature

_CHAIRMAN AND CEO_
Title of Authorized Signatory if Purchaser
Is a corporation, partnership or other entity

Signature of Spouse or Co-owner

THE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES
ACT OF 1933, AS AMENDED (THE "ACT") AND MAY NOT BE OFFERED, SOLD
OR OTHERWISE TRANSFERRED UNLESS THE SECURITIES ARE REGISTERED
UNDER THE ACT OR AN EXEMPTION THEREFROM IS AVAILABLE.

Accepted by Company.

RASLI BAHARI KENYA LIMITED

By: _____ Rocky Sembar-172m

Title: Executive Chairman ; Founder

Date: 12 . 7 . 2015

# EXHIBIT 9

WD
K

ER 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

### WARRANTY DEED

NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU
MAY REMOVE OR STRIKE ANY OR ALL OF THE FOLLOWING INFORMATION
FROM ANY INSTRUMENT THAT TRANSFERS AN INTEREST IN REAL PROPERTY
BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS:  YOUR SOCIAL
SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.

Date:        December ____, 2015

Grantor:   SIDNEY PERKINS and ASHLEY PERKINS, husband and wife

Grantor's Mailing Address (including county):

    71 Laight Street, Apt #2C
    New York, New York County, New York 10013-2093

Grantee:   GOLDIE ROSE, a married person, as her sole and separate property and estate

Grantee's Mailing Address (including county):

    2727 Kirby Drive, Unit 26L
    Houston, Harris County, Texas 77098

Consideration:  For Ten and No/100 Dollars and other valuable consideration.

Property (including any improvements):

    Unit L, Level 26, of 2727 KIRBY CONDOMINIUMS, a Condominium Project in
    Harris County, Texas, together with the limited common elements and an undivided
    interest in and to the general common elements, as defined in that Declaration
    recorded in Film Code No. 205251, Condominium Records of Harris County, Texas.

Reservations from and exceptions to Conveyance and Warranty:

    Easements, rights-of-way, and prescriptive rights of record; all presently recorded
    instruments, other than liens and conveyances, that affect the Property. Taxes for the
    current year have been prorated and are assumed by Grantee.

    Grantor, for the consideration and subject to the reservations from and exceptions to
conveyance and warranty, grants, sells, and conveys to Grantee the Property, together with all and
singular the rights and appurtenances thereto in any wise belonging, to have and hold it to Grantee,
Grantee's heirs, executors, administrators, successors and assigns forever. Grantor binds Grantor and
Grantor's heirs, executors, administrators, successors and assigns to warrant and forever defend all

FILED BY
TRADITION TITLE COMPANY
T000175

1EE

D

and singular the Property to Grantee and Grantee's heirs, executors, administrators, successors and assigns against every person whomsoever lawfully claiming or to claim the same or any part thereof, except to the reservations from and exceptions to conveyance and warranty.

When the context requires, singular nouns and pronouns include the plural.

GRANTOR HAS EXECUTED AND DELIVERED THIS GENERAL WARRANTY DEED AND HAS GRANTED, BARGAINED, SOLD AND CONVEYED THE PROPERTY AND GRANTEE HAS RECEIVED AND ACCEPTED THIS GENERAL WARRANTY DEED AND HAS PURCHASED THE PROPERTY, "AS IS", "WHERE IS", AND WITH ALL FAULTS, AND WITHOUT ANY REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, WRITTEN OR ORAL, EXCEPT SOLELY THE WARRANTY OR TITLE EXPRESSLY SET FORTH HEREIN.

SIDNEY PERKINS

ASHLEY PERKINS

AGREED TO AND ACCEPTED BY:

GOLDIE ROSE

By: Goldie Rose by Verley L Sembritzky Jr
VERLEY LEE SEMBRITZKY, JR.
Agent and Attorney-in-Fact

THE STATE OF NEW YORK        {}

COUNTY OF NEW YORK        {}

This instrument was acknowledged before me on the 14 day of December, 2015, by SIDNEY PERKINS.

JOEL KEPECS
Notary Public, State of New York
Registration #01KE6216122
Qualified in Kings County
Commission Expires January 11, 2018

Notary Public, State of New York
Notary's printed name: Joel Kepecs

Notary's commission expires: 1 11 18

UNOFFICIAL COPY

ER 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

2OR

THE STATE OF NEW YORK     {}

COUNTY OF  NEW YORK     {}

    This instrument was acknowledged before me on the __14__ day of December, 2015, by ASHLEY PERKINS.

```
        JOEL KEPECS
   Notary Public, State of New York
    Registration #01KE6216122
       Qualified in Kings County
   Commission Expires January 11, 2018
```

Notary Public, State of New York

Notary's printed name: _Joel Kepecs_

Notary's commission expires:
_1/11/18_

THE STATE OF TEXAS     {}

COUNTY OF HARRIS     {}

    This instrument was acknowledged before me on the __18__ day of December, 2015, by VERLEY LEE SEMBRITZKY, JR., Agent and Attorney-in-Fact for GOLDIE ROSE, in the capacity therein stated.

```
     MALISSA ELLEN BERNSTEIN
    Notary Public, State of Texas
       My Commission Expires
           July 18, 2019
```

Notary Public, State of Texas

Notary's printed name:

Notary's commission expires:

(H:\Nancy\Office\November 15\19-001705.MB)

UNOFFICIAL COPY

ER 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

ER 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

20150571317

# Pages 4

12/21/2015 01:58 PM

e-Filed & e-Recorded in the

Official Public Records of

HARRIS COUNTY

STAN STANART

COUNTY CLERK

Fees  $24.00

RECORDERS MEMORANDUM
This instrument was received and recorded electronically
and any blackouts, additions or changes were present
at the time the instrument was filed and recorded.

Any provision herein which restricts the sale, rental, or
use of the described real property because of color or
race is invalid and unenforceable under federal law.
THE STATE OF TEXAS
COUNTY OF HARRIS
I hereby certify that this instrument was FILED in
File Number Sequence on the date and at the time stamped
hereon by me; and was duly RECORDED in the Official
Public Records of Real Property of Harris County, Texas.

*Stan Stanart*

COUNTY CLERK
HARRIS COUNTY, TEXAS

# EXHIBIT 10

PA
K

## STATUTORY DURABLE POWER OF ATTORNEY

NOTICE: THE POWERS GRANTED BY THIS DOCUMENT ARE BROAD AND SWEEPING. THEY ARE EXPLAINED IN THE DURABLE POWER OF ATTORNEY ACT, SUBTITLE P, TITLE 2, ESTATES CODE. IF YOU HAVE ANY QUESTIONS ABOUT THESE POWERS, OBTAIN COMPETENT LEGAL ADVICE. THIS DOCUMENT DOES NOT AUTHORIZE ANYONE TO MAKE MEDICAL AND OTHER HEALTH-CARE DECISIONS FOR YOU. YOU MAY REVOKE THIS POWER OF ATTORNEY IF YOU LATER WISH TO DO SO.

You should select someone you trust to serve as your agent (attorney in fact). Unless you specify otherwise, generally the agent's (attorney in fact's) authority will continue until:

(1) you die or revoke the power of attorney;
(2) your agent (attorney in fact) resigns or is unable to act for you; or
(3) a guardian is appointed for your estate.

I, GOLDIE ROSE, of 1135 Sugar Creek Boulevard, Sugar Land, Texas 77478, appoint VERLEY LEE SEMBRITZKY, JR., of 1135 Sugar Creek Boulevard, Sugar Land, Texas 77478, as my agent (attorney-in-fact) to act for me in any lawful way with respect to the following powers that I have initialed below.

TO GRANT ALL OF THE FOLLOWING POWERS, INITIAL THE LINE IN FRONT OF (N) AND IGNORE THE LINES IN FRONT OF THE OTHER POWERS LISTED IN (A) THROUGH (M).

TO GRANT A POWER, YOU MUST INITIAL THE LINE IN FRONT OF THE POWER YOU ARE GRANTING.

TO WITHHOLD A POWER, DO NOT INITIAL THE LINE IN FRONT OF THE POWER. YOU MAY, BUT DO NOT NEED TO, CROSS OUT EACH POWER WITHHELD.

INITIAL

| | | |
|---|---|---|
| ✗ | (A) | real property transactions; |
| ___ | (B) | tangible personal property transactions; |
| ___ | (C) | stock and bond transactions; |
| ___ | (D) | commodity and option transactions; |
| ___ | (E) | banking and other financial institution transactions; |
| ___ | (F) | business operating transactions; |
| ___ | (G) | insurance and annuity transactions; |
| ___ | (H) | estate, trust, and other beneficiary transactions; |
| ___ | (I) | claims and litigation; |
| ___ | (J) | personal and family maintenance; |
| ___ | (K) | benefits from social security, Medicare, Medicaid, or other governmental programs or civil or military service; |
| ___ | (L) | retirement plan transactions; |

1EE

FILED BY
TRADITION TITLE COMPANY
7000 h05

ER 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

_____ (M)   tax matters;

_____ (N)   ALL OF THE POWERS LISTED IN (A) THROUGH (M). YOU DO NOT HAVE TO INITIAL THE LINE IN FRONT OF ANY OTHER POWER IF YOU INITIAL LINE (N).

SPECIAL INSTRUCTIONS

Special instructions applicable to gifts (initial in front of the following sentence to have it apply):

_____ I grant my agent (attorney in fact) the power to apply my property to make gifts outright to or for the benefit of a person, including by the exercise of a presently exercisable general power of appointment held by me, except that the amount of a gift to an individual may not exceed the amount of annual exclusions allowed from the federal gift tax for the calendar year of the gift.

ON THE FOLLOWING LINES YOU MAY GIVE SPECIAL INSTRUCTIONS LIMITING OR EXTENDING THE POWERS GRANTED TO YOUR AGENT.

This Power of Attorney specifically includes the powers required to complete the purchase and acquisition of the following described property, to-wit:

Unit L, Level 26, of 2727 KIRBY CONDOMINIUMS, a Condominium Project in Harris County, Texas, together with the limited common elements and an undivided interest in and to the general common elements, as defined in that Declaration recorded in Film Code No. 205251, Condominium Records of Harris County, Texas, and being more commonly known as 2727 Kirby Drive, Unit 261, Houston, Texas 77098,

D

and to execute all Closing Statements, Water District Notices, and Title Company Forms and the like, and to do all things necessary to consummate the purchase  and acquisition of the above described property, all in accordance with an Earnest Money Contract between SIDNEY PERKINS and ASHLEY PERKINS, as Seller(s) and GOLDIE ROSE, as Purchaser(s), hereby giving and granting my said Attorney my full power and authority to do and perform any and all acts and things necessary in connection with such purchase and acquisition to the same extent which I could do if personally present, with full power of substitution and revocation, hereby ratifying all acts and things that my said Attorney may lawfully do in the premises by virtue hereof and I agree and represent to those dealing with my said Attorney-in-Fact that this Power of Attorney may be voluntarily revoked alone by revocation filed of record in the Office of the County Clerk of Harris County, Texas.

UNLESS YOU DIRECT OTHERWISE ABOVE, THIS POWER OF ATTORNEY IS EFFECTIVE IMMEDIATELY AND WILL CONTINUE UNTIL IT IS REVOKED.

CHOOSE ONE OF THE FOLLOWING ALTERNATIVES BY CROSSING OUT THE ALTERNATIVE NOT CHOSEN:

(A)   This power of attorney is not affected by my subsequent disability or incapacity.

(B)   This power of attorney becomes effective upon my disability or incapacity.

YOU SHOULD CHOOSE ALTERNATIVE (A) IF THIS POWER OF ATTORNEY IS TO BECOME EFFECTIVE ON THE DATE IT IS EXECUTED.

ER 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

IF NEITHER (A) NOR (B) IS CROSSED OUT, IT WILL BE ASSUMED THAT YOU CHOSE ALTERNATIVE (A).

If Alternative (B) is chosen and a definition of my disability or incapacity is not contained in this power of attorney, I shall be considered disabled or incapacitated for purposes of this power of attorney if a physician certifies in writing at a date later than the date this power of attorney is executed that, based on the physician's medical examination of me, I am mentally incapable of managing my financial affairs. I authorize the physician who examines me for this purpose to disclose my physical or mental condition to another person for purposes of this power of attorney. A third party who accepts this power of attorney is fully protected from any action taken under this power of attorney that is based on the determination made by a physician of my disability or incapacity.

I agree that any third party who receives a copy of this document may act under it. Revocation of the durable power of attorney is not effective as to a third party until the third party receives actual notice of the revocation. I agree to indemnify the third party for all claims that arise against the third party because of reliance on this power of attorney.

If any agent named by me dies, becomes legally disabled, resigns, or refuses to act, I name the following (each to act alone and successively, in the order named) as successor(s) to that agent:

_____

Signed this ___9___ day of December, 2015.

_Goldie Rose_

**GOLDIE ROSE**

1OR

THE STATE OF TEXAS          {}

COUNTY OF  HARRIS          {}

This document was acknowledged before me on the ___9___ day of December, 2015, by GOLDIE ROSE.

_____

MALISSA ELLEN BERNSTEIN
Notary Public, State of Texas
My Commission Expires
July 18, 2019

Notary Public, State of Texas
Notary's printed name:

Notary's commission expires:

THE ATTORNEY IN FACT OR AGENT, BY ACCEPTING OR ACTING UNDER THE APPOINTMENT, ASSUMES THE FIDUCIARY AND OTHER LEGAL RESPONSIBILITIES OF AN AGENT.

(G:\ns\titleco\November 2015\70-001705-MB)

ER 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

ER 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

20150571316

# Pages 4

12/21/2015 01:58 PM

e-Filed & e-Recorded in the

Official Public Records of

HARRIS COUNTY

STAN STANART

COUNTY CLERK

Fees   $24.00

RECORDERS MEMORANDUM
This instrument was received and recorded electronically
and any blackouts, additions or changes were present
at the time the instrument was filed and recorded.

Any provision herein which restricts the sale, rental, or
use of the described real property because of color or
race is invalid and unenforceable under federal law.
THE STATE OF TEXAS
COUNTY OF HARRIS
I hereby certify that this instrument was FILED in
File Number Sequence on the date and at the time stamped
hereon by me; and was duly RECORDED in the Official
Public Records of Real Property of Harris County, Texas.

COUNTY CLERK
HARRIS COUNTY, TEXAS

# EXHIBIT 11

RP-2018-89224
03/02/2018   RP1   $76.00

_____ [Space Above This Line For Recording Data]_____

# DEED OF TRUST

**Notice of confidentiality rights: If you are a natural person, you may remove or strike any or all of the following information from any instrument that transfers an interest in real property before it is filed for record in the public records: your Social Security number or your driver's license number.**

DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated February 16, 2018, together with all Riders to this document.

**(B) "Borrower"** is Verley Lee "Rocky" Sembritzky Jr., an individual residing in Texas. Borrower is the grantor under this Security Instrument.

**(C)    "Lender"** is Rosemarie Johnson. Lender is an individual residing in the State of Texas. Lender's address is 11625 Monica St., Houston, TX 77024. Lender is the beneficiary under this Security Instrument.

**(D)    "Trustee"** is John Orton. Trustee's address is 811 Main Street, Ste. 2500, Houston, Texas 77002.

**(E) "Note"** means the promissory note signed by Borrower and dated of even date herewith. The Note states that Borrower owes Lender One Million Three Hundred Thousand and NO/100 Dollars (U.S. $1,300,000.00) plus interest. Borrower has promised to pay this debt on demand of Lender.

**(F)    "Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

**(G)    "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

**(H)    "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Rider is to be executed by Borrower: Condominium Rider

**(I)    "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(J)    "Community Association Dues, Fees, and Assessments"** means all dues, fees,

**TEXAS--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**          Form 3044   (modified) *(page 1 of 14)*

assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(K)** **"Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(L)** **Intentionally Omitted.**

**(M)** **"Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(N)** **Intentionally Omitted.**

**(O)** **"Periodic Payment"** means the regularly scheduled amount due for principal and interest under the Note.

**(P)** **Intentionally Omitted.**

**(Q)** **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, all of Borrower's right, title, and interest in and to the following described property located in Harris County, Texas:



> Unit L, Level Twenty-six (26) together with its appurtenant undivided interest in and to the general and limited common elements of 2727 KIRBY CONDOMINIUMS, a condominium regime in the City of Houston, Harris County, Texas, according to the First Amended and Restated Declaration of Condominium, recorded in/under Film Code No. 205251 of the Condominium Records of Harris County, Texas, and all Amendments and Supplements thereto;

which currently has the address of 2727 Kirby Drive, Unit 26L, Houston, Texas 77098 (**"Property Address"**).

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the **"Property."**

TEXAS--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3044   (modified) *(page 2 of 14)*

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS.  Borrower and Lender covenant and agree as follows:

**1.    Payment of Principal, Interest, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note.  Payments due under the Note and this Security Instrument shall be made in U.S. currency.  However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15.  Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current.  Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted.  If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds.  Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current.  If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower.  If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure.  No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2.    Application of Payments or Proceeds.**  Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; and (b) principal due under the Note. Such payments shall be applied to each Periodic Payment in the order in which it became due.  Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge.  If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full.  To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments,

TEXAS--Single Family--Fannie Mae/Freddie Mac **UNIFORM INSTRUMENT**              Form 3044   (modified) *(page 3 of 14)*

such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

### 3. Intentionally Omitted.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the

**TEXAS—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**   Form 3044   (modified)   *(page 4 of 14)*

contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Intentionally Omitted.**

TEXAS--Single Family--Fannie Mae/Freddie Mac **UNIFORM INSTRUMENT**          Form 3044   (modified) *(page 5 of 14)*

RP-2018-89224

**7.    Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property.  Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition.  Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage.  If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes.  Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed.  If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property.   If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Intentionally Omitted.**

**9.   Protection of Lender's Interest in the Property and Rights Under this Security Instrument.**  If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding.  Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off.  Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so.  It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument.  These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

**TEXAS--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**          Form 3044   (modified) *(page 6 of 14)*

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease.  If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10.  Intentionally Omitted.**

**11.  Assignment of Miscellaneous Proceeds; Forfeiture.**  All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly.  Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed.  Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.  Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then

TEXAS--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3044   (modified)  *(page 7 of 14)*

due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12.  Borrower Not Released; Forbearance By Lender Not a Waiver.**  Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13.  Joint and Several Liability; Co-signers; Successors and Assigns Bound.**  Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14.  Loan Charges.**  Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the

TEXAS--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3044   (modified)  *(page 8 of 14)*

Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, and property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular

shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**TEXAS--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**          Form 3044   (modified) *(page 10 of 14)*

**20.  Sale of Note; Change of Loan Servicer; Notice of Grievance.**  The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower.  A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law.  There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note.  If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information required in connection with a notice of transfer of servicing.  If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action.  If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph.  The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21.  Hazardous Substances.**  As used in this Section 21:  (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials;  (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property.  Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property.  The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

TEXAS--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3044   (modified) *(page 11 of 14)*

RP-2018-89224

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice will result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence. For the purposes of this Section 22, the term "Lender" includes any holder of the Note who is entitled to receive payments under the Note.**

**If Lender invokes the power of sale, Lender, its designee, or Trustee shall give notice of the date, time, place and terms of sale by posting and filing the notice as provided by Applicable Law. Lender or its designee shall mail a copy of the notice to Borrower in the manner prescribed by Applicable Law. Sale shall be public, occurring between the hours of 10 a.m. and 4 p.m. on a date and at a location permitted by Applicable Law. The time of sale must begin at the time stated in the notice of sale or not later than three hours after the stated time. Borrower authorizes Trustee to sell the Property to the highest bidder for cash in one or more parcels and in any order Trustee determines. Lender or its designee may purchase the Property at any sale.**

**Trustee shall deliver to the purchaser Trustee's deed conveying indefeasible title to the Property with covenants of general warranty from Borrower. Borrower covenants and agrees to defend generally the purchaser's title to the Property against all claims and demands. The recitals in the Trustee's deed shall be prima facie evidence of the truth of**

RP-2018-89224

the statements made therein.  Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

If the Property is sold pursuant to this Section 22, Borrower or any person holding possession of the Property through Borrower shall immediately surrender possession of the Property to the purchaser at that sale.  If possession is not surrendered, Borrower or such person shall be a tenant at sufferance and may be removed by writ of possession or other court proceeding.

23.  **Release.**  Upon payment of all sums secured by this Security Instrument, Lender shall provide a release of this Security Instrument to Borrower or Borrower's designated agent in accordance with Applicable Law.  Borrower shall pay any recordation costs.  Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24.  **Substitute Trustee; Trustee Liability.**  All rights, remedies and duties of Trustee under this Security Instrument may be exercised or performed by one or more trustees acting alone or together.  Lender, at its option and with or without cause, may from time to time, by power of attorney or otherwise, remove or substitute any trustee, add one or more trustees, or appoint a successor trustee to any Trustee without the necessity of any formality other than a designation by Lender in writing.  Without any further act or conveyance of the Property the substitute, additional or successor trustee shall become vested with the title, rights, remedies, powers and duties conferred upon Trustee herein and by Applicable Law.

Trustee shall not be liable if acting upon any notice, request, consent, demand, statement or other document believed by Trustee to be correct.  Trustee shall not be liable for any act or omission unless such act or omission is willful.

25.  **Subrogation.**  Any of the proceeds of the Note used to take up outstanding liens against all or any part of the Property have been advanced by Lender at Borrower's request and upon Borrower's representation that such amounts are due and are secured by valid liens against the Property.  Lender shall be subrogated to any and all rights, superior titles, liens and equities owned or claimed by any owner or holder of any outstanding liens and debts, regardless of whether said liens or debts are acquired by Lender by assignment or are released by the holder thereof upon payment.

26.  **Partial Invalidity.**  In the event any portion of the sums intended to be secured by this Security Instrument cannot be lawfully secured hereby, payments in reduction of such sums shall be applied first to those portions not secured hereby.

27.  **Acknowledgment of Cash Advanced Against Non-Homestead Property.**  The Note represents funds advanced to Borrower on this day at Borrower's request and Borrower acknowledges receipt of such funds.  Borrower states that Borrower does not now and does not intend ever to reside on, use in any manner, or claim the Property secured by this Security

Instrument as a business or residential homestead.  Borrower disclaims all homestead rights, interests and exemptions related to the Property.`

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

EXECUTED on the date of acknowledgment indicated below to be effective as of the date first written above.

BORROWER:

_____
**VERLEY LEE "ROCKY" SEMBRITZKY JR.**

THE STATE OF TEXAS

COUNTY OF ___Harris___

This instrument was acknowledged before me on ___March 1st___ 2018, by Verley Lee "Rocky" Sembritzky Jr. an individual residing in Texas.

_____
Notary Public in and for
the State of TEXAS

My Commission Expires: ___11/14/2020___

> MARIA D SALGUERO
> Notary ID # 129186218
> My Commission Expires
> November 14, 2020

**After Recording Return To**:
Thompson & Knight LLP
811 Main Street, Ste 2500
Houston, Texas 77002
Attn: John Orton

TEXAS--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT        Form 3044    (modified) *(page 14 of 14)*

# CONDOMINIUM RIDER

THIS CONDOMINIUM RIDER is made this 16th day of February, 2018, and is incorporated into and shall be deemed to amend and supplement the Deed of Trust (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Note to Rosemarie Johnson, an individual residing in Texas (the "Lender"), of the same date and covering the Property described in the Security Instrument and located at:

2727 Kirby Drive, Unit 26L, Houston, Texas 77098

The Property includes a unit in, together with an undivided interest in the common elements of, a condominium project known as:

2727 Kirby Condominiums

(the "Condominium Project"). If the owners association or other entity which acts for the Condominium Project (the "Owners Association") holds title to property for the benefit or use of its members or shareholders, the Property also includes Borrower's interest in the Owners Association and the uses, proceeds and benefits of Borrower's interest.

**CONDOMINIUM COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. Condominium Obligations.** Borrower shall perform all of Borrower's obligations under the Condominium Project's Constituent Documents. The "Constituent Documents" are the: (i) Declaration or any other document which creates the Condominium Project; (ii) by-laws; (iii) code of regulations; and (iv) other equivalent documents. Borrower shall promptly pay, when due, all dues and assessments imposed pursuant to the Constituent Documents.

**B. Property Insurance.** So long as the Owners Association maintains, with a generally accepted insurance carrier, a "master" or "blanket" policy on the Condominium Project which is satisfactory to Lender and which provides insurance coverage in the amounts (including deductible levels), for the periods, and against loss by fire, hazards included within the term "extended coverage," and any other hazards, including, but not limited to, earthquakes and floods, from which Lender requires insurance, then: (i) Lender waives the provision in Section 3 for the Periodic Payment to Lender of the yearly premium installments for property insurance on the Property; and (ii) Borrower's obligation under Section 5 to maintain property insurance coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the Owners Association policy.

What Lender requires as a condition of this waiver can change during the term of the loan.

Borrower shall give Lender prompt notice of any lapse in required property insurance coverage provided by the master or blanket policy.

In the event of a distribution of property insurance proceeds in lieu of restoration or repair following a loss to the Property, whether to the unit or to common elements, any proceeds payable to

Borrower are hereby assigned and shall be paid to Lender for application to the sums secured by the Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

    **C.  Public Liability Insurance.**  Borrower shall take such actions as may be reasonable to insure that the Owners Association maintains a public liability insurance policy acceptable in form, amount, and extent of coverage to Lender.

    **D.  Condemnation.**   The proceeds of any award or claim for damages, direct or consequential, payable to Borrower in connection with any condemnation or other taking of all or any part of the Property, whether of the unit or of the common elements, or for any conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender. Such proceeds shall be applied by Lender to the sums secured by the Security Instrument as provided in Section 11.

    **E.  Lender's Prior Consent.**  Borrower shall not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to: (i) the abandonment or termination of the Condominium Project, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain; (ii) any amendment to any provision of the Constituent Documents if the provision is for the express benefit of Lender; (iii) termination of professional management and assumption of self-management of the Owners Association; or (iv) any action which would have the effect of rendering the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

    **F.  Remedies.**  If Borrower does not pay condominium dues and assessments when due, then Lender may pay them.  Any amounts disbursed by Lender under this paragraph F shall become additional debt of Borrower secured by the Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Condominium Rider.

BORROWER:

_____
**VERLEY LEE "ROCKY" SEMBRITZKY JR.**

**RECORDER'S MEMORANDUM:**
At the time of recordation, this instrument was found to be inadequate for the best photographic reproduction because of illegibility, carbon or photo copy, discolored paper, etc. All blockouts, additions and changes were present at the time the instrument was filed and recorded.

MULTISTATE CONDOMINIUM RIDER--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT      Form 3140    1/01 *(page 2 of 2 pages)*

FILED FOR RECORD

11:49:43 AM

Friday, March 2, 2018

*Stan Stanart*

COUNTY CLERK, HARRIS COUNTY, TEXAS

ANY PROVISION HEREIN WHICH RESTRICTS THE SALE RENTAL, OR USE OF THE DESCRIBED REAL
PROPERTY BECAUSE OF COLOR OR RACE IS INVALID AND UNENFORCEABLE UNDER FEDERAL LAW.
THE STATE OF TEXAS
COUNTY OF HARRIS
  I hereby certify that this instrument was FILED in File Number Sequence on the date and at the time
stamped hereon by me; and was duly RECORDED; in the Official Public Records of Real Property of Harris
County Texas

Friday, March 2, 2018



*Stan Stanart*
COUNTY CLERK
HARRIS COUNTY, TEXAS

RP-2018-89224