IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| WILLIAM O'KANE, SYNERGY SOURCE, LLC, and AZKARTA CREST CORP., § § § Plaintiffs, § § v. § VERLEY SEMBRITZKY, JR., a/k/a ROCKY § SEMBRITZKY, *et al*., § § Defendants. § | CIVIL ACTION NO. H-18-2728 |

**MEMORANDUM AND ORDER**

William O'Kane, Synergy Source, LLC, and Azkarta Crest Corporation sued individual and corporate defendants over an allegedly fraudulent investment scheme, the proceeds of which are alleged to have paid for a luxury condominium property. (Docket Entry No. 38). The plaintiffs moved for a preliminary injunction to compel two of the defendants, Verley Sembritzky and his ex-wife, Goldie Rose, to pay the property taxes assessed against that condominium, which is titled to Rose. (Docket Entry No. 105). Rose responded, Sembritzky did not, and the plaintiffs replied. (Docket Entry Nos. 107, 110).

Based on the motion, response, and reply; the record; and the applicable law, the court grants the motion to compel Rose to pay the property taxes assessed against the condominium but denies the motion as to Sembritzky. (Docket Entry No. 105). The reasons for this ruling are detailed below.

**I.     Background**

The case presents a colorful cast of characters. In late 2015, Verley Sembritzky, also known as "Rocky," gave O'Kane, Synergy, and Azkarta Regulation D, Rule 506 Private Placement Letters stating that he was authorized to sell 1,000 shares of Rasli Bahari Kenya Limited stock for $175.5 million. (Docket Entry No. 38 at ¶¶ 20–22). This common stock was to be sold to accredited investors for $175,500 per share. (*Id.* at ¶ 22). The letter represented Sembritzky as Rasli Bahari's founder and

managing director. (*Id.*). Sembritzky told the plaintiffs that the money would be used to design, build, and operate the first of several Kenyan desalination plants, which the letter predicted would earn hundreds of millions of dollars starting in 2019. (*Id.* at ¶¶ 23–24).

O'Kane completed and signed the Stock Subscription Agreement, offering to purchase five shares for $875,000. (*Id.* at ¶¶ 29, 30). Sembritzky countersigned and responded that the offer was "Accepted By Rocky Sembritzky, Executive Chairman & Founder." (*Id.* at ¶ 30). The Agreement instructed O'Kane to send a check to Ocean Harvest, which supposedly maintained an operating account for Rasli Bahari in the United States. (*Id.* at ¶ 32). A few days later, O'Kane was told to wire his payment to a bank account at BBVA Compass Bank in Houston under the name "Bounty of the Ocean," purportedly Rasli Bahari's American agent. (*Id.* at ¶ 33; *see id.* at ¶ 12). Sembritzky emailed O'Kane these revised payment instructions, stating that O'Kane's investment would be used for Rasli Bahari's business expenses and that the total investment was $877,500. (*Id.* at ¶ 34). O'Kane followed the instructions and wired his payment to the Bounty of the Ocean account at Compass Bank. (*Id.* at ¶ 35). Synergy and Azkarta followed similar instructions, investing $351,000 and $175,000 through transfers to the Bounty of the Ocean account. (*Id.* at ¶¶ 43, 51).

A few days after receiving the money, Sembritzky transferred it to other Compass accounts Sembritzky or his then-wife, Rose, owned. (Docket Entry No. 102-1 at ¶¶ 10–12; 102-2 at ¶¶ 10–12; *see* Docket Entry No. 110-2 at 11). Before November 23, 2015, the Bounty of the Ocean bank account had a $0 balance. (Docket Entry No. 110-2 at 297). From November 23 to November 25, the account received deposits totaling $2,106,000, most from the plaintiffs. (*Id.*). On November 30, 2015, Sembritzky transferred $2 million to his personal account, and then transferred the same $2 million to Rose's personal account. (*Id.* at 11–12, 109). After Rose transferred $1.76 million back to Sembritzky and Sembritzky received a $580,000 transfer from the Bounty of the Ocean account, Sembritzky transferred $2.3 million to a title company. (*Id.* at 111). The plaintiffs allege that none of the money was invested in Rasli Bahari. (Docket Entry No. 105-1 at 2). The plaintiffs also allege that Rasli

2

Bahari has never attempted to build or operate any desalination plant, harvested any minerals, produced any fresh water, or engaged in operations or charitable donations. (*Id.*). The plaintiffs never received any financial statements or proof of stock purchase. (*See* Docket Entry No. 38 at ¶ 61; Docket Entry No. 5-1 at ¶ 9).

The plaintiffs allege that Sembritzky and Rose used the money to buy a luxury condominium located at 2727 Kirby Drive, Unit 26L in Houston (the "Kirby Condominium"). (Docket Entry No. 102-1 at ¶ 12; Docket Entry No. 102-2 at ¶ 12; Docket Entry No. 5-1 at ¶¶ 12–16; Docket Entry No. 110-2 at 111). The building was deeded to Rose on December 14, 2015. (Docket Entry No. 5-1 at ¶ 14). Rose executed a Statutory Durable Power of Attorney appointing Sembritzky as her attorney-in-fact, with the power to act for her in real-estate transactions relating to the Kirby Condominium. (Docket Entry No. 5-1 at ¶ 16). In October 2016, Sembritzky and Rose began divorce proceedings in Harris County. (Docket Entry No. 38 at ¶ 66; Docket Entry No. 107-1). The plaintiffs allege that on March 1, 2018, Sembritzky executed a mortgage on the Kirby Condominium and delivered it to Rosemarie Johnson, with whom Sembritzky was romantically involved. (Docket Entry No. 38 at ¶ 68). The mortgage used the Kirby Condominium as collateral to secure a $1,300,000 loan. (Docket Entry No. 5-1 at ¶ 17; Docket Entry No. 38 at ¶¶ 67–68). Rose and Sembritzky were divorced on March 6, 2019, and the family court concluded that Sembritzky has no rights, title, or interest in the Kirby Condominium. (Docket Entry No. 107 at 1, 9–10; Docket Entry No. 107-4 at 4).

The plaintiffs assert 20 counts against Sembritzky and Rose, including conversion; breach of fiduciary duty; aiding and abetting breach of fiduciary duty; defalcation; embezzlement; constructive trust; accounting; fraudulent conveyance and transfer, in violation of the Texas Uniform Fraudulent Transfer Act §§ 24.005(A)(1), (A)(2), 240.006(A), 24.006(B); unjust enrichment; and conspiracy. (Docket Entry No. 38 at ¶¶ 72–76, 85–102, 108–173, 178–85). They also seek a declaratory judgment against Sembritzky and Rose and assert additional fraud claims and federal securities violations against Sembritzky. (*Id.* at ¶¶ 77–84, 186–90).

In September 2018, the court issued a preliminary injunction prohibiting Sembritzky and Rose "from selling, assigning, transferring, encumbering, or otherwise disposing of any interest in the Kirby Condominium and from receiving or acquiring any interest in the Kirby Condominium, without order from a court of competent jurisdiction." (Docket Entry No. 11 at 3). The plaintiffs now argue that Sembritzky and Rose have not paid $132,462.57 in property taxes assessed against the Kirby Condominium. (Docket Entry No. 105; Docket Entry No. 105-1 at 7). They move for a preliminary injunction to compel payment of those taxes and future taxes assessed against the property during this litigation. (Docket Entry No. 105).

## II.     The Legal Standard

A preliminary injunction is an "extraordinary remedy." *Texans for Free Enter. v. Tex. Ethics Comm'n*, 732 F.3d 535, 536 (5th Cir. 2013). A court may grant a preliminary injunction only if the movant shows: "(1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest." *Jones v. Tex. Dep't of Criminal Justice*, 880 F.3d 756, 759 (5th Cir. 2018) (quoting *Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009)).

## III.    Analysis

The plaintiffs argue that they seek a preliminary injunction "to preserve the status quo and prevent the loss of the luxury condominium that is the subject matter of this case." (Docket Entry No. 105-1 at 1). Without payment of the approximately $130,000 in assessed taxes, they argue, the "condominium [is] in jeopardy" because the state could confiscate it in a tax sale. (*Id.* at 2, 3).

### A.     Substantial Likelihood of Success on the Merits

A plaintiff "is not required to prove [his] entitlement to summary judgment" to show a likelihood of success on the merits, *Byrum,* 566 F.3d at 466, but the "plaintiff must present a prima facie case," *Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 582 (5th Cir.

4

2013).  The plaintiffs argue that they are substantially likely to succeed on the merits because ample circumstantial evidence supports their allegations that Sembritzky and Rose used the plaintiffs' money to buy the Kirby Condominium.  They discuss only their fraud and fraudulent-transfer claims.  (Docket Entry No. 105-1 at 8–10).  The parties assume that Texas law applies.  (*Id.* at 8 n.8; *see* Docket Entry No. 107).

As a threshold matter, the plaintiffs have not established that Sembritzky has an obligation to pay the real estate taxes owed on the Kirby Condominium.  Rose points to language in her the Agreed Final Decree of Divorce stating that the Kirby Condominium "is the sole and separate property of" Rose and that Sembritzky "has no and has never had any right, title or interest in or to" the Kirby Condominium.  (Docket Entry No. 107-4 at 4).  The 2018 Property Tax Statement for the Kirby Condominium that the plaintiffs attach to their motion is also addressed only to Rose, not Sembritzky.  (Docket Entry No. 105-3 at 5).  Although Sembritzky may have fraudulently used funds from the plaintiffs to purchase the Kirby Condominium, the plaintiffs have not shown that he has a current interest in the property that would make him responsible for paying its property taxes.  Although, as discussed below, the plaintiffs have shown a substantial likelihood of succeeding on their fraud and fraudulent transfer claims against Sembritzky, they have not pointed to evidence that he has a present obligation to pay the real estate taxes owed for the Condominium.

    1.    **Fraud**

"A common-law fraud claim requires 'a material misrepresentation, which was false, and which was either known to be false when made or was asserted without knowledge of its truth, which was intended to be acted upon, which was relied upon, and which caused injury.'" *Zorrilla v. Aypco Constr. II, LLC*, 469 S.W.3d 143, 153 (quoting *Formosa Plastics Corp. United States v. Presidio Eng'rs & Contrs.*, 960 S.W.2d 41, 47 (Tex. 1998)).  "A promise of future performance constitutes an actionable misrepresentation if the promise was made with no intention of performing at the time it was made." *Formosa*, 960 S.W.3d at 48.  "However, the mere failure to perform a contract is not

5

evidence of fraud. Rather, [the plaintiff] had to present evidence that [the defendant] made representations with the intent to deceive and with no intention of performing as represented." *Id.* Fraud is typically proven by circumstantial evidence. *See In re Lipsky*, 460 S.W.3d 579, 588 (Tex. 2015) ("Intent to defraud is not susceptible to direct proof [and] invariably must be proven by circumstantial evidence." (quoting *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 435 (Tex. 1986) (alterations in original)).

The plaintiffs argue that the circumstantial evidence showing fraud is overwhelming. (Docket Entry No. 105-1 at 9). Sembritzky represented that the plaintiffs would receive shares of stock, that the investment would be used build a desalination plant in Kenya, and that they would receive quarterly financial statements. (*Id.*; Docket Entry No. 102-1 at ¶¶ 3–4; 102-2 at ¶¶ 3–4). None of those things occurred, and the plaintiffs argue that Sembritzky allegedly took no steps to make them occur. (*See* Docket Entry No. 105-1 at 9).

The bank records and other evidence show that the plaintiffs are likely to succeed on their fraud claims. The bank records show that Sembritzky transferred the funds to his personal account only a few days after receiving the investment money of O'Kane and the businesses and that Sembritzky and Rose bought the Kirby Condominium only a few weeks later. (Docket Entry No. 5-1 at ¶¶ 11–12; Docket Entry Nos. 5-4–5-8). The quick turnaround indicates that the money was never intended to be used for the Kenya project. The plaintiffs relied on Sembritzky's representations about the investments and were injured when their investment was misappropriated.

Rose argues that the fraud claim is unlikely to succeed because the money transferred to and from Sembritzky's bank accounts was a $15 million "licensing fee" to which Sembrtizky was entitled. (Docket Entry No. 107 at 12). Her evidence, however, shows that while the parties negotiated Sembritzky would receive a licensing fee and the Private Placement Memorandum given to potential investors stated that invested funds would pay for licensing intellectual property, that money was to be "repaid out of distributions to the Founder on the Founder's stock," not paid directly out of investor

6

funds. (Docket Entry No. 107-9 at 7). Although the Private Placement Memorandum stated that the intellectual property license payment would be $15 million, it also stated that that amount "will be offset by future royalties and contributed to the company during the first calendar year." (Docket Entry No. 110 at 5). The bank records show that the plaintiffs' funds did not go to a Rasli Bahari account, but instead to the Bounty of the Ocean account. From there, the funds went to Sembrtizky's personal account. The plaintiffs point to evidence that only $100,000 was transferred to Rasli Bahari from the Compass Bank accounts. (Docket Entry No. 110 at 5; Docket Entry No. 110-1 at ¶ 11). The Private Placement Memorandum agreement does not suggest that this is how investor funds would be used. The plaintiffs have demonstrated a substantial likelihood of success on their fraud claim.

### 2. Fraudulent Transfer Against Sembritzky

Texas has adopted the Uniform Fraudulent Transfer Act, TEX. BUS. & COM. CODE § 24.001 *et seq.*, "to prevent debtors from defrauding creditors by placing assets beyond their reach." *Challengers Gaming Sols., Inc. v. Earp.*, 402 S.W.3d 290, 293 (Tex. App.—Dallas 2013, no pet). The Act "provides remedies to creditors of debtors who fraudulently transfer assets under certain circumstances." *Corpus v. Arriaga*, 294 S.W.3d 629, 634 (Tex. App.—Houston [1st Dist.] 2009, no pet.). An asset is property of a debtor not including "property to the extent it is encumbered by a valid lien." TEX. BUS. & COM. CODE § 24.002(2)(A). "In general, a determination of liability under [the Act] is a two-step process: first, a finding that a debtor made an actual fraudulent transfer or a constructive fraudulent transfer; and, second, recovery for that fraudulent transfer, or its value, from the transferees." *Spring Street Partners–IV v. Lam*, 730 F.3d 427, 436 (5th Cir. 2013) (citations omitted).

A transfer is actually fraudulent "if the debtor made the transfer . . . with actual intent to hinder, delay, or defraud any creditor of the debtor." TEX. BUS. & COM. CODE § 24.005(a)(1); *see also Spring Street*, 730 F.3d at 436–37. The Act "supplies a 'non-exclusive list of eleven factors . . . that courts may consider in determining whether a debtor actually intended to defraud creditors.'" *Spring Street*, 730 F.3d at 437 (quoting *In re Soza*, 542 F.3d 1060, 1066 (5th Cir. 2008)); *see* TEX. BUS. & COM. CODE

7

§ 24.005(b) (listing the eleven factors). A transfer "is not voidable under [the actual fraud provision] against a person who took in good faith and for a reasonably equivalent value or against any subsequent transferee or obligee." *Id.* § 24.009(a).

A transfer is constructively fraudulent if "the debtor made the transfer . . . without receiving a reasonably equivalent value." *Id.* § 24.005(a)(2). A "debtor" is "a person who is liable on a claim" or has "a right to payment or property." *Id.* §§ 24.002(3), (6). Because the plaintiffs are likely to succeed on their fraud claim against Sembritzky and Rose, they are likely to have a right to payment or property as tort claimants. The plaintiffs qualify as claimants under the Act. *See In re Primera Energy, LLC*, 579 B.R. 75, 172 (Bankr. W.D. Tex. 2017).

The plaintiffs argue that "several badges of fraud are present with regard to [Sembritzky's] transfers to Rose," including that "the transfers were made to an insider ([Sembritzky's] wife)," that Sembritzky continued to have de facto ownership of the assets, "the transfers were concealed and for no consideration," and the transfers were made days after Sembritzky "had incurred a substantial debt to the plaintiffs." (Docket Entry No. 105-1 at 10).

Rose responds that the plaintiffs are unlikely to prevail against her because she "was a subsequent transferee" who received the Kirby Condominium from Sembritzky after he purchased it with his $15 million license payment. (Docket Entry No. 107 at 11). She argues that the transfer was to pay a $1.8 million debt Sembritzky owed her for a prior loan, meaning that, even if the plaintiffs prove that they are entitled to the money used to purchase the Kirby Condominium, she "would still be entitled to a lien, prior to the rights of a voiding creditor under the Fraudulent Transfer Act, to the extent of the value given to [Sembritzky] for the cancellation of the antecedent debt owed her separate property estate." (*Id.* at 12).

Rose is correct that the Act protects transferees who "took in good faith and for a reasonably equivalent value." TEX. BUS. & COM. CODE § 24.009(a). But Rose offers no evidence of any prior loan to Sembritzky, including the amount or repayment terms. *See, e.g., T.O. Stanley Boot Co. v. Bank*

8

*of El Paso*, 847 S.W.2d 218, 221 (Tex. 1992) ("In a contract to loan money, the material terms will generally be: the amount to be loaned, maturity date of the loan, the interest rate, and the repayment terms."). The record instead supports the plaintiffs' version of events, in which Sembritzky had the plaintiffs transfer funds into an account from which he transferred funds to his own accounts, then to Rose. Rose transferred the funds back to Sembritzky, her then-husband, and Sembritzky used the money to purchase the Kirby Condominium. Under the Act, Sembritzky incurred a debt to the plaintiffs through the first transfer, and the plaintiffs are likely to succeed in showing that Sembritzky and Rose fraudulently transferred those funds to purchase the Kirby Condominium. The plaintiffs have demonstrated a substantial likelihood of success on their fraudulent transfer claim.

B.  **Substantial Threat of Irreparable Harm**

The plaintiffs argue that the irreparable harm prong is satisfied because losing the Kirby Condominium, a piece of real property, in a tax sale is irreparable harm. (Docket Entry No. 105-1 at 10–11); *see Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 297 (5th Cir. 2012) ("The deprivation of an interest in real property constitutes irreparable harm." (quoting *Third Church of Christ, Scientist, of N.Y.C. v. City of New York*, 617 F. Supp. 2d 201, 215 (S.D.N.Y. 2008), *aff'd*, 626 F.3d 667 (2d Cir. 2010))). If the property is sold at a tax sale, the plaintiffs contend, they will "hav[e] to pursue multiple lawsuits against successive transferees of the Kirby Condominium." (*Id.*). According to the plaintiffs, the Uniform Fraudulent Transfer Act authorizes injunctive relief, meaning that even if their other arguments fail, they need not establish irreparable injury. (*Id.* at 11–12).

"[T]he mere fact that economic damages may be available does not always mean that a remedy at law is 'adequate.'" *Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011). Damages may be inadequate if the plaintiff would have to pursue multiple actions for relief. *Id.* (citing *Lee v. Bickell*, 292 U.S. 415, 421 (1934) ("[W]e are not in doubt, the multiplicity of actions necessary for redress at law [is] sufficient . . . to uphold the remedy by injunction")). In *Janvey*, the Fifth Circuit concluded that a receiver had shown a substantial threat of irreparable harm because he "provided evidence of a

9

massive Ponzi scheme and proof that each individual received proceeds from the fraudulent scheme." *Id.* at 601. The court explained that "where a district court has determined that a meaningful decision on the merits would be impossible without an injunction, the district court may maintain the status quo and issue a preliminary injunction to protect a remedy, including a damages remedy, when the freezing of the assets is limited to the property in dispute or its direct, traceable proceeds." *Id.* at 600 (citing *Productos Carnic, S.A. v. Cent. Am. Beef & Seafood Trading Co.*, 621 F.2d 683, 686–87 (5th Cir. 1980)).

The plaintiffs cite the Texas Business and Commerce Code § 24.008(a)(2), entitled "Remedies of Creditors," which allows a creditor seeking relief to get "an attachment or other provisional remedy against the asset transferred or other property of the transferee." In *Telephone Equipment Network Inc. v. TA/Westchase Place, Ltd.*, 80 S.W.3d 601 (Tex. App.—Houston [1st Dist.] 2002), the court affirmed the district court's decision to grant a temporary injunction enjoining the Telephone Equipment Network from foreclosing on and disposing of property based on Westchase's allegations that the Network had violated the Texas Uniform Fraudulent Transfer Act. The Network had a security interest in the property, but it was owned by another company. The court explained that the Act "creates a statutory cause of action through which a creditor may seek recourse for a fraudulent transfer of assets or property" and "provides that a transfer of an asset is fraudulent, as to a creditor, if the debtor made the transfer with the actual intent to hinder, delay or defraud any of the debtor's creditors." *Id.* at 607 (quoting TEX. BUS. & COM. CODE § 24.005(a)(1)); *see, e.g.*, *Sargeant v. Al Saleh*, 512 S.W.3d 399, 411 (Tex. App.—Corpus Christi 2016, orig. proceeding) (a preliminary injunction was granted to a plaintiff who was attempting to collect on a judgment based on his claims under the Act because the Act "is intended to prevent debtors from defrauding creditors by moving assets out of reach"). Based on the Act's purpose, the court found that the lower court did not err in granting the injunction.

The plaintiffs have not identified evidence showing that the loss of the Kirby Condominium would make Sembritzky or Rose insolvent or judgment proof. The record does, however, show that

the Kirby Condominium is "an identifiable res that can be traced back to [the] Plaintiffs' subscription payments and the proceeds thereof." (Docket Entry No. 38 at ¶ 111). The plaintiffs point to bank records showing that several accounts were used to transfer the plaintiffs' money; those accounts are essentially empty. (*See* Docket Entry No. 110-2 at 243, 246, 249, 252, 256, 343, 346, 349, 352). The purchase of the Kirby Condominium soon after the plaintiffs' payments suggests that Sembritzky used that money to purchase the Kirby Condominium. The loss of the Condominium through a tax sale could mean that Sembritzky and Rose's means of satisfying the judgment is likely to disappear. *See Tujague v. Eckerd*, No. 4:18-CV-00408, 2018 WL 3376967, at *3 (E.D. Tex. July 11, 2018). The plaintiffs also seek a constructive trust. (Docket Entry No. 38 at ¶¶ 108–11). If injunctive relief is denied and Rose loses the Kirby Condominium through a tax sale, the plaintiff's equitable remedy would be moot. *See Janvey*, 647 F.3d at 601.

Rose responds that there is no substantial risk of irreparable harm because the Kirby Condominium is not mortgaged and because she is entitled to a real estate tax deferment based on her age and use of the Kirby Condominium as her homestead. (Docket Entry No. 107 at 11 (citing TEX. TAX CODE § 33.06(b))). She offers no evidence that she has applied for this deferment or that she plans to take advantage of it. And Rose cannot rely on this homestead deferment to argue against the possibility of irreparable harm because the plaintiffs have shown a likelihood of success on their fraud and fraudulent transfer claims. "Stolen funds used for the purchase of a homestead . . . can never acquire homestead rights as they are held in trust for the rightful owners of the funds." *Bransom v. Standard Hardware, Inc.*, 874 S.W.2d 919, 928 (Tex. App. 1994).

"Recovery of property is a fundamental remedy under" the Act, and the Act contemplates the issuance of an injunction to stop continued transfers of fraudulently obtained property. *In re Primera Energy*, 579 B.R. at 180. The plaintiffs seek a constructive trust as an equitable remedy for the alleged fraudulent transfer, which the court could not provide if the Kirby Condominium were lost in a tax sale. Because Rose's failure to pay real estate taxes on the Kirby Condominium puts that property at

11

risk of being sold and lost to the plaintiffs, the plaintiffs have shown that there is substantial threat of irreparable harm.

### C. The Balance of Harms

The plaintiffs argue that Rose will not suffer injury by paying the property taxes she owes on the Kirby Condominium. That is likely true, because the plaintiffs allege nothing indicating that there is any plan to dispose of the building. They argue that the other defendants may want to collect judgments against Sembritzky and Rose, and their interests will be served by preserving the Kirby Condominium. The public interest will be served, according to the plaintiffs, based on the Uniform Fraudulent Transfer Act and the Texas Legislature's intent to protect against fraudulent transfers and the public interest in paying taxes.

Rose responds that the 2017 and 2018 real estate taxes were past due when the court granted the plaintiffs' first preliminary injunction. (Docket Entry No. 107 at 11). According to Rose, granting this preliminary injunction would put the plaintiffs "in a better position than when the preliminary injunctions were originally granted," not preserve the status quo. (*Id.*).

Because the Kirby Condominium is central to the litigation and the prior preliminary injunction was intended to protect that interest, the balance of harms heavily weighs in favor of granting this preliminary injunction to require Rose to pay the real estate taxes owed. The court is requiring Rose to do only what is already required under law.

### D. Bond Requirement

The court may issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." FED. R. CIV. P. 65(c). The court has discretion to decide the amount of security or that no security is necessary. *Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996).

The security bond's purpose is to prevent damages to a party from a wrongful injunction. FED. R. CIV. P. 65(c). The court has narrowly tailored the injunction to prevent damages to Rose. The injunction requires her to pay real estate taxes owed for the condominium but does not prevent her from otherwise using the condominium. The injunction merely requires Rose to the pay taxes required under Texas law. No bond is necessary.

**IV.     Conclusion**

The court grants the plaintiffs' motion for a preliminary injunction as to Rose and orders Rose to pay the 2017 and 2018 real estate taxes on the Kirby Condominium by **July 31, 2019**. (Docket Entry No. 105). The court also orders Rose to pay real estate taxes on the property until the conclusion of this litigation. The court denies the plaintiffs' motion for a preliminary injunction as to Sembritzky.

SIGNED on June 19, 2019, at Houston, Texas.

_____
Lee H. Rosenthal
Chief United States District Judge