United States District Court
Southern District of Texas

**ENTERED**

August 11, 2020

David J. Bradley, Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| WILLIAM O'KANE, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-18-2728 |
| | § | |
| VERLEY SEMBRITZKY, JR., a/k/a | § | |
| ROCKY SEMBRITZKY, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND OPINION**

Combine a colorful cast of characters—an entrepreneur named "Rocky," his ex-wife, Goldie Rose, and his girlfriend—with a luxury high-rise condominium purchased with funds allegedly obtained by defrauding the plaintiffs, investors, in a never-built Kenyan desalination project, and the result is . . . an unusual case.  William O'Kane, Synergy Source LLC, and Azkarta Crest Corporation sued Verley Sembritzky, Jr., also known as "Rocky," his ex-wife Goldie Rose, and a host of other defendants after the plaintiffs invested just over $1.4 million in Rocky's company, Rasli Bahari Kenya Limited.  The plaintiffs assert fraud, conversion, unjust enrichment, fraudulent transfer, and federal securities claims.  They allege that Rocky took the money he told them would be invested in Rasli Bahari to build a revolutionary desalination plant in Kenya, and instead transferred it to his ex-wife to buy a luxury condominium in Houston.  The plaintiffs want their money, other losses, and a constructive trust over the condominium to recover their lost investment.

The plaintiffs have moved for summary judgment on their fraud, conversion, fraudulent transfer, and unjust enrichment claims against Rocky Sembritzky and Goldie Rose, arguing that

the defendants' admissions, bank records, and deposition testimony conclusively establish all the elements of the claims.  The plaintiffs also moved for summary judgment against two investment trusts, seeking a declaratory judgment as to the parties' rights and interest in the condominium. And, after Goldie Rose failed to pay the required assessments on the condominium, the plaintiffs moved for sanctions against her and paid the assessments to prevent foreclosure.

After a careful review of the motions, the responses, and replies; the record evidence; and the applicable law, the court denies the plaintiffs' motions.  Although there is significant evidence to support the summary and declaratory judgments sought, at bottom, on the present record, this case is a swearing match that requires the factfinder to make credibility judgments. Hearing the evidence and making those judgments in this unusual case should be interesting.

The reasons for these rulings are explained in detail below.

## I.    Background

### A.    The Private Placement Letters

In late 2015, Verley Sembritzky, also known as Rocky, solicited investment funds from O'Kane, Synergy Source LLC, and Azkarta Crest Corporation, giving them Regulation D, Rule 506 Private Placement Letters.  (Docket Entry No. 5-1 at ¶¶ 2–3; Docket Entry No. 102-1 at ¶¶ 2–3; Docket Entry No. 102-2 at ¶¶ 2–3).  The Letters stated that Sembritzky was authorized to sell 1,000 shares of Rasli Bahari Kenya Limited, or "RBKL," for a total price of $175.5 million. (*Id.*).  The investment was to build "a sustainable and economic solution to address the global water shortage" in the form of a desalination plant in Kenya.  (Docket Entry No. 145-8 at 5). According to the Letters, Sembritzky founded RBKL to "design, construct and own desalination with mineral recovery facilities" as a project that would "not only change Kenya but will become a cost effective and eco-friendly model for the world."  (*Id.* at 11–12).  Investments in RBKL

were "designed to yield outstanding returns from its mineral processing facilities while providing revenue of over $20 million annually to our JV partner Millennium Water Alliance Kenya which is helping to bring safe drinking water for all of Kenya under Kenya's Vision 2030." (*Id.* at 11).

The Letters describe the benefits of the desalination plant in detail. "The Rasli Bahari process eliminates all reject streams by harvesting the minerals, eliminating polluting discharges and thus protecting marine life. . . . It is important to note that each component used in the process has years of proven operational history and has been financed numerous times." (*Id.*). The Letters touted RBKL's technology as better than conventional desalination processes in two ways: it offered maximum efficiency in the form of "zero discharge"; and it worked to "reduce energy consumption in the reverse osmosis" stage. (*Id.* at 13). This process, the Letters state, produces "ultra-pure" water, which could be used as drinking water, industrial makeup water, or in agriculture. (*Id.*). The Letters described "low-cost mineral extraction," which would create "additional revenue streams through the sustainable extraction of high-purity industrial minerals." (*Id.* at 15). Along with ultra-pure drinking water and humanitarian benefits, would come economic returns. The Letters described financial models that showed plant owners earning approximately $300 million or more per year, before interest and tax. (*Id.* at 16). The project would also be "future-proof" by virtue of its "modular design," according to the Letters. (*Id.*).

The Letters also provided financing details. Several debt and equity "pledges" were listed, including the European Investment Bank for $150 million in debt financing, and GE Africa, for $100 million in equity financing. (*Id.* at 24). In total, the "pledges" accounted for almost $1 billion in financing. (*Id.*).

A table in the Letters shows how RBKL would use proceeds from the initial $175.5 million raised from investors.  The table shows a $15 million expense for an "IP License Payment," which the Letters explain "will be offset by future royalties and contributed to the company during the first full calendar year of operations."  (*Id.* at 29).  The Letters also state that "[c]ompany books will be audited quarterly and results made available to all shareholders," and that "[a]ny funds not used (placement & legal) will be allocated to the company operating account."  (*Id.*).

O'Kane, Synergy, and Azkarta each completed the subscription agreements that were attached to the Private Placement Letters.  (Docket Entry No. 5-1 at ¶ 6; Docket Entry No. 102-1 at ¶ 6; Docket Entry No. 102-2 at ¶ 6).  The subscription agreements, bearing the plaintiffs' and Sembritzky's signatures, show that the plaintiffs invested $1,404,000 for 8 shares of RBKL.  (Docket Entry No. 5-1 at ¶ 7; Docket Entry No. 5-3 at 8–9; Docket Entry No. 102-1 at ¶ 7; Docket Entry No. 102-2 at ¶ 7).

### B.      The Wire Transfers and Purchase of the Kirby Condominium

After O'Kane, Synergy, and Azkarta completed the subscription agreements, Sembritzky instructed them to wire payment to a bank account at BBVA Compass Bank in Houston under the name "Bounty of the Ocean," which Sembritzky said was RBKL's American agent.  (Docket Entry No. 5-1 at ¶¶ 8–9; Docket Entry No. 102-1 at ¶¶ 8–9; Docket Entry No. 102-2 at ¶¶ 8–9).  Together, the plaintiffs wired payments totaling $1,404,000.  (*Id.*).

Instead of investing the money in RBKL, Sembritzky promptly transferred the $1,404,000 to his personal bank account.  Compass Bank's records show that on November 25, 2015, Bounty of the Ocean received the plaintiffs' funds.  (Docket Entry No. 5-4 at 2).  Five days later, Bounty of the Ocean sent $2 million to Sembritzky's personal bank account at Compass.

4

(Docket Entry Nos. 5-4, 5-5).  The same day, Sembritzky transferred the $2 million to the bank account of his then-wife, Goldie Rose.  (Docket Entry Nos. 5-5, 5-6).  Rose sent $1,940,000 back to Sembritzky over the next three weeks, who then transferred $2,338,372.36 to the Tradition Title Company.  (Docket Entry No. 5-5 at 2–4).

In December 2015, the Tradition Title Company used the $2,338,372.36 to purchase "Goldie Rose 2727 Kirby Dr., Unit 26L Houston, TX 77098," the "Kirby Condominium." (Docket Entry No. 5-8).  Rose signed a Residential Condominium Contract, stating that Tradition Title issued the title policy and received Rose's escrow deposit.  (Docket Entry No. 5-9 at 5–11). Rose had her warranty deed for the Kirby Condominium notarized one day after Sembritzky transferred the funds to Tradition Title.  (Docket Entry No. 5-10).  Although the deed named Rose as the sole grantee, she executed a power of attorney that named Sembritzky as her attorney-in-fact, giving him authority to act on her behalf in any real-estate transactions involving the Kirby Condominium.  (Docket Entry No. 5-12).

Months later, Sembritzky executed and delivered a Deed of Trust for the Kirby Condominium, securing a $1.3 million loan, to a woman named Rosemarie Johnson.  (Docket Entry No. 5-13).  According to Rose, Ms. Johnson was Sembritzky's girlfriend.  (Docket Entry No. 5-9 at 2).  Despite the Deed issued to Ms. Johnson, Rose continued to occupy the Kirby Condominium.  (Docket Entry No. 131-1 at 1).  Rose and Sembritzky divorced in March 2019, and the family-law court concluded that Sembritzky had no rights, title, or interest in the Kirby Condominium.  (Docket Entry No. 107-4 at 4).

The desalination plant remains unbuilt.  (Docket Entry No. 145-6 at 58–59).  The plaintiffs received no funds and have lost their investment.  Rose has the Kirby Condominium.

C.      The Lawsuit

In late 2016 and early 2017, Sembritzky allegedly failed to pay engineers retained by RBKL in Kenya.  (Docket Entry No. 79 at 4–5).  Malcolm Morris, an investor in RBKL and a trustee of the Malcom Morris Roth IRA, alleges that the engineers contacted him to address this issue.  (*Id.*).  Morris investigated and discovered the wire transfers shown in the Compass Bank records.  (*Id.* at 6).  Before the plaintiffs wired their investment to the Bounty of the Ocean account, it had a $0 balance.  (Docket Entry No. 110-2 at 297).  After Sembritzky transferred the funds out of the Bounty of the Ocean account, it had a balance of $1,000.34.  (*Id.* at 300).

O'Kane sued Sembritzky, RBKL, Rose, Johnson, Bounty of the Ocean, Ocean Harvest, LLC, Malcom Morris, and the Quest IRA investment fund, and he quickly moved for a temporary restraining order to prevent the defendants from transferring their interest in the Kirby Condominium.  (Docket Entry No. 4).  The court entered the order.  (Docket Entry No. 10).  The court then entered a preliminary injunction granting the same relief, finding that the plaintiffs had shown a substantial likelihood of success on the merits of their fraud, fraudulent transfer, and declaratory judgment claims against the defendants.  (Docket Entry No. 11).

O'Kane amended his complaint, and Synergy and Azkarta intervened as plaintiffs. (Docket Entry Nos. 38, 39).  Morris then cross-claimed against Bounty of the Ocean, Ocean Harvest, and Sembritzky, alleging fraud, breach of fiduciary duty, and conversion, among other claims.  (Docket Entry No. 79).  The court entered default judgments against Johnson, RBKL, Bounty of the Ocean, and Ocean Harvest, LLC, after they failed to answer or otherwise appear. (Docket Entry No. 94).

The plaintiffs moved for summary judgment against Morris, as trustee of the Malcom Morris Roth IRA, and against Quest IRA Inc., as trustee of the Carolyn Mene Roth IRA, seeking

a declaratory judgment that their interest in the Kirby Condominium has priority over any interest the IRA defendants might have in the property.  (Docket Entry No. 103).  The court denied the motion without prejudice, allowing the plaintiffs to move again on a fuller record that resolved Sembritzky's and Rose's interest in the property.  (Docket Entry No. 113).

In April 2019, the plaintiffs moved to compel Sembritzky and Rose to pay the outstanding property taxes on the Kirby Condominium to prevent foreclosure.  (Docket Entry No. 105).  The court entered another preliminary injunction, ordering Rose to pay the property taxes until the litigation's conclusion.  (Docket Entry No. 111).  Rose did not pay the taxes, and the plaintiffs moved for civil-contempt sanctions against Rose.  (Docket Entry No. 127).  The court granted the motion.  (Docket Entry No. 143).  Rose's attorney then withdrew, leaving Rose to represent herself.  (Docket Entry No. 163).

Rose continued to live in the Kirby Condominium without payment, including of the Condo Association assessments.  (Docket Entry No. 169-1 at 2).  The Association notified the plaintiffs' counsel of its intent to foreclose.  The plaintiffs again moved for a preliminary injunction requiring Rose to pay the assessments.  (Docket Entry No. 168).  The court granted the motion, allowing the plaintiffs to pay the assessments if Rose did not, to avoid foreclosure. (Docket Entry No. 171).

In the plaintiffs' Second Amended Complaint, they allege that none of their money was invested in RBKL, and that RBKL never attempted to build or operate any desalination plant, harvest any minerals, produce any fresh water, or engage in operations or charitable donations. (Docket Entry No. 38).  The plaintiffs allege that Sembritzky and Rose instead used the money to buy the Kirby Condominium.  (*Id.* at 2).  They assert claims for conversion, fraud, breach of fiduciary duty, defalcation, embezzlement, breach of contract, fraudulent conveyance, fraudulent

transfer, violations of federal securities laws, unjust enrichment, and conspiracy, seeking damages, a constructive trust over the Kirby Condominium, an accounting of their subscription payments, and a declaratory judgment as to their rights in the Kirby Condominium.  (Docket Entry No. 38 at 16–37).

The plaintiffs have moved for summary judgment against Sembritzky, Rose, Morris, and Quest IRA, on the conversion, fraud, unjust enrichment, and fraudulent transfer claims, and on their request for a declaratory judgment.  (Docket Entry Nos. 144, 145, 146, 148).  Because Rose did not pay the Condo Association assessments, requiring the plaintiffs to pay instead, the plaintiffs have also moved for more sanctions against Rose.  (Docket Entry No. 173).  The defendants responded to the summary judgment motions, and the plaintiffs replied.  (Docket Entry Nos. 152, 156, 157, 160, 161, 164).

The parties' arguments and the record evidence are examined under the applicable legal standards.

## II.     The Summary-Judgment Standard

"Summary judgment is appropriate only when 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"  *Shepherd on Behalf of Estate of Shepherd v. City of Shreveport*, 920 F.3d 278, 282–83 (5th Cir. 2019) (quoting Fed. R. Civ. P. 56(a)).  "A material fact is one that might affect the outcome of the suit under governing law," and "a fact issue is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Renwick v. PNK Lake Charles, L.L.C.*, 901 F.3d 605, 611 (5th Cir. 2018) (quotations omitted).  The moving party "always bears the initial responsibility of informing the district court of the basis for its motion,"

and identifying the record evidence "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

"Where the non-movant bears the burden of proof at trial, 'the movant may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating that there is an issue of material fact warranting trial.'" *Kim v. Hospira, Inc.*, 709 F. App'x 287, 288 (5th Cir. 2018) (alteration omitted) (quoting *Nola Spice Designs, L.L.C. v. Haydel Enters., Inc.*, 783 F.3d 527, 536 (5th Cir. 2015)). The moving party must demonstrate the absence of a genuine issue of material fact, but it need not negate the elements of the nonmovant's case. *Austin v. Kroger Tex., L.P.*, 864 F.3d 326, 335 (5th Cir. 2017). "If the moving party fails to meet [its] initial burden, the motion must be denied, regardless of the nonmovant's response." *Pioneer Expl., L.L.C. v. Steadfast Ins. Co.*, 767 F.3d 503, 511 (5th Cir. 2014) (quoting *Kee v. City of Rowlett*, 247 F.3d 206, 210 (5th Cir. 2001)).

"When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings." *Duffie v. United States*, 600 F.3d 362, 371 (5th Cir. 2010). The nonmovant must identify specific evidence in the record and articulate "the precise manner in which" that evidence supports that party's claim. *Willis v. Cleco Corp.*, 749 F.3d 314, 317 (5th Cir. 2014) (quoting *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994)). "A party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." *Lamb v. Ashford Place Apartments L.L.C.*, 914 F.3d 940, 946 (5th Cir. 2019) (quotation omitted). In deciding a summary judgment motion, "the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his or her favor." *Waste Mgmt. of La., L.L.C. v. River Birch, Inc.*,

920 F.3d 958, 972 (5th Cir. 2019) (alterations omitted) (quoting *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (per curiam)).

## III.    The Summary-Judgment Motions Against Sembritzky and Rose

### A.    Fraud

The plaintiffs assert common-law fraud against Sembritzky, alleging that he made numerous misrepresentations about the desalination project that the plaintiffs relied on in investing their money. (Docket Entry No. 38 at ¶¶ 77–84). Under Texas law, a fraud claim requires that the defendant: (1) "made a material misrepresentation"; (2) "knew the representation was false or made it recklessly without any knowledge of its truth"; (3) "intended that the plaintiff would act upon the representation or intended to induce the plaintiff's reliance on the representation"; and (4) "the plaintiff justifiably relied upon the representation and thereby suffered injury." *Samson Lone Star Ltd. P'ship v. Hooks*, 497 S.W.3d 1, 13 (Tex. App.—Houston [1st Dist.] 2016, pet. denied) (citing *Exxon Corp. v. Emerald Oil & Gas Co.*, 348 S.W.3d 194, 217 (Tex. 2011)). "A promise to do an act in the future is actionable fraud when made with the intention, design and purpose of deceiving, and with no intention of performing the act." *W & F Transp., Inc. v. Wilhelm*, 208 S.W.3d 32, 48 (Tex. App.—Houston [14th Dist.] 2006, no pet.) (citing *Spoljaric v. Perival Tours, Inc.*, 708 S.W.2d 432, 434–35 (Tex. 1986)). "While a party's intent is determined at the time the party made the representation, it may be inferred from the party's subsequent acts after the representation is made." *JSC Neftegas-Impex v. Citibank, N.A.*, 365 S.W.3d 387, 406 (Tex. App.—Houston [1st Dist.] 2011, pet. denied) (quoting *Spoljaric*, 708 S.W.2d at 434–35).

The plaintiffs point to numerous statements in the Private Placement Letters about the investment and the desalination project, arguing that these were material misrepresentations that

"overwhelmingly demonstrate all the elements of fraud."   (Docket Entry No. 145 at 21).

Sembritzky stated that the plaintiffs would receive eight shares of RBKL stock, which they never

received.   According to the plaintiffs, the investments were to be "subject to strict financial

controls and would be used exclusively to fund" the desalination project.  (Docket Entry No. 145

at 21).  None of the money went to the project.

Sembritzky agreed, in his deposition, that the Private Placement Letters stated that

"[c]ompany books will be audited quarterly and results made available to all shareholders," and

he admitted that this "never actually happened."  (Docket Entry No. 145-3 at 251).  Sembritzky

testified that neither the plaintiffs, nor anyone else, including himself, received physical stock

certificates.  (*Id.* at 96–97).  But he also testified that although "in the beginning," he thought that

the plaintiffs would get a certificate "at some point," his lawyers later explained that under

Kenya law, "[n]o one is a shareholder until financial closing," when the certificates would issue.

(*Id.* at 97–98).  According to Sembritzky, the project investors were not shareholders; they were

"subscribers."  (*Id.*).  Sembritzky testified that he and Morris initially agreed that investors would

receive quarterly financial reports, but the Kenyan legal team later told him that they "couldn't

do it."  (*Id.* at 251–52).

The present record does not show that there are no factual disputes material to

determining whether Sembritzky knew that the statements about receiving shares or providing

quarterly financials were false, or that he made them "recklessly without any knowledge of

[their] truth."  *Samson*, 497 S.W.3d at 13.  Nor do the plaintiffs identify record evidence to show

that Sembritzky knew that no investors would receive physical stock certificates when they first

subscribed, or that he knew that quarterly financial statements were impossible.  Sembritzky's

testimony that he initially thought the investors would receive stock certificates, and that the

11

Kenyan legal team later told him they could not provide quarterly audits, presents a factual dispute that is material to determining whether Sembritzky knew these representations were false when the plaintiffs invested.

The plaintiffs point to other statements in the Letters, arguing that "virtually all the other representations in the [Letters] were fraudulent as well," including that: (1) the money would be used exclusively to fund the desalination project; (2) the technology existed and worked; and (3) RBKL had $490 million in debt and equity financing along with other partnerships.  (Docket Entry No. 145 at 22).

The Letters present these statements somewhat differently than the plaintiffs describe. As to the money's "exclusive" use, the Letters state only that "[a]ny funds not used (placement & legal) will be allocated to the company operating account."  (Docket Entry No. 5-2 at 29). The Letters also provide that $15 million would be paid from the initial $175.5 million in proceeds as an "IP License Payment."  (*Id.*).  An email from Malcom Morris to other investors explains that this fee is to be "paid out of the first dollars raised" and "repaid out of distributions to the Founder," Sembritzky, "on the Founder's stock."   (Docket Entry No. 156-1 at 11). Sembritzky testified in his affidavit that "the solicitation of US investors has always provided for the raising of about $20 million that would fund a $15 million IP payment to me—which would actually be repaid by me from proceeds from [my] shares upon commencement of operations by RBKL."  (*Id.* at 7).

The plaintiffs respond that the version of the Letters presented to them did not specify that an IP license fee would be paid to Sembritzky out of the initial investment before the investors received any money.  But the plaintiffs' version of the Letters identifies the $15 million IP license fee payment and states that it "will be offset by future royalties and contributed to the

company during the first full calendar year of operations." (Docket Entry No. 5-2 at 29). The plaintiffs' Private Placement Letter shows the payment as part of the use of $175.5 million in "proceeds," the same amount that Sembritzky was authorized to initially raise. (*Id.*). Viewing Sembritzky's evidence in the light most favorable to him and drawing all inferences in his favor, genuine factual disputes exist material to determining whether Sembritzky misrepresented how the plaintiffs' investment would be applied, at least initially.

As to the financing arrangements, the agreement lists several "[d]ebt and equity partners," and amounts next to each. (Docket Entry No. 5-2 at 24). Sembritzky testified that no bank in fact guaranteed to commit funds to the project. (Docket Entry No. 145-3 at 226). Sembritzky also testified that he met with individuals from each investing partner, who made oral agreements with him "across the table" to pledge money to the project. (*Id.* at 226–39). According to Sembritzky, "none of these people [would] be involved in the picture anymore anyway," because the "African banks wanted them all out, so they're all gone." (*Id.* at 227). Sembritzky's testimony does not establish that when he solicited the plaintiffs' investment, he knew that none of the listed banks would be involved.

The Letters describe the technology and processes that the desalination plant would use, stating:

> The Rasli Bahari process eliminates all reject streams by harvesting the minerals, eliminating polluting discharges and thus protecting marine life.
>
> . . .
>
> It is important to note that each component used in the process has years of proven operational history and has been financed numerous times.
>
> . . .

13

> There are two extreme differences between RBKL's process and conventional desalination facilities.  The first is maximum efficiency, RBKL's zero discharge plant designed for 30MGD of desalinated water production only consumes and processes 30 MGD of seawater.  This stands in sharp contrast to conventional plants, where seawater-processing capacity must be more than doubled to generate a similar yield of desalinated water.
>
> . . .
>
> RBKL uses an enhanced pretreatment system to enable high purity mineral recovery.  This reduces energy consumption in the reverse osmosis (RO) stage, where membranes designed with maximum flux allow the system to operate at lower pressures without any impact on water yield or purity.

(Docket Entry No. 5-2 at 11–13).

According to the plaintiffs, the technology was developed by Hunton Energy and Katana, who hold patents on the technology.  (Docket Entry No. 145-6 at 56–57).  Katana's successor is suing Sembritzky for trade-secret misappropriation.   (Docket Entry Nos. 145-9, 145-10).  Sembritzky testified that Katana and Hunton's technology is now obsolete, explaining that: "[i]t's just not as efficient as it should be"; "there's just a number of problems with it"; and "the original process did not work."  (Docket Entry No. 145-6 at 56–57).  Sembritzky also testified that the desalination project was "a vision" and "a dream."  (*Id.* at 59).  The plaintiffs argue that this evidence shows that Sembritzky knew that his representations about the desalination technology were fraudulent when made.

But Sembritzky also testified that Hunton and Katana's technology was an "integration." (*Id.* at 30).  Sembritzky explained that it was "not anything that was invented from the ground up, meaning that it's nothing new. . . . it's taking processes or equipment that have been in use for well over 20 years and putting them together."  (*Id.*).  This is consistent with the Letter statements that "each component used in the process has years of proven operational history and has been financed numerous times."  (Docket Entry No. 5-2 at 11).  Sembritzky's testimony does

not establish when he knew that the original technology was "obsolete."  Although Sembritzky eventually realized that the original technology was obsolete, and Sembritzky later admitted the project was a "vision" and a "dream," this does not establish, as a matter of law, that he knew that the statements describing the desalination technology were false when made.

At bottom, the plaintiffs appear to argue that Sembritzky's testimony describing how most aspects of the project later turned out not to occur as originally envisioned[1]—including the original technology's effectiveness, the financing, the quarterly audits, and the stock certificates—conclusively establishes that these statements were fraudulent when made.  The record presents strong circumstantial evidence that would support an inference of fraud.  *See Spoljaric*, 708 S.W.2d at 435 ("'Slight circumstantial evidence' of fraud, when considered with the breach of promise to perform, is sufficient to support a finding of fraudulent intent.").  But Sembritzky's testimony presents genuine factual disputes that are material to determining whether he knew that the Letters' representations were false when made.  "Intent is a fact question uniquely within the realm of the trier of fact because," as is the case here, "it so depends upon the credibility of the witnesses and the weight to be given to their testimony."  *Samson*, 497 S.W.3d at 15 (citing *Spoljaric*, 708 S.W.2d at 434).

Summary judgment is narrowly denied on the present record as to the plaintiffs' fraud claims against Sembritzky.

---

[1]  Sembritzky disputes that nothing has happened on the desalination project.  He has submitted photographs of Kenyan officials signing documents, arguing that plans are still in motion to finish the project.  (Docket Entry No. 156 at 5–6).  In the plaintiffs' reply brief, they object to Sembritzky's evidence of the plant's progress on multiple grounds.  (Docket Entry No. 160 at 16–18).  Sembritzky did not file a surreply to address the evidentiary objections.  Because the evidence is unnecessary to determine whether material factual disputes exist, the court does not rule on them at this time.

### B.      Conversion

"Conversion is the unauthorized and unlawful assumption and exercise of dominion and control over the personal property of another to the exclusion of, or inconsistent with, the owner's rights." *Freezia v. IS Storage Venture, LLC*, 474 S.W.3d 379, 386 (Tex. App.—Houston [14th Dist.] 2015, no pet.) (citing *Waisath v. Lack's Stores, Inc.*, 474 S.W.2d 444, 446 (Tex. 1971)).  The elements of a conversion claim are: (1) the plaintiff owned or had possession of the property or entitlement to possession; (2) the defendant unlawfully and without authorization assumed and exercised control over the property to the exclusion of, or inconsistent with, the plaintiff's rights as an owner; (3) the plaintiff demanded return of the property; and (4) the defendant refused to return the property.  *Id.* at 386–87.  "Generally, the measure of damages for conversion is the fair market value of the property at the time and place of the conversion." *United Mobile Networks, L.P. v. Deaton*, 939 S.W.2d 146, 147–48 (Tex. 1997) (per curiam).

### 1.      Limitations

Sembritzky and Rose both raised the statute of limitations for the first time at summary judgment.  Neither of their answers asserts it as a defense to the conversion claim.  (Docket Entry No. 70 at 17; Docket Entry No. 78 at 29; Docket Entry No. 81 at 19).  If a defendant pleads an affirmative defense within a "pragmatically sufficient time," it is not waived.  *Rogers v. McDorman*, 521 F.3d 381, 386 (5th Cir. 2008).  "A district court has discretion to determine whether the party against whom the defense was raised suffered prejudice or unfair surprise as a result of the delay." *LSREF2 Baron, L.L.C. v. Tauch*, 751 F.3d 394, 398 (5th Cir. 2014).  The defendant must plead with "enough specificity or factual particularity to give the plaintiff 'fair notice' of the defense that is being advanced." *Rogers*, 521 F.3d at 385 (quoting *Woodfield v. Bowman*, 193 F.3d 354, 362 (5th Cir. 1999)).

16

The present record does not show that Sembritzky or Rose gave the plaintiffs fair notice of the statute of limitations defense.  They both raised the defense in their answers as to the plaintiffs' fraudulent-transfer claims but not to the conversion claim.  Even if the defense was not waived, the claims are not time-barred.  Texas has a two-year limitations period for conversion. TEX. CIV. PRAC. & REM. CODE § 16.003.  The claim accrues when the conversion takes place. *Dynamic Prod., Inc. v. CIMA Energy Ltd.*, No. 4:17-CV-01032, 2018 WL 1801193, at *11 (S.D. Tex. Feb. 21, 2018) (citing *Republic Supply Co. v. French Oil Co.*, 392 S.W.2d 462, 464–65 (Tex. App.—El Paso 1965, no writ)).

The plaintiffs allege that they did not learn of the conversion until after the statute of limitations had expired.  (Docket Entry No. 38 at ¶ 69).  They invoke the discovery rule or fraudulent-concealment rule, which delays claim accrual until the plaintiffs reasonably should have discovered the fraud.  *Childs v. Haussecker*, 974 S.W.2d 31, 40 (Tex. 1998); *see, e.g.*, *Hays v. Hall*, 488 S.W.2d 412, 414 (Tex. 1972) (the discovery rule was warranted when a vasectomy patient learned that he was still fertile when his wife became pregnant, as this was virtually the only possible way for him to learn that the surgery was ineffective).  The discovery rule applies unless reasonable diligence would have made the fraud apparent earlier.  *Stonecipher's Estate v. Butts' Estate*, 591 S.W.2d 806, 809 (Tex. 1979).

Sembritzky does not address the issue.  Rose argues that the plaintiffs should have known of the facts they allege as early as April 17, 2017, when Morris conducted his own investigation and sued Sembritzky and Rose.  (Docket Entry No. 157 at 13).  If so, the date of the plaintiffs' lawsuit, August 7, 2018, is still within the two-year period and is not barred.

### 2.    Sembritzky

The plaintiffs argue that the record evidence that Sembritzky transferred the plaintiffs'
funds from Bounty of the Ocean to Sembritzky's own account, and then to a title company to
purchase the Kirby Condominium, establishes conversion against Sembritzky as a matter of law.
Sembritzky responds that the plaintiffs agreed to invest in exchange for shares of RBKL, and that
money is generally not subject to a conversion claim.

The plaintiffs argue that Sembritzky took their combined $1,404,000 "without their
permission, used the money to purchase the Kirby Condominium, and now refuses to return
Plaintiffs' money—despite Plaintiffs' repeated demands."  (Docket Entry No. 145 at 18–19).
The plaintiffs point to their sworn affidavit testimony, Sembritzky's deemed admissions and
deposition testimony, and Sembritzky's bank records in support.  The bank records show that
Bounty of the Ocean received the plaintiffs' funds, (Docket Entry No. 5-4); Bounty of the Ocean
sent $2 million to Sembritzky's personal bank account, (Docket Entry Nos. 5-4, 5-5); Sembritzky
transferred the $2 million to Rose's bank account, (Docket Entry Nos. 5-5, 5-6); and Rose sent
$1,940,000 back to Sembritzky, who transferred $2,338,372.36 to the Tradition Title Company,
which applied the $2,338,372.36 toward the purchase of "Goldie Rose 2727 Kirby Dr., Unit 26L
Houston, TX 77098."  (Docket Entry Nos. 5-5, 5-8).

Sembritzky confirms the transactions in his deposition testimony.  When asked if
"precisely zero dollars from [the plaintiffs' investment] made it to RBKL," he answered "[t]hat's
what it looks like."  (Docket Entry No. 145-3 at 388).  He testified that he transferred the money
to Rose to satisfy a debt he owed, and that she transferred the money back to him as "an
administrative convenience" to purchase the Kirby Condominium for her because "[s]he was
playing in a bridge tournament in California."  (*Id.* at 393).

The record also shows, however, that the plaintiffs agreed to invest their money in RBKL in exchange for shares of the company.   (Docket Entry No. 5-3).   Conversion requires that Sembritzky took the plaintiffs' money without their consent.   *See Taylor Pipeline Constr., Inc. v. Directional Rd. Boring, Inc.*, 438 F. Supp. 2d 696, 708 (E.D. Tex. 2006) (citing *Mack v. Newton*, 737 F.2d 1343, 1354 (5th Cir. 1984)) ("Conversion involves the taking of property without the owner's consent."); *Robinson v. Nat'l Autotech, Inc.*, 117 S.W.3d 37, 39–40 (Tex. App.—Dallas 2003, pet. denied) ("There can be no conversion where the owner has expressly or impliedly assented to the taking.").   Although the plaintiffs argue that they never received physical stock certificates, Sembritzky testified that they would receive shares "at financial close."   (Docket Entry No. 145-3 at 97–98).   And as discussed above, the Letters stated that a $15 million "IP License Payment" would be paid out of the $175.5 million invested.   (Docket Entry No. 5-2 at 29).   There are factual disputes material to determining whether Sembritzky took the plaintiffs' money without their consent when he received the funds and when he transferred them from Bounty of the Ocean to his personal account.

Money is generally not subject to a conversion claim in Texas.   Under Texas law, "[a]n action for conversion of money will lie where the money is '(1) delivered for safe keeping; (2) intended to be kept segregated; (3) substantially in the form in which it is received or an intact fund; and (4) not the subject of a title claim by the keeper.'"   *Estate of Townes v. Townes*, 867 S.W.2d 414, 419–20 (Tex. App.—Houston [14th Dist.] 1993, writ denied) (quoting *Edlund v. Bounds,* 842 S.W.2d 719, 727 (Tex. App.—Dallas 1992, writ denied)).   According to Sembritzky, the plaintiffs' money was not intended to be kept segregated because they invested that money in return for shares of RBKL.

19

The plaintiffs respond that they delivered the funds to Bounty of the Ocean "for safekeeping with the understanding [that Bounty of the Ocean] would act as their agent to keep those funds segregated from its own funds and faithfully transmit them to RBKL intact." (Docket Entry No. 160 at 9).   But the evidence the plaintiffs offer in support does not conclusively establish that their money was intended to be kept separate.   The plaintiffs submitted affidavit testimony stating that Sembritzky instructed them to wire the funds to Bounty of the Ocean's Compass Bank account, which was "now the entity responsible for maintaining its operating account at Compass."   (Docket Entry No. 5-1 at ¶ 8).   O'Kane states that Sembritzky provided him with a cover email, which "reiterated [that his] investment would be used for RBKL's business expenses."   (*Id.*).   But according to the Letters, those business expenses included the $15 million IP License Payment.   The parties dispute whether the IP License Payment was intended to come from the initial investments, and whether the plaintiffs understood this to be the case.   These factual disputes, material to determining whether the plaintiffs' money was intended to be kept segregated, preclude finding as a matter of law that any debt to the plaintiffs cannot "be discharged by the payment of money."   *Estate of Townes*, 867 S.W.2d at 419.

On the present record, the plaintiffs have not shown that the undisputed record evidence establishes their conversion claim as a matter of law.

### 3.  Rose

The plaintiffs also assert a conversion claim against Rose, arguing that she used the funds to purchase the Kirby Condominium and did not return the funds to the plaintiffs on demand. The plaintiffs seek a constructive trust on the Kirby Condominium as an equitable remedy for conversion.

The plaintiffs argue that all the elements of conversion are satisfied, because: (1) the bank documents in the record indicate, and Sembritzky and Rose concede, that the funds came from the plaintiffs; (2) the funds were supposed to be for the operations of RBKL but were transferred to Rose and used to purchase the Kirby Condominium; (3) the plaintiffs have repeatedly demanded the money back; and (4) Rose has refused.

The same factual disputes that preclude granting summary judgment on the plaintiffs' conversion claim against Sembritzky also prevent finding, as a matter of law, on the present record, that Rose converted the plaintiffs' funds. The record evidence shows genuine factual disputes material to determining whether Sembritzky took the plaintiffs' money from the Bounty of the Ocean account without authorization, before transferring it to Rose. Summary judgment is denied on the present record as to the plaintiffs' conversion claim against Rose.

## C.     Unjust Enrichment

The plaintiffs assert unjust enrichment claims against Rose, alleging that she retains the benefit of living in the Kirby Condominium as a result of Sembritzky's fraud. Rose again raises limitations as a defense, without asserting it in her answer. (Docket Entry No. 78 at 29). The statute of limitations for unjust enrichment is two years. *Wagner & Brown, Ltd. v. Horwood*, 58 S.W.3d 732, 737 (Tex. 2001). Because the plaintiffs discovered the alleged fraud and transfer only after Morris alerted them, their unjust enrichment claim is not time-barred.

"Unjust enrichment is an implied-contract basis for requiring restitution when it would be unjust to retain benefits received," such as those gained through "fraud, duress, or the taking of an undue advantage." *White v. Ameriquest Mortg.*, No. H-18-4013, 2019 WL 2297572, at *6 (S.D. Tex. May 30, 2019) (citing *Perales v. Bank of Am., N.A.*, No. H-14-1791, 2014 WL 3907793, at *3 (S.D. Tex. Aug. 11, 2014)). Courts often find unjust enrichment even in cases

where the party "has passively received [a benefit] which it would be unconscionable to retain." *Tex. Integrated Conveyor Sys., Inc. v. Innovative Conveyor Concepts, Inc.*, 300 S.W.3d 348, 367 (Tex. App.—Dallas 2009, pet. denied) (quoting *Heldenfels Bros., Inc. v. City of Corpus Christi*, 832 S.W.2d 39, 41 (Tex. 1992)).

The plaintiffs argue that they are entitled to summary judgment on their unjust enrichment claim because Rose received a benefit from the fraud, at their expense. The plaintiffs contend that it would be unconscionable for Rose to retain ownership and possession of the Kirby Condominium. Rose responds that an unjust enrichment claim is based on quasi-contract and does not apply when a written contract governs. Rose argues that because the plaintiffs entered into a written contract with Sembritzky to invest in RBKL, they are limited to breach of contract.

An unjust enrichment claim is unavailable "when a valid, express contract covers the subject matter of the parties' dispute." *Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 684 (Tex. 2000). Rose argues that the Subscription Agreement between the plaintiffs and Sembritzky covers the stock purchase in RBKL and precludes the plaintiffs' unjust enrichment claim against her. But unjust enrichment applies when there is no contract between the contending parties, even if the funds or property in question are subject to some other contract. The Subscription Agreement here does not cover the means by which Rose was allegedly enriched at the plaintiffs' expense; that exchange is not governed by a contract and is not immune to an unjust enrichment claim.

Although the Subscription Agreement does not preclude the unjust enrichment claim, the plaintiffs have not established on the present record that Rose received the Kirby Condominium

as the result of Sembritzky's fraud or theft.  Summary judgment is denied on the present record on the plaintiffs' unjust enrichment claim.

### D.    Fraudulent Transfer

The plaintiffs also allege that Sembritzky fraudulently transferred funds to Rose, violating §§ 24.005(a)(1), 24.005(a)(2), and 24.006 of the Texas Uniform Fraudulent Transfer Act.

Rose argues that limitations bar these claims.  She asserts a one-year limitations period for transfers to an insider, two years for transfers that are challenged by a spouse, minor, or ward, and four years for other transfers.  The relevant parts of the statute provide:

> (a)  Except as provided by Subsection (b) of this section, a cause of action with respect to a fraudulent transfer or obligation under this chapter is extinguished unless action is brought:
>
> (1)  under Section 24.005(a)(1) of this code, within four years after the transfer was made or the obligation was incurred or, if later, within one year after the transfer or obligation was or could reasonably have been discovered by the claimant;
>
> (2)  under Section 24.005(a)(2) or 24.006(a) of this code, within four years after the transfer was made or the obligation was incurred . . .
>
> (b)  A cause of action on behalf of a spouse, minor, or ward with respect to a fraudulent transfer or obligation under this chapter is extinguished unless the action is brought:
>
> (1)  under Section 24.005(a) or 24.006(a) of this code, within two years after the cause of action accrues, or if later, within one year after the transfer or obligation was or could reasonably have been discovered by the claimant.

TEX. BUS. & COM. CODE § 24.010.

The four-year limitations period applies.  Sembritzky transferred the funds to Rose in December 2015.  The plaintiffs sued in August 2018, within the four-year period.  The fraudulent transfer claim is not time-barred.

The three statutory sections provide different ways to determine when a transfer is fraudulent. Under § 24.005(a)(1), a "transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or within a reasonable time after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation with actual intent to delay or defraud any creditor of the debtor." TEX. BUS. & COM. CODE § 24.005(a)(1). The Act defines "transfer" as "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset," including "payment of money, release, lease, and creation of a lien or other encumbrance." *Id.* § 24.002(12). The statute lists various "badges of fraud" that courts consider in determining actual intent under § 24.005(a)(1), including whether "the transfer or obligation was to an insider," and whether "the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred," among others. *Id.* § 24.005(b).

Under § 24.005(a)(2), a transfer is constructively fraudulent if the transferor did not receive a reasonably equivalent value for the transfer and if the transferor "was engaged in or about to engage in a business transaction for which the remaining assets . . . were unreasonably small in relation to the business or transaction." *Id.* § 24.005(a)(2). Actual fraudulent intent is unnecessary. *Janvey v. Golf Channel, Inc.*, 487 S.W.3d 560, 562 (Tex. 2016) (this subsection applies even "without proof of actual intent"). Value is given when "property is transferred or an antecedent debt is secured or satisfied." TEX. BUS. & COM. CODE § 24.004(a). In determining reasonable equivalence, courts look beyond the financial value provided to the debtor, evaluating the loss to the creditor's estate and other surrounding facts. *See In re TransTexas Gas Corp.*, 597 F.3d 298, 306 (5th Cir. 2010) (quoting *In re Hinsley*, 201 F.3d 638, 644 (5th Cir. 2000)) ("To

measure reasonably equivalent value, we judge the consideration given for a transfer from the standpoint of creditors.  The proper focus is on the net effect of the transfers on the debtor's estate, [and] the funds available to the unsecured creditors.") (quotations and citations omitted).  If the elements are established, a judgment for fraudulent transfer may be entered against the transferee, the beneficiary, or any subsequent transferee.  TEX. BUS. & COM. CODE § 24.009(b).

The plaintiffs also assert fraudulent transfer claims under § 24.006, which applies to creditors who have a claim at the time of the transfer.  *Id.* § 24.006.  Under § 24.006, a transfer is fraudulent if the creditor's claim arose before the debtor made the transfer, the debtor did not receive a reasonably equivalent value for the transfer, and the debtor became insolvent because of the transfer.  *Id.* § 24.006; *see also Corpus v. Arriaga*, 294 S.W.3d 629, 634 (Tex. App.—Houston [1st Dist.] 2009, no pet.).

The plaintiffs argue that the record does not contain evidence that Sembritzky received "reasonably equivalent value" for the funds he transferred to Rose, and that according to Rose's own sworn statement, the transfer was a "gift."  (Docket Entry No. 5-9 at 1).  The plaintiffs also contend that the undisputed record evidence shows that Sembritzky was insolvent at the time of the transfer to Rose.  Sembritzky's bank records confirm that Bounty of the Ocean had little money left in its account after Sembritzky transferred the plaintiffs' money to his personal account and used the money to purchase the Kirby Condominium for Rose.  (Docket Entry No. 110-2 at 300).

Each of the three fraudulent transfer sections also requires that the plaintiff was a creditor of, or had a "claim" against, the transferor, either before or after the transfer.  The statute defines a "creditor" as "a person . . . who has a claim."  TEX. BUS. & COM. CODE § 24.002(4).  "Claim" is defined as "a right to payment or property, whether or not the right is reduced to judgment,

liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." *Id.* § 24.002(3). A plaintiff may bring a claim under the statute when he or she "has asserted against the transferor a cause of action that accrued prior to the transfer," but to be entitled to relief, "the claimant must introduce evidence that judgment was rendered in its favor." *Colonial Leasing Co. of New England v. Logistics Control Grp. Int'l*, 762 F.2d 454, 458 (5th Cir. 1985).

The plaintiffs' claims for conversion and fraud accrued, for the purpose of determining creditor status, when Sembritzky's allegedly fraudulent misrepresentations induced the plaintiffs' investment, and when he allegedly took unauthorized control over the plaintiffs' money. But the record contains factual disputes material to determining their fraud, conversion, and unjust enrichment claims. The present record does not support summary judgment on fraudulent transfer.

Summary judgment on the plaintiffs' fraudulent transfer claims is denied.

**E.     Constructive Trust**

The plaintiffs ask the court to impose a constructive trust over the Kirby Condominium as a remedy for their claims against Sembritzky and Rose. A constructive trust is an appropriate remedy to prevent unjust enrichment when property is acquired through a breach of fiduciary responsibility, conversion, or fraud. *Newman v. Link*, 866 S.W.2d 721, 725 (Tex. App.— Houston [14th Dist.] 1993, writ denied). Even when the beneficiary of a wrongful act is blameless, courts may still impose this remedy in cases of fraud. *Bransom v. Standard Hardware, Inc.*, 874 S.W.2d 919, 928 (Tex. App.—Fort Worth 1994, writ denied). The party seeking to impose the constructive trust must show that the funds obtained by breach,

conversion, or fraud were used to acquire the property. *KCM Fin. LLC v. Bradshaw*, 457 S.W.3d 70, 87 (Tex. 2015).

The plaintiffs argue that the undisputed evidence shows that what they thought was their investment in RBKL was instead used to purchase the Kirby Condominium for Goldie Rose. Sembritzky agreed in his deposition testimony that, as the bank records show, the plaintiffs' money was transferred to his personal bank account, and then to the Tradition Title Company to purchase the Kirby Condominium. The plaintiffs have met their "initial burden of tracing funds to the specific property sought to be recovered." *Fed. Land Bank Ass'n of S. Ala., FLCA v. Cornelius & Salhab*, No. H-09-3115, 2010 WL 3545406, at *11 (S.D. Tex. Sept. 9, 2010) (quoting *Wilz. v. Flournoy*, 228 S.W.3d 674, 676 (Tex. 2007)).

The movant must also show breach of a fiduciary relationship, conversion, or fraud. *KCM Fin. LLC*, 457 S.W.3d at 87. The present record does not show that, as a matter of law, Rose received the funds as a result of Sembritzky's breach. The constructive trust remedy depends on finding that Sembritzky unlawfully took the plaintiffs' money or knowingly misrepresented material facts to induce the plaintiffs to invest. Factual disputes material to these findings preclude summary judgment at this time.

## IV.   The Summary-Judgment Motion Against Morris and Quest IRA

The plaintiffs moved for summary judgment against Morris, as trustee of the Malcom Morris Roth IRA, and Quest IRA Inc., as trustee of the Carolyn Mene Roth IRA. (Docket Entry No. 148). The plaintiffs seek a declaratory judgment that their right, title, and interest in the Kirby Condominium is superior to, and has priority over, any interest the IRA defendants may have in the property.

The plaintiffs submitted the IRA defendants' interrogatory answers in support.  Morris and Quest IRA state that they make "no claim to any right, title or interest in the Kirby Condominium."  (Docket Entry No. 103-3 at 8; Docket Entry No. 103-4 at 8).  The plaintiffs argue that these responses warrant summary judgment that their rights in the Kirby Condominium are superior to the rights of the IRA defendants.  The present record, however, does not yet establish that the plaintiffs have a right or interest in the Kirby Condominium.  The plaintiffs' motion for summary judgment against Morris and Quest IRA is denied on this record.

## V.     The Motion for Sanctions

The plaintiffs moved for a second round of sanctions against Rose after she failed to comply with the court order to pay the Condo Association assessments.  (Docket Entry Nos. 171, 173).  In an earlier order, the court entered sanctions against Rose in the amount of $500 per day until she paid outstanding property taxes.  (Docket Entry No. 143).

"Civil contempt can serve two purposes, either coercing compliance with an order or compensat[ing] a party who has suffered unnecessary injuries or costs because of contemptuous conduct."  *In re Bradley*, 588 F.3d 254, 263 (5th Cir. 2009) (citations omitted) (alteration in original).  Civil contempt requires "(1) that a court order was *in effect*, and (2) that the order required certain conduct by the respondent, and (3) that the respondent failed to comply with the court's order."  *Bradley*, 588 F.3d at 264.  An alleged contemnor may assert "a *present* inability to comply with the order in question" as a defense, *United States v. Rylander*, 460 U.S. 752, 757 (1983) (emphasis in original), pointing to credible evidence that compliance with the court order is impossible.  *Quilling v. Funding Res. Grp.*, 227 F.3d 231, 235 (5th Cir. 2000) (citing *United States v. Sorrells*, 877 F.2d 346, 349–50 & n.4 (5th Cir. 1989)).

The court has "broad discretion in assessing sanctions to protect the sanctity of its decrees and the legal process." *Test Masters Educ. Servs., Inc. v. Singh*, 428 F.3d 559, 582 (5th Cir. 2005) (citing *Am. Airlines, Inc. v. Allied Pilots Ass'n*, 228 F.3d 574, 585 (5th Cir.2000)). "A district court's imposition or denial of sanctions is reviewed under the abuse of discretion standard." *Id.* (citing *Mercury Air Grp., Inc. v. Mansour*, 237 F.3d 542, 548–49 (5th Cir. 2001)).

The court's order, requiring Rose to pay the Condo Association fees as well as future assessments, also ordered Rose to authorize the Condo Association to accept payment from the plaintiffs if she failed to timely pay the assessments. (Docket Entry No. 171 at 3). Rose asserts that she could not pay the assessments because she has no money and cannot afford even to pay an attorney to represent her. Her attorney withdrew after Rose did not pay her fees. (Docket Entry No. 150 at 1). The plaintiffs paid the assessment fees and avoided foreclosure on that basis.

"The imposition or denial of sanctions of necessity involves a fact-intensive inquiry into the circumstances surrounding the activity that is the subject of sanctions." *Test Masters*, 428 F.3d at 582 (quoting *Thomas v. Capital Sec. Serv., Inc.*, 836 F.2d 866, 873 (5th Cir. 1988)). The court, and the plaintiffs, considered the possibility that Rose could not afford to pay the assessments when it entered an order allowing the plaintiffs to pay the assessments to avoid foreclosure.

The court finds that Rose did not comply with the part of the order requiring her to pay the assessments because she was unable to do so. The order provided the plaintiffs with relief, by allowing them to pay the assessments and avoid the Condo Association foreclosing. Entering additional sanctions against Rose is unnecessary to "protect the sanctity of its decrees and the

legal process." *Test Masters*, 428 F.3d at 582.  The motion for additional sanctions against Rose is denied.

## VI.      Conclusion

The plaintiffs' motions for summary judgment against Sembritzky, Rose, Morris, and Quest IRA are denied on the basis of the present record.  (Docket Entry Nos. 144, 145, 146, 148).  The plaintiffs' motion for additional sanctions against Rose is also denied.  (Docket Entry No. 173).

SIGNED on August 11, 2020, at Houston, Texas.

_____
Lee H. Rosenthal
Chief United States District Judge